UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Jenna Gordon, by her Guardians Debra and Marvin Gordon; Tenner Murphy, by his guardians Kay and Richard Murphy; Marrie Bottelson; Dionne Swanson; and on behalf of others similarly situated,

　　　　　　　Plaintiffs,

v.

The Minnesota Department of Human Services, an agency of the State of Minnesota; and Emily Johnson Piper in her Capacity as Commissioner of The Minnesota Department of Human Services,

　　　　　　　Defendants.

---

Case No.: _____

**CLASS ACTION COMPLAINT AND REQUEST FOR INJUNCTIVE DECLARATORY RELIEF**

**JURY TRIAL DEMANDED**

## INTRODUCTION

This is a case about individual choice. Specifically, choosing where to live – a choice most of us take for granted. But Plaintiffs, who are individuals with disabilities, have been denied this most basic choice. The Minnesota Department of Human Services ("DHS") has promised for many years to "help[] people move to more integrated settings, homes that they choose," (*DHS Advertisement*, ACCESS PRESS, September, 2015) but it has failed to give Plaintiffs and hundreds of similarly situated individuals the opportunity to meet that goal. Defendants established and maintain a discriminatory residential service system that funnels individuals with disabilities into segregated housing while restricting their ability to move to more integrated settings of their own choice.

Plaintiffs in this class action lawsuit are individuals with disabilities who want to be integrated into their communities, like people without disabilities, but have been denied the opportunity due to the actions and inactions of Defendants. The Class consists of individuals who are receiving a Medicaid Home and Community Based Disability Waiver ("Disability Waiver") and are living in a Community Residential Setting ("CRS") facility, but want to live elsewhere and be integrated into their community. Instead, Defendants have needlessly segregated the Individual Plaintiffs and Class Members (collectively referred to as the "Plaintiffs") away from their family, friends, and the communities in which they wish to live.

## FACTUAL BACKGROUND

1.     Plaintiffs have various disabilities, including but not limited to developmental, physical, and mental health disabilities, as well as brain injuries.

2.     Each Plaintiff receives a Disability Waiver to pay for services. The main purposes of the Disability Waiver are to enable Plaintiffs to interact with the larger nondisabled community and to allow them to live where they want and with whom they want.

3.     Defendants' management of the Disability Waivers has failed to achieve these purposes. Instead, Defendants have created, maintained, and over-relied on a residential service system that limits individual autonomy, choice, and integration. This system violates the integration mandate in Title II of the Americans with Disabilities Act ("ADA") which requires Defendants to "administer services, programs, and activities in

2

the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

4.     Defendants' overreliance on services provided in CRS facilities results in the segregation of Plaintiffs. Plaintiffs demand that Defendants offer an informed choice and realistic opportunity to receive residential services in the most integrated setting.

5.     Defendant DHS defines segregated settings as "congregate settings populated exclusively or primarily with individuals with disabilities . . . [and] characterized by regimentation in daily activities [and] limits on individuals' ability to engage freely in community activities." Minnesota Olmstead Plan: Demographic Analysis, Segregated Settings Counts, Targets and Timelines, September 20, 2014, p. 8.

6.     Many of Defendants' sanctioned CRS facilities are segregated settings because Plaintiffs are limited in who they can live and associate with. They are also limited in where and how they spend their leisure time, how their days are structured, and what opportunities they are given to interact with people outside the CRS facility. CRS facilities contain up to five persons, all with disabilities, living in a residence that is owned, leased, operated, and/or controlled by the same organization that provides the services. Consequently, Defendants do not provide Plaintiffs with adequate individual choices necessary to allow them to live in the most integrated setting.

7.     In contrast to the CRS model, individualized housing uses Disability Waiver services, including person-centered planning, to design and implement a customized setting for the individual to live, work, and enjoy leisure time in the most integrated setting.

3

8.     Person-centered planning is "an organized process of discovery and action meant to improve a person's quality of life . . . [designed to ensure people] the right and opportunity to . . . develop and maintain relationships; make choices about their daily lives; and achieve their personal goals." Minnesota Olmstead Plan, August 10, 2015 p. 33.

9.     Person-centered planning, when facilitated by a trained person-centered planner, enables individuals to develop comprehensive individualized transition plans.

10.     As part of their Disability Waiver services, Plaintiffs are entitled to hire a trained person-centered planner. Plaintiffs need such services in order to develop a comprehensive individualized transition plan to move to more integrated housing.

11.     Defendants' actions and inactions have denied Plaintiffs the opportunity to find trained person-centered planners, to receive services from a person-centered planner in a timely fashion, or to receive any such services in order to develop and implement comprehensive individualized transition plans.

12.     Even if Plaintiffs are eventually enabled to develop comprehensive individualized transition plans, Defendants' failure to reasonably modify their residential service system prevents Plaintiffs from implementing their transition plans and living in the most integrated setting.

13.     Although Plaintiffs are capable of living in a more integrated setting, Defendants' administration, operation, and oversight (or lack thereof) has led to a pervasive overreliance on segregated CRS facilities. Defendants discriminate against Plaintiffs by failing to provide integrated individualized housing services that would

4

enable them to have the choice and realistic opportunity to live in the most integrated setting.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States, as enforced by 42 U.S.C. § 1983; Title II of the ADA, 42 U.S.C. §§ 12101 and 12131 *et seq.*, and implementing regulations; Section 504 of the Rehabilitation Act of 1973 and implementing regulations; and the Medicaid Act 42 U.S.C. §§ 1396a *et seq.*, and implementing regulations, as enforced by 42 U.S.C. § 1983.

15.     This Court has federal question jurisdiction over the claims pursuant to 28 U.S.C. § 1331, and has original jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3) and (4).

16.     Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1391(b), as the conduct alleged is occurring in this District.

## THE PARTIES

### *The Individual Plaintiffs*

17.     Jenna Gordon is a 24-year-old resident of Dakota County, Minnesota.

18.     Marvin and Debra Gordon are the parents and legal guardians of Jenna Gordon.  Marvin is a resident of Wright County, Minnesota, and Debra is a resident of Hennepin County, Minnesota.

19.     Tenner Murphy is a 32-year-old resident of Hennepin County, Minnesota.

20.     Kay and Richard Murphy are the parents and legal guardians of Tenner

Murphy and are residents of Hennepin County, Minnesota.

21.     Marrie Bottelson is a 41-year-old resident of Hennepin County, Minnesota.

22.     Dionne Swanson is a 43-year old resident of Hennepin County, Minnesota.

*The Defendants*

23.     Defendant DHS is the statewide agency charged with overseeing and

setting policies for Minnesota's Medicaid programs. This includes the Disability Waivers

and residential services for persons with intellectual and developmental disabilities,

traumatic brain injury, mental illness, and other disabilities.

24.     DHS is a public entity subject to Title II of the ADA and Section 504 of the

Rehabilitation Act. DHS receives federal funds for the administration of its programs.

25.     Defendant Emily Johnson Piper is the Commissioner of DHS. She is

responsible for administering and managing the Disability Waiver programs. She also

oversees the licensing and monitoring of residential services providers, including those

that own and operate CRS facilities. Defendant Piper is sued in her official capacity.

## STATEMENTS OF FACT

26.     Defendants administer four community service waiver programs for

persons with disabilities: the Developmental Disabilities ("DD") Waiver, the Community

Access for Disability Inclusion ("CADI") Waiver, the Community Alternative Care

("CAC") Waiver, and the Brain Injury ("BI") Waiver (collectively referred to as the

"Disability Waivers"). Defendants submit these Disability Waivers to the Federal

Government and the Centers for Medicare and Medicaid Services ("CMS") approves them.

27.     The Disability Waivers are funded by federal and state dollars, pursuant to Section 1915(c) of the Social Security Act. These Disability Waivers allow Defendants to provide a variety of services with Medicaid funding, such as residential support services, without having to meet certain Medicaid statutory requirements. The Disability Waivers can fund a variety of residential services, including individualized housing services. Services under the Disability Waivers are public programs, services, and activities covered by Title II of the ADA.

28.     Defendants manage Disability Waiver services in a manner that disproportionately provides residential services in segregated, rather than individualized and integrated, settings.

29.     Defendants direct and manage counties, which serve as lead agencies, for purposes of administering many health and social services programs, including Disability Waiver services. Rather than require statewide access to individualized housing services, Defendants provide impermissible discretion to each lead agency to choose whether to offer individualized housing services. Most counties do not offer individualized housing services. This abdication of DHS's responsibility to provide and ensure choice prevents individuals receiving Disability Waiver services from receiving an informed choice and opportunity to live in the most integrated setting.

30.     Defendants have failed to inform all persons receiving a Disability Waiver of individualized housing service options and have failed to explain how to access such

services. Defendants have also failed to provide transition planning and support for such services. Defendants have further failed to provide notices of denial or information regarding due process rights in regards to requests for these services.

31.    Plaintiff Jenna Gordon has various developmental disabilities, including Coffin Siris Syndrome and Dandy Walker Syndrome that impede her cognitive functioning.

   a. Over the past six years, Ms. Gordon has lived in four different CRS facilities. None of them have allowed her to live the most integrated life possible.

   b. A common pattern for Ms. Gordon is a brief "honeymoon" period upon moving into a CRS facility, but then a realization that living with three other people with disabilities creates unnecessary conflicts. In February 2016, her former CRS facility kicked her out, and she was forced to move to a CRS facility specifically designed to serve people in crisis.

   c. Neither Ms. Gordon nor her guardians consider her to be in crisis. She has simply not been able to find a setting and services customized to her needs.

   d. Specifically, Ms. Gordon prefers her own personal space and the ability to be alone. She wants her own small apartment so that she can clean and organize things just the way she likes them.

   e. While she is not opposed to having roommates, she wants individualized housing services so she can choose who she lives with and have control in

the hiring and management of staff. The consistency of staffing is very important to Ms. Gordon's ability to integrate into the community.

    f.  Ms. Gordon would also like to have more access to the community on a more regular basis. Because of staffing patterns in her various CRS facilities, she has had a very limited ability to engage and interact in public.

    g.  Ms. Gordon and her guardians have requested, but have not received, a person-centered planner and other individualized housing services to enable her to plan for and transition into a more integrated setting.

    h.  Since she was evicted from her previous CRS facility in February, 2016, her guardians have been asking providers to consider serving her in a home of her own. They have not been given information regarding her due process rights in regards to this request for these services. To this point, it is unclear when, if ever, Ms. Gordon will be allowed to live in a more integrated setting.

32.    Plaintiff Tenner Murphy has severe physical and cognitive disabilities as a result of a lifelong battle with degenerative brain cancer.

    a.  Despite his condition, he graduated from high school envisioning living a typical adult life pursuing relationships, a job, activities and interests, and his own place to live.

    b.  As his disability progressed during his twenties, he stayed in his parents' home where his family acted as his primary caretakers.

c. Mr. Murphy developed hobbies, such as archery, and had many nondisabled friends in the community.

d. In 2010, Mr. Murphy's physical needs became more difficult to manage, and his parents made the difficult decision to look for an out-of-home placement.

e. Mr. Murphy's case manager at the time told Mr. Murphy and his family that he could receive a Disability Waiver in order to move into a CRS facility.

f. When he moved into his CRS facility, Mr. Murphy was walking on a regular basis. But the CRS staff now make him use a wheelchair because there is often not enough staff available or willing to assist him when he wants to walk.

g. On a typical day, Mr. Murphy spends most of his time alone, even though he would prefer to interact with other people. He will often spend several hours sitting on the deck, the porch, or the dining room table by himself.

h. Because of distance and staffing patterns at the CRS facility, he rarely goes to the archery range. He no longer follows his favorite television news programs because his preferred shows are broadcast at a time when house rules prohibit television watching.

i. Mr. Murphy has no control about how staff members are hired or trained and has no control of what housemates are moved into the facility.

j.  The other residents in the CRS facility have difficulty communicating and Mr. Murphy rarely speaks or interacts with them. Because he enjoys meeting new people and conversing with others, Mr. Murphy wants to be able to choose his own roommates.

k.  Although Kay Murphy, Mr. Murphy's mother and legal guardian, has asked several people at the lead agency about accessing more individualized housing options, Mr. Murphy remains stuck in a segregated setting, where his interactions are largely limited to other persons with disabilities and paid staff.

l.  Despite receiving no information from Defendants about Mr. Murphy's right to live in his own home, Mr. Murphy's family recently purchased a new housing unit, with the hopes of having Mr. Murphy move into it with roommates of his choosing.

m.  Despite this positive advancement, Mr. Murphy is still stuck in the CRS facility because of Defendants' failure to provide an informed choice of integrated alternatives. They have prevented Mr. Murphy from choosing individualized housing services, such as a live-in caregiver that he can hire and train to help him more fully interact with his community and be as integrated as possible.

n.  Mr. Murphy has not received a notice of denial or information regarding his due process rights in regards to his request for these services.

33.    Plaintiff Marrie Bottelson has cerebral palsy and other developmental disabilities.

 a. She uses a motorized wheelchair and needs personal assistance in order to do basic daily tasks, such as getting dressed and eating.

 b. Despite her disabilities, she is a successful artist and a valued member of the arts community in Minnesota. She is also her own guardian and prides herself in making independent decisions about her life.

 c. She has lived in a CRS facility for about thirteen years.

 d. For the past several years, she has asked the different case managers she has had to help her move into her own apartment with her current roommate and best friend, Dionne Swanson. Her case managers and county workers, however, have told Ms. Bottelson that there are no other options for her.

 e. Because of staffing patterns in the facility, Ms. Bottelson is forced to go to bed at 7 or 8 p.m. because there is no other way for her to receive necessary care.

 f. Staffing patterns also dictate how much time Ms. Bottelson can spend in the community. Because of this, her interaction with the community is severely limited, and she does not get out into the community nearly as much as she would if she were able to create her own schedule.

 g. To be as independent as possible, Ms. Bottelson would like to hire her own staff and live in her own apartment. One of her goals is to continue building

her art business, and she would like space in her own home to set up a small art studio to more easily work from home.

h. Ms. Bottelson would like to live with her best friend and current roommate, Dionne Swanson. Together, they have often talked of finding an apartment or other small residence. She needs person-centered planning to help her develop an individualized moving plan and other individualized housing services in order to make these goals a reality.

i. Ms. Bottelson's previous case managers told her several times that individualized housing is not a possibility for her, even though she lived in her own apartment for nearly ten years before moving into her current CRS.

j. In 2013 Ms. Bottelson asked her previous case manager to help her find individualized housing as an alternative to her CRS facility. She was told that such housing was too hard to find, and has not been given alternative options to consider.

k. Although she recently met with a person-centered planner in July, 2016, she has not received all the necessary individualized housing services to help her find or develop alternatives to her current CRS facility.

l. Ms. Bottelson has not received a notice of denial or information regarding her due process rights in regards to her request for these services.

34.    Plaintiff Dionne Swanson has cerebral palsy and other developmental disabilities.

a.  She uses a motorized wheelchair and needs personal assistance in order to do basic daily tasks, such as getting dressed and eating.

b.  Ms. Swanson is her own guardian and has developed many independent skills over the years. Still, Ms. Swanson's case managers have told her she is not "independent enough" for individualized housing. Defendants, however, do not impose such criteria for individualized housing.

c.  As her own guardian, Ms. Swanson wants to make basic decisions other adults are able to make, such as choosing what time to go to bed. Instead, for staff convenience, she is often forced to go to bed at 7:00 or 8:00 p.m.

d.  Ms. Swanson has had difficulty getting group home staff to provide care that respects her wishes.

e.  Ms. Swanson needs person-centered planning services, and other individualized housing services to help her create and execute a plan to live in the most integrated setting appropriate to her needs.

f.  Despite asking for person-centered planning and other individualized housing services for a long time, Ms. Swanson has not received them.  She has never received a notice of denial or information regarding her due process rights in regards to her request for these services.

**STATUTORY BACKGROUND**

*Section 1983 Medicaid and Constitutional Claims*

35.     Medicaid is a healthcare and related services program jointly operated and funded by the federal government and each participating state. Once a state chooses to

14

participate, it must operate its program in compliance with federal statutory and regulatory requirements. 42 U.S.C. § 1396a. The State of Minnesota has chosen to participate in the Medicaid program.

36.     Minnesota's Disability Waiver services are Medicaid services that provide a comprehensive, cost-effective, home and community-based package of services for individuals with disabilities, such as Plaintiffs. They allow individuals to receive services outside of institutional settings such as nursing facilities and intermediate care facilities for persons with developmental disabilities.

37.     Disability Waiver services include a wide array of services and supports, such as direct care staffing, vocational skills and employment assistance, environmental modifications and other assistive technology, transitional and housing assistance, and other services designed to help people with disabilities live in his or her own home and interact with the larger nondisabled community.

38.     Medicaid requires the provision of services with reasonable promptness. 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a).

39.     42 U.S.C. § 1983 entitles Plaintiffs to enforce provisions of Defendant DHS's Medicaid Act obligations, including 42 U.S.C. § 1396a(a)(8).

40.     Constitutional Due Process requirements mandate that Defendants provide proper notice prior to adverse actions and access to fair hearings. Medicaid also requires the provision of notice and due process requirements, including a fair hearing when services are not provided with reasonable promptness. 42 U.S.C. § 1396a(a)(3). 42 U.S.C. § 1983 entitles Plaintiffs to enforce these requirements.

15

*The Americans with Disabilities Act and the Rehabilitation Act*

41.     The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act similarly prohibits discrimination against persons with disabilities by entities that receive federal financial assistance. 29 U.S.C. § 794(a).

42.     In 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Among the specific issues the ADA addresses are actions that prevent persons with disabilities from "fully participat[ing] in all aspects of society" and "relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." *Id*. §§ 12101(a)(1), (5).

43.     In enacting the ADA, Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id*. § 12101(a)(2).

44.     Congress also found that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; [and] the Nation's proper goals regarding individuals

16

with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." *Id.* §§ 12101(a)(6), (7).

45.     Title II of the ADA prohibits discrimination on the basis of disability by public entities. 42 U.S.C. § 12132. A "public entity" is any state or local government and any department, agency, or other instrumentality of a state or local government, and covers all services, programs, and activities provided or made available by public entities, including through contractual, licensing, or other arrangements. *See id.* §§ 12131(1), 12132; 28 C.F.R. § 35.130. Accordingly, Title II's coverage extends to the state of Minnesota, Defendants' agencies, and Defendants' residential service system and Disability Waiver programs.

46.     Congress directed the Attorney General to issue regulations implementing Title II of the ADA. 42 U.S.C. § 12134.

47.     The Title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). This is known as the integration mandate. The Rehabilitation Act contains a similar requirement. *Id.* § 41.51(d).

48.     The "most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible . . . ." 28 C.F.R. § Pt. 35, App. A (2010).

49.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), also prohibits discrimination on the basis of disability. Section 504's implementing regulations provide

17

that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

*Olmstead v. L.C.*

50.     The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999).

51.     The Supreme Court's holding in *Olmstead* affirmed that segregation of disabled persons is inconsistent with the interest of community integration and impedes certain daily activities to which they are entitled to participate: "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. at 600. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id*. at 601.

52.     Under *Olmstead*, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities.  *Id*. at 607.

*Home and Community Based Services: Community Setting Rule*

18

53.     In January 2014, the CMS published a final administrative rule defining a community setting for the purposes of Home and Community Based Services ("HCBS"). 42 CFR § 441.301(c).

54.     In order to comply with the rule, all persons receiving a Disability Waiver in Minnesota must receive services in a setting that, among other things, is: "selected by the individual from among options, including non-disability purposed housing; integrated in and supports full access to the greater community; optimizes autonomy and independence in making life choices; facilitates choice regarding services and who provides them." 42 CFR § 441.301(c)(4).

55.     This rule is intended to "ensure that the setting chosen by the individual is integrated in, and supports full access of individuals receiving Medicaid HCBS to the greater community, including opportunities to seek employment and work in competitive integrated settings, engage in community life, control personal resources, and receive services in the community to the same degree of access as individuals not receiving Medicaid HCBS." 42 CFR § 441.301(c)(2)(i).

*The Minnesota Olmstead Plan*

56.     Pursuant to a 2011 Stipulated Class Action Settlement Agreement arising out of a lawsuit filed in Minnesota Federal District Court, the State of Minnesota and Defendant DHS agreed to develop and implement an *Olmstead* Plan. Defendants submitted their most recent draft on August 10, 2015. The Court approved the plan on September 29, 2015. Corresponding "Work Plans" were approved by the Court on November 6, 2015.

57.     Neither the *Olmstead* Plan nor the Work Plans addresses CRS facilities or individualized housing services. Nor do they describe how DHS plans to provide residential services in more integrated settings for persons stuck in a CRS facility.

58.     In its Orders approving the *Olmstead* plan and the Work Plans, the Court reserved jurisdiction over implementation of the plan and the Work Plans. *Jensen v. MDSH*, Order, 14-15, September 29, 2015; *Jensen v. MDSH*, Order, 3, November 3, 2015.

59.     In March, 2016, as part of the *Olmstead* Plan, Defendants released their Person-Centered, Informed Choice and Transition Protocols ("Protocols") as a guide for lead agencies. Defendants claim the Protocols are designed to communicate DHS's expectations to lead agencies regarding person-centered practices.

60.     Although Defendants require lead agencies to implement the Protocols, they have failed to directly inform persons in CRS facilities about person-centered planning services and other individualized housing services that would allow them to move to a more integrated setting.

61.     These expectations about person-centered principles and practices in the Protocols are purposefully broad, designed to apply to all populations who receive long-term services from Defendants. They only provide generalized suggestions, rather than enforceable requirements, for lead agencies to consider when someone receiving services is moving from one setting to another.  As such, the Protocols do not ensure Plaintiffs access to a trained person-centered planner who is able to help develop a comprehensive individualized moving plan.

62.     While Defendants claim the Protocols are useful to helping change general culture and practice within Defendants' service system, they are not designed to help Plaintiffs move into the most integrated setting and therefore, they are not sufficient. They fail to direct or provide any guidance as to how lead agencies and individuals with disabilities can actually receive services in the most integrated setting.

63.     In earlier drafts of the *Olmstead* Plan, DHS identified some specific individualized housing services, such as Individualized Housing Options ("IHO"), as assistance to help people move to and remain in the most integrated setting. In the current plan, however, Defendants have eliminated all references to IHO. The Protocols are similarly silent on how individuals are supposed to learn about, develop, plan for, move into, and remain in individualized and integrated alternatives to segregated settings.

64.     Nothing in the Protocols, the *Olmstead* Plan, or the Work Plans indicates how DHS will reduce its overreliance on CRS facilities by providing appropriate services to people entitled to more integrated alternatives than CRS facilities, as required under the integration mandates of the ADA and Section 504 of the Rehabilitation Act.

65.     While Defendants have promised, in the *Olmstead* Plan, to move 5,547 people into more integrated settings, there are very few details of how or when this will happen, where these persons will come from (including whether or not they will come from CRS settings), or how and if they will be informed of the purported options.

66.     Defendants lack a working plan with accurate data, details, and measurable goals to:

a. specifically address how to fix its residential service system that over-relies on CRS facilities to the detriment of integrated alternatives such as individualized housing services; and

b. ensure that Individual Plaintiffs and Class Members are receiving services in the most integrated settings.

## MINNESOTA'S RESIDENTIAL SERVICE SYSTEM
## FOR PERSONS RECEIVING A DISABILITY WAIVER

67. As noted above, Minnesota's Disability Waivers pay for residential services in a variety of settings, including CRS facilities. Defendants license CRS facilities through Minnesota Statute Chapter 245D.

68. As of July, 2016, there are approximately 3,457 actively licensed CRS facilities, serving nearly 13,800 individual Disability Waiver recipients.

69. Defendants have known, since at least 2009, that individuals receiving Disability Waiver services need access to individualized housing as an alternative to CRS facilities. In that year, the state legislature enacted a moratorium on the building of new CRS facilities. This moratorium has capped the total number of available CRS facility beds statewide.

70. While Defendants currently approve some limited individualized alternatives for a small number of Disability Waiver recipients, they have failed to recognize Plaintiffs' individual choice and circumstances and have thus refused to ensure the residential service system provides services in the most integrated setting.

*The CRS Model*

22

71.     Before receiving Disability Waiver services, individuals must first go through an assessment process. If they qualify, the lead agency should offer the individual Disability Waiver services as an alternative to services in an institution.

72.     Defendants require the lead agency to develop a support plan for the individual that identifies his or her needs and the types of services necessary and available to meet those needs. Defendants do not ensure, however, that individuals are receiving services in the most integrated setting appropriate to their needs.

73.     Under the current system, Defendants approve the funding of Disability Waiver services in CRS facilities while failing to ensure that such a setting is the most integrated setting appropriate for the individual.

74.     If given a Disability Waiver, the individual is notified of available CRS facilities where the Disability Waiver will pay for support services. Defendants, however, do not provide information about more integrated alternatives to CRS facilities or information about how to access individualized housing services.

75.     If no CRS openings are immediately available, the case manager may contact CRS providers directly, speak with other case managers and lead agencies, or search the CRS online database to determine when an open bed in a CRS facility may become available.

76.     If an opening is located and the CRS operator is willing to accept the individual, then he or she can move in.

77.     Case managers rarely discuss integrated alternatives to CRS facilities. Defendants have failed to require case managers to inform individuals of such services or

23

provide individualized plans that could help Disability Waiver recipients choose, plan for, and eventually move into individualized and integrated settings.

78.     CRS facilities are inadequate for Plaintiffs because they do not enable them to access their communities and interact with nondisabled persons in the community to the fullest extent possible as required by the integration mandates of the ADA and Section 504 of the Rehabilitation Act.

79.     Although many CRS residents, including Individual Plaintiffs, are told they can go into the community, staffing patterns, CRS house rules, and other administrative restrictions limit the scope and duration individuals can actually participate in everyday community activities.

80.     Many CRS residents have daily tasks done "for them," even if they want to and are capable of doing tasks on their own. The lowered expectations and reduced skill-sets that CRS facilities engender pervade the public consciousness. This reinforces and perpetuates negative stereotypes about people with intellectual and developmental disabilities, mainly that they are unable and unfit to live in more integrated settings.

81.     Many CRS residents are frequently forced to spend their time secluded in CRS facilities, unable to participate in community life with their nondisabled peers. They have little or no choice about whom to associate with, where or when to go into the community, and how to structure their everyday schedule and lives.

82.     This lack of interaction with the larger community can be harmful. For many residents, an unchanging daily routine causes their social and independent living skills to atrophy, leading to an even lower likelihood that they will ever transition to

24

living and working in the community. It also leads to lower self-esteem and lowered expectations of themselves, similar to the "learned helplessness" described in *DAI v. Paterson*, 653 F. Supp. 2d 184, 214 (E.D.N.Y. 2009) ("When individuals are treated as if they are helpless, the helplessness becomes a learned phenomenon.") (internal quotations omitted).

*Integrated Alternatives to CRS Facilities*

83.    Individualized housing services are both a process and a result. Collectively, the process of assisting a person to create an individualized residential services plan and to obtain the services necessary to live in a more integrated setting complies with the concepts of a "community setting" as required by the CMS Settings rule and the most integrated setting as articulated in *Olmstead v. L.C.*

84.    Individuals who develop and live in individualized housing settings are given greater opportunities to interact and integrate themselves in the greater community, as they can, for example, have nondisabled roommates, set their own daily schedules and social outings, hire and control their staffing and services, and develop networks of friends without disabilities.

85.    Individualized housing services help ensure individuals are living and working in the most integrated setting.

86.    Persons receiving individualized housing services experience greater opportunities to interact with neighbors, meet and develop relationships with persons without disabilities, and build or maintain basic living skills in a manner that often is not possible in CRS facilities.

87.     Disability Waivers offer services that help individuals transition from less integrated settings into homes of their own. These include, but are not limited to:

    a.  the service of Consumer Training and Education and Family Training and Counseling, which allows individuals to hire trained person-centered planners to help develop self-advocacy skills and create more individualized service plans, including a personal housing transition plan that will lay the foundation for a move into a more integrated setting; and

    b.  the service of Housing Access Coordination and Transitional Services which helps people with the logistics of moving.

88.     Plaintiffs want access to these and other Disability Waiver services to help them transition to more integrated settings, but Defendants fail to ensure individuals have notice of, information regarding, or access to these services. Because these services are never offered or provided, Plaintiffs have no means of appealing or otherwise challenging DHS's actions.

89.     Defendants claim their Protocols require lead agencies to follow person-centered practices when individuals with disabilities are moving from one setting to another. Disability Waiver recipients, however, have no means of knowing about the Protocols or any mechanism to enforce them.

90.     Furthermore, Defendants' Protocols only provide generalized and vague suggestions regarding person-centered planning rather than requiring specific, customized, written, and enforceable personal housing transition plans necessary to help individuals plan for, develop, and eventually move into integrated and individualized

settings. The Protocols also fail to ensure service recipients will be offered the opportunity to receive person-centered planning, transition, and individualized housing services from trained providers.

91.     DHS regulates all individualized housing services for individuals with disabilities while primarily relying on individual counties and private service providers to provide such services. Defendants have designed Protocols that fail to provide or require policies, procedures, rules, or other regulations to direct counties to deliver individualized housing services.

92.     As a result of Defendants' lack of individualized housing services management, Plaintiffs are denied access to individualized housing services.

93.     Because of Defendants' lack of planning and oversight, there is a severe shortage of individualized housing providers in the state.

94.     Defendants have failed to implement individualized housing services as alternatives to CRS, or to ensure that its current service planning system requires even the consideration of alternatives to CRS. Defendants have also failed to implement the integrated residential goals of persons with disabilities, or to ensure there is a sufficient capacity or planning for individualized housing services to allow persons with disabilities to find individualized housing and support to live in a setting more integrated than CRS facilities.

### CLASS ACTION ALLEGATIONS

95.     Plaintiffs bring this class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure; the Due Process Clause of the Fourteenth Amendment

of the Constitution of the United States and the Medicaid Act, 42 U.S.C. §§ 1396a(a)(8) and 1396a(a)(3), as enforceable under 42 U.S.C. § 1983; Title II of the ADA, 42 U.S.C. §§ 12101 and 12131 *et seq.* and implementing regulations; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and implementing regulations.

96.     The Individual Plaintiffs bring this action on behalf of themselves and other individuals age 18 and older who are eligible for and have received a Disability Waiver, live in a licensed CRS facility, and have not been given the choice and opportunity to reside in the most integrated residential setting appropriate to their needs.

97.     The members in the Class are so numerous that joinder of all members is impracticable.

98.     The Class is ascertainable, as all potential Class Members can be identified in Defendants' current records of Medical Assistance and Disability Waiver recipients and CRS facility residents.

99.     Plaintiffs estimate that there are at least 800 members of the Class.

100.     There are common issues of law relating to the Class that predominate, including, among other issues:

      a.   whether the Defendants are violating the Due Process Clause of the United States Constitution and Plaintiffs' Medicaid rights by failing to provide written notice of appeal rights when Individualized Housing services are denied, including person-centered planning provided through the Disability Waivers and notice of appeal rights for such denial;

b.  whether the Defendants are violating the Plaintiffs' Medicaid rights by
     failing to provide timely access to person-centered planning;

c.  whether the Defendants are violating the ADA and Rehabilitation Act by
     planning, administering, and operating a residential services system that:

   i.  unnecessarily segregates Plaintiffs in CRS facilities and fails to
        provide informed choice of more integrated alternatives;

   ii.  discriminates against the Plaintiffs by providing residential services
         to them in settings that are not the most integrated settings
         appropriate to their needs; and

   iii.  fails to provide the Plaintiffs with individualized housing services to
          allow them to transition to the most integrated settings appropriate to
          their needs.

101.   There are common issues of fact relating to the Class that predominate,
including, among other facts:

a.  whether the Plaintiffs are receiving notice of adverse action and opportunity
     to challenge the failure to provide individualized housing services,
     including person-centered planning services;

b.  whether the Defendants have failed to provide person-centered planning
     services to Plaintiffs with reasonable promptness;

c.  whether as a result of the Defendants' actions and inactions in planning,
     administering, and operating the residential service system for persons with

29

disabilities, Plaintiffs are provided services that enable them to live in the

most integrated residential setting appropriate to their needs; and

d.   whether the Defendants have a comprehensive and effective working plan

for providing integrated residential services to the Plaintiffs.

102.   The Individual Plaintiffs seek injunctive and declaratory relief individually

and on behalf of the respective Class Members in order to access, utilize, and benefit

from the Disability Waiver services for which they are eligible. The Individual Plaintiffs

adequately and fairly represent the interest of all Class Members, will fully and

vigorously prosecute this action, and are represented by attorneys experienced in class

action litigation and disability law.

103.   The Individual Plaintiffs' injuries and claims are typical of those of the

Class in that all the Class Members are unable to access and use individualized housing

services for the purpose of moving to the most integrated setting appropriate to their

needs. This harm to Class Members is a result of the Defendants' failure to act properly

with regard to planning, administering, and supporting their residential service system for

persons with disabilities.

104.   Individual Plaintiffs and Class Members have a common remedy:

modifications to Defendants' residential service system to provide individuals with

choices and prevent needless segregation of individuals in segregated residential settings.

**COUNT I**
**(Asserted Against Commissioner Piper)**
**Failure to Furnish Services with Reasonable Promptness in Violation of**
**42 U.S.C. § 1396a(a)(8) as Enforceable Under 42 U.S.C. § 1983**

105.     Plaintiffs re-allege the preceding paragraphs as though fully set forth herein.

106.     Minnesota voluntarily participates in the federal Medicaid program under 42 U.S.C. §§ 1396 *et seq.*, and as a condition of its participation in that program, must ensure that services for eligible persons are provided in a reasonably prompt manner.

107.     The Medicaid program in Minnesota includes the provision of Disability Waiver services that Plaintiffs receive.

108.     Federal law requires any state which has elected to participate in the Medicaid program under 42 U.S.C. §§ 1396 *et seq.*, to provide all services to eligible individuals with reasonable promptness. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930.

109.     Defendant Piper has administered and continues to administer Disability Waiver services in a manner that denies Plaintiffs person-centered planning and other individualized housing services offered through Disability Waivered services.

110.     Specifically, Defendant Piper has failed to establish administrative procedures that ensure individuals who are qualified for and requesting services to help transition to a more integrated setting will actually receive those services. She has failed to direct counties and lead agencies to obtain, respond to, and act upon individual requests to use Disability Waiver services in more integrated settings. Her actions and inactions have violated Plaintiffs' rights under 42 U.S.C. § 1396a(a)(8) and its implementing regulations and thus are enforceable as violations of 42 U.S.C. § 1983.

111.     Defendant Piper's acts and omissions violate the law and have caused and continue to cause Plaintiffs harm. Defendant Piper has denied Plaintiffs timely

31

individualized housing services without proper notice thereof, and they have thereby sustained injuries that include, but are not limited to, ongoing segregation from persons without disabilities.

112.    Plaintiffs are entitled to injunctive relief, declaratory relief, and attorneys' fees and costs resulting from the violation of Plaintiffs' Medicaid rights, as enforceable under 42 U.S.C. § 1983.

### COUNT II
### (Asserted Against Commissioner Piper)
### Violation of Due Process, Advance Notice, and Fair Hearing
### as Enforceable Under 42 U.S.C. § 1983

113.    Plaintiffs re-allege the preceding paragraphs as though fully set forth herein.

114.    Plaintiffs are Medicaid beneficiaries receiving a Disability Waiver who have been denied access to individualized housing services, including person-centered planning, due to Defendant Piper's actions and inactions.

115.    Defendant Piper has failed to provide Plaintiffs notice of adverse action and opportunity to challenge the failure to provide these individualized housing services.

116.    Defendant Piper has failed to require lead agencies to provide Plaintiffs notice of adverse action and opportunity to challenge the failure to provide these individualized housing services.

117.    These failures have resulted in ongoing harm and Plaintiffs' continued inability to receive individualized housing services.

118.    Defendant Piper's conduct has caused Plaintiffs harm and has violated:

a. Plaintiffs' Due Process rights under the Fourteenth Amendment of the Constitution of the United States; and

b. the advance notice and fair hearing requirements contained in the Medicaid Act, 42 U.S.C. § 1396a(a)(3), and its implementing regulations, 42 C.F.R. §§ 431.200 to 431.250.

119. Defendant Piper's conduct violates Plaintiffs' rights and is redressable under 42 U.S.C. § 1983.

120. Plaintiffs are entitled to injunctive relief and declaratory relief resulting from the violation of Plaintiffs' Constitutional rights and injunctive relief, declaratory relief, and attorneys' fees and costs resulting from the violation of Medicaid rights, as enforceable under 42 U.S.C. § 1983.

**COUNT III**
**(Asserted Against Commissioner Piper)**
**Violation of Title II of**
**The Americans with Disabilities Act**

121. Plaintiffs re-allege the preceding paragraphs as though fully set forth herein.

122. Plaintiffs are individuals with disabilities within the meaning of the ADA. 42 U.S.C. § 12131(2). Plaintiffs are substantially limited in one or more major life activities such as learning, working, and brain function.

123. Defendant Piper, acting in her official capacity, is responsible for the operation of DHS, which is a public entity within the meaning of the ADA.

124.    Plaintiffs are qualified to receive Disability Waiver services, which are public programs, services, and activities covered by Title II of the ADA.  Plaintiffs are capable of and want to live in the most integrated setting appropriate to their needs and Defendant Piper can reasonably accommodate their requests.

125.    Defendant Piper is violating Title II of the ADA and its implementing regulations by failing to offer and provide services to Plaintiffs in the most integrated setting appropriate to their needs.

126.    Defendant Piper is violating Title II of the ADA and its implementing regulations by unnecessarily segregating the Plaintiffs in CRS facilities that are not the most integrated settings available to meet their needs.

127.    Defendant's violations, through acts and omissions, have caused Plaintiffs harm. Plaintiffs have sustained injuries that include, but are not limited to, ongoing segregation from persons without disabilities.

128.    Plaintiffs are entitled to injunctive relief, declaratory relief, and attorneys' fees and costs resulting from the violation of Title II of the ADA and its implementing regulations.

## COUNT IV
### Violation of Section 504 of the Rehabilitation Act

129.    The Plaintiffs re-allege the preceding paragraphs as though fully set forth herein.

130.    The Plaintiffs are qualified individuals with disabilities under Section 504 of the Rehabilitation Act.

131.    The Defendants receive federal financial assistance for their programs and activities.

132.    The Defendants are violating Section 504 and its regulations by failing to offer and provide services to Plaintiffs in the most integrated setting appropriate to their needs.

133.    The Defendants are violating Section 504 and its regulations by unnecessarily segregating the Plaintiffs in CRS facilities that are not the most integrated settings available to meet their needs.

134.    Defendants' violations, through acts and omissions, have caused Plaintiffs harm. Plaintiffs have sustained injuries that include, but are not limited to, ongoing segregation from persons without disabilities.

135.    Plaintiffs are entitled to injunctive relief, declaratory relief, and attorneys' fees and costs resulting from the violation of Section 504 and its regulations.

## PRAYER FOR RELIEF

**WHEREFORE**, the Individual Plaintiffs respectfully request that this Court:

1.    Certify this case as a class action pursuant to Fed. R. Civ. P. 23.

2.    Issue a declaratory judgment that Defendant Piper is violating the Medicaid Act by failing to provide the Plaintiffs Medical Assistance services with reasonable promptness and violating their Constitutional Due Process and Medicaid due process rights related to Medical Assistance services.

3.    Issue a declaratory judgment that:

a. Defendant Piper is violating the Americans with Disabilities Act by segregating the Individual Plaintiffs and Class Members while failing to provide them with individualized housing services for which they are eligible;

b. Defendants are violating the Rehabilitation Act by segregating the Individual Plaintiffs and Class Members while failing to provide them with individualized housing services for which they are eligible.

4. Issue preliminary and permanent injunctions requiring the Defendants to:

a. promptly ensure every Disability Waiver recipient living in a CRS facility receives notice about eligibility for and access to individualized housing services, including person-centered planning;

b. specifically provide access and take prompt steps to make individualized housing services, including person-centered planning, available to Plaintiffs in a reasonable amount of time, including:

   i. access to person-centered planning services that ensure an individual receives a comprehensive personal transition plan with enforceable timelines, identifiable tasks, persons responsible for such tasks, descriptions of the integrated housing options from which to choose, and any other information necessary to facilitate a transition and subsequent life in the most integrated setting; and

   ii. access to services that ensure creation of and facilitate implementation of the comprehensive moving plan.

36

c. take such other steps as necessary to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs, including, but not limited to:

    i. administering and operating their residential service system in a manner which actively promotes individualized housing services;

    ii. modifying their residential service system, making such changes as approved by the Court, that describe each of the activities that must be undertaken to permit timely access to available individualized housing services, including but not limited to:

        A. changes to benefit programs that ensure an individual has adequate notice of, access to, and support to enable a proper transition into the most integrated setting for which they are eligible;

        B. changes to applicable service definitions and regulations;

        C. changes to policies and procedures and lead agency requirements regarding person-centered transition planning;

        D. statewide planning related to the implementation of person-centered transition plans;

        E. statewide planning and training, including the proper development of direct service professionals, case managers, and lead agency staff to provide individualized housing

services and to support service recipients in the most
integrated setting;

    F.  family and self-advocacy education regarding housing
options for individuals;

    G.  infrastructure modifications such as changes to the statewide
individualized housing networking process;

    H.  planning and interagency coordination to ensure that
integrated alternatives to CRS facilities are available to those
who want to live in the most integrated setting; and

   iii. developing a periodic auditing process that ensures people in CRS
facilities are enabled to develop personal transition plans and
implement such plans so as to live in the most integrated setting
appropriate to their needs.

5.     Award the Plaintiffs their reasonable attorneys' fees, costs, disbursements, interests and costs of investigation, as allowed by and consistent with applicable law; and

6.     Grant any other relief which is necessary and proper to protect the rights of the Individual Plaintiffs and Class Members.

**MID-MINNESOTA LEGAL AID**
**MINNESOTA DISABILITY**
**LAW CENTER**


Dated:  August 3, 2016                By:    *s/ Justin H. Perl*
                                              Justin H. Perl (# 151397)
                                              Sean Burke (# 0392115)
                                       430 First Avenue North, Suite 300
                                       Minneapolis, MN  55401
                                       (612) 746-3759 (Telephone and Fax)

                                       jperl@mylegalaid.org
                                       sburke@mylegalaid.org



**ANTHONY OSTLUND**
**BAER & LOUWAGIE P.A.**


Dated:  August 3, 2016                By:    *s/ Joseph W. Anthony*
                                              Joseph W. Anthony (#0002872)
                                              Steven M. Pincus (#0171414)
                                              Laura A. Farley (#0397455)
                                              Peter J. McElligott (#0397578)
                                       90 South 7th Street
                                       3600 Wells Fargo Center
                                       Minneapolis, MN  55402
                                       Telephone:  612-349-6969

                                       janthony@anthonyostlund.com
                                       spincus@anthonyostlund.com
                                       lfarley@anthonyostlund.com
                                       pmcelligott@anthonyostlund.com

**ATTORNEYS FOR THE PLAINTIFFS**


39