UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Jenna Gordon, by her Guardians Debra and Marvin Gordon; Tenner Murphy, by his guardians Kay and Richard Murphy; Marrie Bottleson; Dionne Swanson; and on behalf of others similarly situated, | Civil File No. 16-cv-2623 (DWF/BRT) |
| Plaintiffs, | |
| vs. | DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS |
| The Minnesota Department of Human Services, an agency of the State of Minnesota; and Emily Johnson Piper in her Capacity as Commissioner of the Minnesota Department of Human Services, | |
| Defendants. | |

## INTRODUCTION

Defendants Minnesota Department of Human Services ("DHS") and Commissioner Emily Johnson Piper ("the Commissioner") bring this motion to dismiss Plaintiffs' Complaint because Plaintiffs lack standing and fail to state a claim. Defendants move to dismiss Plaintiffs' Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") claims, because neither statute imposes the standard of care or requires the level of services that Plaintiffs request. Plaintiffs' Medicaid Act claim fails because Plaintiffs have not alleged sufficient facts showing that Defendants failed to provide requested waiver services with reasonable promptness. Lastly, Plaintiffs' Due Process claim fails because Plaintiffs have not alleged that they were denied services. For these reasons, and pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6),

Defendants respectfully request that the Court dismiss Plaintiffs' Complaint, with prejudice.

**STATUTORY BACKGROUND**

## I.   THE FEDERAL MEDICAID PROGRAM.

Medicaid is a jointly-funded program in which the federal government reimburses participating states for a portion of the costs of providing medical care to eligible individuals in need.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2581 (2012).  Minnesota's Medicaid program is called "Medical Assistance" or "MA."  Minn. Stat. § 256B.01.

At the state level, counties administer MA for their eligible residents, and DHS is responsible for statewide administration.  Minn. Stat. § 256B.04, subd. 1; Compl. ¶¶23, 24.  At the federal level, Medicaid is administered by the Center for Medicare and Medicaid Services ("CMS"), an agency directed by the Secretary of the U.S. Department of Health and Human Services ("HHS").  *See* Compl. ¶26.

To participate in Medicaid, a state must submit a plan to CMS setting out the nature and scope of its program and providing assurances that the state's program will comply with the federal Medicaid Act and implementing regulations.   42 C.F.R. § 430.10.  CMS approves or disapproves the state's plan and any amendments to the plan. 42 C.F.R. § 430.15(a)-(c).

### A.   Section 1915(c) Waivers.

Historically, Medicaid has paid for medical care provided to individuals in institutional settings.  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 583 (1999).  In

2

1981, Congress enacted section 1915(c) of the Social Security Act, which authorized Medicaid reimbursement for home and community-based services ("HCBS").  *Id.* at 583, 601 fn.12.  Because section 1915(c) afforded states the authority to waive certain Medicaid requirements while administering HCBS, the services became known as "waiver services."  *See* 42 C.F.R. §§ 441.300, 430.25.

In order to receive federal funding for waiver services, Medicaid-participating states must comply with governing federal law.  *See generally Armstrong v. Exceptional Child Care Ctr., Inc.*, 135 S. Ct. 1378, 1382 (2015).  To provide waiver services, a state Medicaid plan must include a detailed "waiver plan." 42 U.S.C. §§ 1396a(a), 1396n(c)(2)(A); *see also* 42 C.F.R. § 441.302 (describing necessary waiver plan assurances).

### B.  Minnesota's Waiver Program.

DHS developed four waivers for individuals with disabilities:  the Developmental Disabilities ("DD") waiver, for people with developmental disabilities who need the level of care provided at an intermediate care facility; the Community Alternative Care ("CAC") waiver, for people who have a chronic illness and need the level of care provided at a hospital; the Community Access for Disability Inclusion ("CADI") waiver,[1] for people who have a disability and require the level of care provided in a nursing home; and the Brain Injury ("BI") waiver, for people with a traumatic or acquired brain injury who need the level of care provided in a nursing home or neurobehavioral hospital.  *See*

---

[1] Formerly known as "Community Alternatives for Disabled Individuals."  Laws of Minnesota 2015, Chapter 71, Article 6, section 31.

3

Information Brief, Medicaid Home and Community-Based Waiver Programs, Minnesota House of Representatives, November 2013, attached to the Affidavit of Ian Welsh ("Welsh Aff.") as Ex. 1 at pg. 3.

Disability waiver services are implemented by Minnesota counties and tribes or "Lead Agencies," Minn. Stat. § 256B.05 subd. 1, and provided in an individual's residence, such as a Community Residential Setting ("CRS").[2]  Compl. at p 2.  A CRS is a licensed foster care setting where certain residential supports and services are provided and the license holder does not reside.  Minn. Stat. § 245D.02, subd. 4a; Compl. ¶6. CRSs are sometimes referred to as "congregate" settings.  *See* Compl. ¶5.

### C.   Minnesota's Waiver Services.

Minnesota covers an array of services through its waivers.  Some waiver services help waiver recipients move from a licensed setting, such as a CRS, into his or her own home.  For example, Minnesota's waivers offer Housing Access Coordination and Transitional Services.[3]   Minn. Stat. §§ 256B.0916, subd. 10, 256B.49, subd. 16, 256B.4914, subd. 3(8).  Both provide services to assist in locating and securing a home,

---

[2] Community Residential Settings were previously known as corporate adult foster care sites.  *See* Home and Community-Based Service Licenses and Service Settings, available at
http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION
&RevisionSelectionMethod=LatestReleased&dDocName=dhs16_177381#CommunityRe
sidentialSettings

[3] HCBS Overview, Covered Services/Non-Covered Services, available at
http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION
&RevisionSelectionMethod=LatestReleased&dDocName=id_008995#

and up to $3,000 to cover the associated costs.[4]  *Id.*  The money can also be used to pay for household items such as furniture, cleaning supplies, dishes, pots and pans, and bedding.[5]  To have these expenses covered, an individual must make a request to his or her Lead Agency.[6]

As a health care program, Minnesota's waiver programs do not pay for a recipient's rent, room and board, or any other subsidy related to housing.[7]  Federal law explicitly prohibits state waiver programs from paying for such costs.  *See* 42 U.S.C. § 1396n(c)(1); 42 C.F.R. § 441.310(a)(2).

Other waiver services are designed to assist family members with a recipient's care or support.  For instance, Minnesota's Family Training and Counseling waiver service provides education regarding an individual's treatment regimen.[8]  This service also enables a Lead Agency to pay for a professional person-centered planner to help the waiver recipient develop his or her plan.[9]

### D.   Notifications And The Fair Hearing Process.

Minnesota counties are charged by statute with administering the waiver programs.  Minn. Stat. §§ 256B.05, subd. 1, 256B.0916, subd. 2.  The counties are

---

[4]Transitional Services, available at
http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION
&RevisionSelectionMethod=LatestReleased&dDocName=id_053178#
[5]*Id.*
[6] *Id.*
[7] *Id.*
[8]Family Training and Counseling, available at
http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION
&RevisionSelectionMethod=LatestReleased&dDocName=id_002195#
[9] *Id.*

required by law to arrange for an assessment of individuals with developmental disabilities requesting waiver services.  Minn. Stat. § 256B.092, subd. 1.  As part of that assessment, counties and tribal officials inform recipients of the types of services and supports that are available and ask which they would ideally like to receive.  Minn. Stat. § 256B.0911; MnCHOICES Initiative, Ex. 2.  Within 40 days of the assessment visit, the individual is provided a written community support plan.  Minn. Stat. § 256B.0911, subd. 3a(e).

As part of that written community support plan, the individual is asked whether he or she was allowed to choose between receiving services in the community or in an institution, and whether he or she was able to choose from different types of services that could meet the individual's needs.  DHS, Community Support Plan with Coordinated Services and Supports, Ex. 3 at 9.

In addition, DHS provides Lead Agencies with Notice of Action forms to send to individuals who are denied services they requested.  *See, e.g.,* DD Application, Ex. 4 at 183-84; CADI Application, Ex. 5 at 206; DHS, Community-Based Services Manual ("CBS Manual"), Ex. 6 at Appeals (describing Notice of Action and appeal rights); *id.* at BI, CAC, CADI, and DD Waiver General Process and Procedures.  The Notice of Action form provides notice of appeal rights.  DD Application, Ex. 4 at 183.  The appeal rights state that an individual may challenge a determination made by the county in an administrative hearing before a DHS Judge.  Minn. Stat. § 256.045, subd. 3.  The judge issues a recommendation that the Commissioner may accept or reject.  *Id.*, subd. 5.  The

6

benefit recipient may appeal an adverse Commissioner's Order to the county district court. *Id.*, subd. 7.

## II.     CMS RULES AND REGULATIONS GOVERNING HCBS.

As the federal agency charged with overseeing Medicaid, CMS promulgates rules and regulations for Medicaid-participating states to follow.  In 2014, CMS published a final rule (the "2014 rule") that for the first time defined section 1915(c) home and community-based settings and conveyed expectations regarding "person-centered" plans of care.   Final Rule Amending Medicaid Regulations, 79 Fed. Reg. 2948, 2014 WL 132005 (2014) (codified at 42 C.F.R. § 441.301 *et seq*.).

### A.     Definition Of Home and Community-Based Settings.

Traditionally, a HCBS was defined by the setting's location, geography, or physical characteristics.  By contrast, under federal regulations as amended by the 2014 rule, the definition of HCBS is determined by the quality of an individual's experiences in addition to the characteristics of a given setting.  42 C.F.R. § 441.301(c)(4)(i), (iii)-(v). A HCBS setting must: facilitate individual choice regarding services and who provides them; be integrated in, and support full access to, the greater community; ensure individual rights of privacy, dignity and respect; and optimize the individual's autonomy and independence in making life choices.  *Id.*

Federal regulations also require that HCBS settings be "selected by the individual from among setting options including non-disability specific settings and an option for a private unit in a residential setting," subject to "resources available for room and board." 42 C.F.R.  § 441.301(c)(4)(ii); 79 Fed. Reg. 2948, 2964 ("[T]he financial resources

available to an individual may impact the options available to a particular individual."). In promulgating the 2014 rules, CMS cautioned that it was not attempting to prohibit the provision of services in congregate settings nor attempting to regulate housing.  79 Fed. Reg. 2948, 2957, 2977.

Federal regulations also grant the Secretary of HHS discretion to determine whether settings are institutional or qualify as home and community-based.  42 C.F.R. § 441.530(a)(2)(v).  Any setting that has the effect of isolating individuals receiving Medicaid HCBS is presumed to be an institutional setting, unless, based on information presented by the State or other parties, the Secretary concludes that the setting "does not have the qualities of an institution and that the setting does have the qualities of home and community-based settings."  *Id.*  Recognizing that the new rules are a major departure from existing requirements and practices, CMS gave the states five years to come into compliance with the new HCBS rules and regulations.  79 Fed. Reg. 2948, 2979.

### B.    Person-Centered Planning Requirement.

The 2014 rule also imposed new requirements for waiver service plans submitted to CMS for approval.  Waiver service plans must include a person-centered planning process that offers informed choices to the waiver recipient regarding the services and supports they receive and from whom, 42 C.F.R. § 441.301(c)(1)(vii), as well as a person-centered service plan, 42 C.F.R. § 441.301(c)(2).  Among other requirements, the plan "ensure[s] that the setting chosen by the individual is integrated in, and supports full access . . . to the greater community to the same degree of access as individuals not receiving Medicaid HCBS."  42 C.F.R. § 441.301(c)(2)(i).  The service plan is to be

8

reviewed every twelve months, when an individual's circumstances change, or at the request of the individual.  42 C.F.R. § 441.301(c)(3).

## III.   MINNESOTA'S TRANSITION PLAN, *OLMSTEAD* PLAN AND TRANSITION PROTOCOL

### A.   Minnesota's Transition Plan.

Under the 2014 rule, each state is required to write a "transition plan" for its existing waiver services.  42 C.F.R. § 441.301(c)(6)(A).  The purpose of the transition plan is to bring state standards and settings into compliance with the 2014 rules.[10] Minnesota submitted its initial transition plan to CMS on January 8, 2015.[11]  Minnesota is in the process of revising its plan with technical assistance from CMS.[12]

As outlined in the initial plan, Minnesota developed a process for identifying settings that may not be in compliance with the 2014 rule.[13]  Through provider self-assessment and additional data sources, DHS will generate a list of settings that it considers are not home and community-based.[14]  DHS will then require providers who are not in compliance with the 2014 rule to establish a setting-specific transition plan.[15] DHS will verify compliance in all HCBS settings by March 2019.[16]  The revised plan will contain more detail.

---

[10]    https://www.medicaid.gov/medicaid-chip-program-information/by-topics/long-term-services-and-supports/home-and-community-based-services/downloads/mn/mn-cmia.pdf
[11] *Id.*
[12] *Id.*
[13] https://mn.gov/dhs/assets/HCBSRuleTransitionPlan_tcm1053-165177.pdf at 3-5.
[14] *Id.* at 6-12.
[15] *Id.*
[16] *Id.* at 6.

B.    **Minnesota's *Olmstead* Plan.**

On September 29, 2015, this Court approved the Minnesota *Olmstead* Plan, finding, among other things, that it "upholds th[e] central feature of the *Olmstead* decision by respecting and prioritizing an individual's informed choice."  Sept. 29, 2015 Order, Doc. No. 510, Jensen, 09-CV-01775; Compl. ¶56.  The Plan includes several goals and strategies for implementing the person-centered planning process and transitioning waiver participants from segregated to more integrated settings.[17]

C.    **Minnesota's Transition Protocol.**

On February 10, 2016, DHS published its Person-centered, Informed Choice and Transition Protocol ("Transition Protocol").[18] Compl. ¶59.  The purpose of the protocol is to communicate to Lead Agencies the expectations regarding person-centered practices.[19]  *See id*. at ¶60.  To that end, the Protocol lists the  "essential elements" of the person-centered planning process, as well as a means to assess an individual's preferences, needs, and choices.[20]  It includes developing plans for finding and paying for the recipient's preferred housing choice, and supporting the individual during and after a move.[21]  The protocol must be followed by a recipient's waiver case manager and others involved in the recipient's care.[22]

---

[17] http://www.dhs.state.mn.us/main/groups/olmstead/documents/pub/dhs-287592.pdf
[18] http://mn.gov/dhs-stat/images/pcp_protocol.pdf
[19] *Id.* at 1.
[20] *Id.* at 8.
[21] *Id.* at 12, 16.
[22] *Id.* at 5.

## STANDARD OF REVIEW

A motion under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). When considering a motion to dismiss, a court "must assume that all the facts alleged in the complaint are true." *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555.

The Court may consider documents embraced by Plaintiffs' Complaint and public documents without converting the motion to dismiss into one for summary judgment. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997); *U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075, 1083 (8th Cir. 2014).

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING TO BRING THEIR CLAIMS.

The U.S. Supreme Court has outlined three necessary requirements for a party to have standing. "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is . . . concrete and particularized . . . and . . . actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotation marks and citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly

. . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (quotation marks and citations omitted).   Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*

Plaintiffs do not have standing because they have not alleged injury in fact.   They allege generally that Defendants have denied them an opportunity to hire a trained person-centered planner, a service to which Plaintiffs claim an entitlement.   Compl. ¶¶10, 11.   Although waiver services will cover the cost of a dedicated, professional person-centered planner, there is no legal authority that requires Defendants to affirmatively provide such a professional.   Moreover, at least one Plaintiff has alleged that she met with a person-centered planner.   Compl. ¶33k.   Plaintiffs have no legally protected interest in the provision of dedicated, trained, person-centered planners, so they cannot claim that the denial of this service constitutes injury in fact.   Therefore, they lack standing to bring their claims.

## II.   PLAINTIFFS HAVE FAILED TO STATE A REASONABLE PROMPTNESS CLAIM.

Plaintiffs erroneously assert that Defendants are violating the reasonable promptness provision set out in 42 U.S.C. § 1396a(a)(8).   That provision is one of many Medicaid Act provisions setting out conditions the State must meet to CMS's satisfaction in its Medicaid plan to receive federal funding.   *See Lankford v. Sherman,* 451 F.3d 496, 508 (8th Cir. 2006) (recognizing Medicaid is Spending Clause Litigation); *see also Armstrong v. Exceptional Child Ctr., Inc.* 135 S.Ct. 1378, 1385 (2015) (questioning private enforcement).

The reasonable promptness provision was not violated by Defendants. The provision does not require Defendants to provide the services Plaintiffs desire at will. Moreover the specific services Plaintiffs seek are affected by Minnesota's Statewide Transition Plan and Protocol which establish a time frame for implementing the 2014 Medicaid rule and regulations in its waiver programs.

### A.    Plaintiffs Have Not Alleged A Legally Cognizable Violation Of § 1396a(a)(8).

Section 1396a(a)(8) provides that:

A State plan for medical assistance must— . . . (8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals.

The federal regulation implementing § 1396a(a)(8) sets no specific timeframe; rather, it instructs state agencies to "[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930(a).

Plaintiffs allege no facts that would enable the court to determine, at the pleading stage, whether they have stated a reasonable promptness claim. Plaintiffs here allege only that they requested services "for a long time," Compl. ¶ 34f (Plaintiff Swanson), while others admit that they have received services, *id.* at ¶ 33k (Plaintiff Bottelson). Although Fed. R. Civ. P. 8(a) does not require Plaintiffs to plead detailed factual allegations, Plaintiffs must assert more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," and "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, courts have required factual allegations that waiver services have been denied for several years in order to

13

survive a motion to dismiss.  *See, e.g., Lewis v. N.M. Dep't of Health*, 94 F. Supp. 2d 1217, 1235 (D.N.M. 2000) (allegation of two to seven year wait sufficient to withstand motion to dismiss); *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 182 (3d Cir. 2004) (finding "no dispute that plaintiffs languished on waiting lists for years" while reversing dismissal of reasonable promptness claim on other grounds); *Wagner v. Dep't of Health Servs.*, 12-CV-463-WMC, 2013 WL 3776327, at *2 (W.D. Wis. Jul. 17, 2013) (allegation of two-year wait sufficient to avoid motion to dismiss).  Plaintiffs have not provided factual allegations necessary to avoid a motion to dismiss their reasonable promptness claim.

### B.   Waiver Programs Are Not An Entitlement.

Moreover, the reasonable promptness provision does not require states to provide waiver recipients with all desired services.  As the Seventh Circuit explained:

> The idea behind § 1396a(a)(8) is that states must comply with all Medicaid obligations:   to enter the program at all is to agree to supply medical services for every eligible person.  *Once Congress created the waiver program in 1981, however, that situation changed.*

*Bertrand ex rel. Bertrand v. Maram,* 495 F.3d 452, 457 (7th Cir. 2007) (emphasis added).

Unlike other Medicaid entitlements, federal waiver statutes contain limitations and caps on enrollment and costs.  *See* 42 U.S.C. §§ 1396n(c)(9), 1396n(c)(4).  *See also Skandalis v. Rowe,* 14 F.3d 173, 181 (2d Cir. 1994) (recognizing that waiver services were intended to be flexible and limited to ensure states would continue providing the services); *Makin ex rel. Russell v. Hawaii*, 114 F. Supp. 2d 1017, 1028 (D. Haw. 1999) (finding no entitlement given financial and population caps on waiver services).

14

The HHS Secretary also has the statutory authority to waive "any such requirements of section 1396a . . . as may be necessary for a State" to accomplish the objectives of the waiver program.  42 U.S.C. § 1396n(b).  Congress, by granting the Secretary discretion to approve waiver programs containing limits on enrollment and costs, acknowledged that state waiver programs were not required to provide recipients with desired services at will.

Plaintiffs cannot state a claim under § 1396a(a)(8) by simply making threadbare allegations that they are entitled to requested services but have not received them. *Guggenberger v. Minnesota*, CV 15-3439 (DWF/BRT), ___ F. Supp. 3d ___, 2016 WL 4098562, at *22 (D. Minn. July 28, 2016) ("[I]ndividuals who qualify for Waiver Services do not have an absolute entitlement to such services.").  In the context of § 1396a(a)(8), CMS explained that states may not be liable for delays caused by the unavailability of providers.  *See* United States Department of Health & Human Services Center for Medicaid and State Operations, Olmstead Update No. 4, dated January 10, 2001, Ex. 7 at p. 6 ("We appreciate that a State's ability to provide timely access to particular services within the waiver may be constrained by supply of providers, or similar factors.").  Indeed, CMS allowed states a transition period of up to five years to bring their waivers and regular state plans into compliance with the HCBS regulations. *See* 79 Fed. Reg. 2948, 2979 (Jan. 16, 2014) ("we will afford states the opportunity to propose a transition plan that encompasses a period of up to five years after the effective date of the regulation").  As the agency charged with administering Medicaid, CMS is entitled to deference on its interpretation of the reasonable promptness provision.

15

*Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984) (where Congress has not spoken on question at issue, a court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency").   CMS has determined that a transition period of several years to fully implement the federal HCBS regulations is reasonable.

It is well established that Medicaid is a payment scheme, not a scheme for state-provided medical assistance. *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003) ("Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals."). *See also* Compl. ¶2 ("Each Plaintiff receives a disability waiver to pay for services.").  Thus, it is the failure to provide reimbursement for covered services—and not a failure to provide the services themselves—that may give rise to liability under § 1396a(a)(8). *Coffey v. Xerox Corp.*, 1:13-CV-00097-SEB-DM, 2015 WL 2338550, at *8 (S.D. Ind. May 15, 2015) (reasonable promptness "obliges the states to provide eligible beneficiaries with prompt access to the Medicaid system—so that their medical care is reimbursed—rather than mandating any particular standard of accessibility or quality for the care itself"); *Scofero v. Zucker*, 6:16-CV-06125(MAT), 2016 WL 3964589, at *5 (W.D.N.Y. Jul. 25, 2016) ("medical assistance" refers to "'payment' for various medical services" and not the "actual medical services" themselves).  To hold otherwise would be to interpret section 1396a(a)(8) as federal legislation mandating provider participation. *Bruggeman*, 324 F.3d at 910 (reasonable promptness provision should not be read to require direct regulation of medical services).

16

C.   **Federal Transition Period Regulations And Minnesota's Transition Plan And Protocol Impact The Reasonable Promptness Requirement.**

The 2014 federal regulations governing HCBS provide a transition period for existing waiver programs to come into compliance with the new requirements.  42 C.F.R. § 441.301(c)(6)(ii)(B).  The regulations require states to develop transition plans with public input which set out timelines for meeting the requirements of the new HCBS regulations.  *Id.*  CMS allows states up to five years (until March 17, 2019) to comply fully with the new HCBS requirements.  79 Fed. Reg. 2948, 2979 (Jan. 16, 2014).  Transitions plans must be submitted to CMS for approval.  42 C.F.R. § 441.301(c)(6)(ii)(B).  Once approved, the state can begin implementing its plan.  *Id.*

Minnesota submitted its initial transition plan to CMS in January 2015.[23]  The plan is currently being revised with technical assistance from CMS.  Under the transition plan, Minnesota's waiver programs must receive CMS approval by March 2019.  The reasonable promptness provision set out in § 1396a(a)(8) must be interpreted in light of the federal transition plan regulation, Minnesota's Transition Plan once approved and Minnesota's Transition Protocol.  Indeed Plaintiffs admit that the integrated housing services they seek are not readily available at this time.  Compl. ¶93.  The reasonable promptness requirement, when interpreted in light of the federal transition regulations and Minnesota's developing plan and protocol, was not violated by Defendants.

---

[23]   https://www.medicaid.gov/medicaid-chip-program-information/by-topics/long-term-services-and-supports/home-and-community-based-services/downloads/mn/mn-cmia.pdf

### D.       Plaintiffs' Reasonable Promptness Claim Is Not Ripe.

Finally, Plaintiffs' reasonable promptness claim is not ripe for review.  Ripeness doctrine "flows from both the Article III 'cases' and 'controversies' limitation and also from prudential consideration for refusing to exercise jurisdiction."  *Iowa League of Cities v. Envtl. Prot. Agency*, 711 F.3d 844, 867 (8th Cir. 2013) (citations omitted).  The ripeness inquiry requires the Court to examine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Texas v. United States*, 523 U.S. 296, 300-01 (1998) (citation omitted).

To the extent that Plaintiffs allege that they live in a segregated setting, the 2014 rules allow for the parties to submit information to the Secretary in order for the Secretary to determine whether a particular setting is community-based.  42 C.F.R. § 441.530(a)(2)(v).  CRSs are not presumed institutional under the 2014 rules, and CMS cautioned that it did not intend to prohibit the provision of waiver services in congregate settings.  79 Fed. Reg. 2948, 2957 ("It is not the intent of this rule to prohibit congregate settings from being considered home and community-based settings.").  Instead, should an individual choose to live in a CRS, the setting must meet the new HCBS standards outlined in the 2014 rules.  *Id.*

This Court cannot fully adjudicate Plaintiffs' claims until after the 2019 compliance deadline, and only if the Secretary makes a determination that Plaintiffs' CRS settings are not home and community-based.  Without these factual developments, Plaintiffs' claims under the Medicaid Act are not ripe for review.

### III.   PLAINTIFFS HAVE FAILED TO STATE A VIABLE DUE PROCESS CLAIM.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." "To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake." *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999) (per curiam). "Second, the plaintiff must prove that the defendant deprived him of such an interest without due process of law." *Id.*

As to the first step, only those interests to which an individual has a legitimate claim of entitlement are subject to procedural due process protections. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). The Due Process Clause protects property rights arising from an independent source such as state law. *Id.* A property interest is created when state law gives rise to expectations that are justifiable. *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 796 (1980) (citation omitted).

Plaintiffs allege that they were denied "individualized housing services" but fail to define that term in their Complaint. *See* Compl. *generally*. As such, the Court cannot determine whether Plaintiffs have a legitimate claim of entitlement to such services, whatever they may be. *Roth*, 408 U.S. at 577 (Constitution does not recognize expectancies that are "unilateral"). To the extent that Plaintiffs base their claim on their alleged entitlement to hire trained person-centered planners, Compl. ¶ 10, this Court has held that Minnesota's waiver services are not an entitlement. Section IV.B, *supra*. As discussed above, waiver services provide payment for dedicated, professional person-centered planners, and does not guarantee provision of planners themselves. *Id.*

Assuming for the sake of argument that Plaintiffs have stated a due process claim, Plaintiffs have an opportunity to appeal an adverse determination.  Minn. Stat. § 256.045, subd. 3.  *See also Winskowski v. City of Stephen,* 442 F.3d 1107, 1110-111 (8th Cir. 2006) (finding no due process violation where plaintiff failed to avail himself of process available to him) (citatiosn omitted); *Hester v. Redwood County*, CIV. 11-1690 ADM/JJK, 2012 WL 863730, at *5 (D. Minn. Mar. 13, 2012) (no procedural due process violation where plaintiff failed to avail himself of statutory appeal opportunity). Plaintiffs must exhaust available state remedies before filing a federal procedural due process claim under § 1983.  *Wax 'n Works v. St. Paul*, 213 F.3d 1016, 1020 (8th Cir. 2000).

## IV.   PLAINTIFFS DID NOT PLEAD A VIOLATION OF THE ADA AND REHABILITATION ACT.

Title II of the ADA prohibits public entities from discriminating against a "qualified individual with a disability . . . by reason of such disability."   42 U.S.C. § 12132.   Under the ADA, public entities are required to make only "reasonable modifications" to their policies and practices, and only when necessary to avoid discrimination on the basis of disability.  28 C.F.R. § 35.130(b)(7).  A public entity is not required to make a modification which would "fundamentally alter" a program.  *Id.*

The integration mandate of the ADA requires a public entity to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  28 C.F.R. § 35.130(d).  The Rehabilitation Act contains a similar provision.  *See* 28 C.F.R. §  41.51(d) (requiring recipients of federal

20

funds to "administer programs and activities in the most integrated setting appropriate to the needs of the qualified handicapped person"). The ADA and the Rehabilitation Act can be analyzed together because the statutes are "similar in substance."[24] *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (quotation omitted) (stating that "cases interpreting either [statute] are applicable and interchangeable").

In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Court held that "unjustified institutional isolation" of individuals with disability violates Title II of the ADA. *Id.* at 600. *Olmstead* thus established the following rule:

> States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.

The Court reasoned that requiring people with a disability to give up community life in order to receive medical services—even when community placement could be reasonably accommodated—constituted disability discrimination, given that others could receive the same services in the community. *Id*. at 601. The Court indicated that an ADA plaintiff has the burden of demonstrating that the modification she seeks is

---

[24] Although similar in substance, the Rehabilitation Act also "imposes a requirement that a person's disability serve as the *sole* impetus for a defendant's adverse action against the plaintiff." *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 n. 5 (8th Cir.1999) (emphasis in original). Plaintiffs' Complaint does not allege that disability was the "sole impetus" for any alleged adverse action, and at a minimum, their Rehabilitation Act claim should be dismissed on this basis alone.

"reasonable," a question the plurality distinguished from that of the public entity's "fundamental alteration" defense. *Id.* at 587; *id.* at 603 (plurality) (distinguishing between questions of "reasonable modification" and "fundamental alteration"). The plurality in *Olmstead* reasoned that "the State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." *Id.* at 604. The Court did not "impose[] on the States a 'standard of care' for whatever medical services they render, or [hold] that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities." *Id.* at 603 n.14 (citations omitted).

Unlike the plaintiffs in *Olmstead*, Plaintiffs are not, and have not been, institutionalized. *See generally* Compl. Where plaintiffs residing in the community have stated viable claims under the integration mandate of the ADA, those plaintiffs pled both an inability to continue living in the community absent services and foreseeable or imminent institutionalization. *See, e.g.*, *Grooms v. Maram*, 563 F. Supp. 2d 840, 850 (N.D. Ill. 2008) (holding that a plaintiff could maintain a claim under Title II where the level of assistance under a waiver was "insufficient to permit [the individual] to survive at home, and that his parents will be forced to institutionalize him . . ."); *Cruz v. Dudek*, No. 10-23048, 2010 WL 4284955, at *16 (S.D. Fla. Oct. 12, 2010) (holding that two plaintiffs with quadriplegia who faced "significant" and "imminent" risk of institutionalization established a likelihood of success on the merits of their *Olmstead* claim where waivers would allow them to avoid institutionalization and stay in their homes). But Plaintiffs reside in the community in private residences, Compl. ¶¶31-34,

and have not pled any facts indicating that any are under an impending risk of institutionalization.

In addition, as recognized by the plurality in *Olmstead*, DHS's plan aimed to deinstitutionalize individuals and provide services to prevent institutionalization through waiver services is a reasonable-modification that the Court should not second guess. *Olmstead*, 527 U.S. at 605-06. "[T]he integration imperative is qualified by the 'fundamental alteration' defense, under which integration may be excused if it would result in a 'fundamental alteration' of the state's mental health system, for example, one that would cause the state to disregard or neglect the needs of other institutionalized patients." *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 157 (3d Cir. 2005) (citing *Olmstead*, 527 U.S. at 604). "Courts are to remain sympathetic to the fundamental alteration defense and give states 'leeway' in administering services for the disabled." *Jones v. Dep't of Pub. Aid*, 373 Ill. App. 3d 184, 195 (2007) (quoting 527 U.S. at 605.).

Here, as an initial matter, Plaintiffs are not clear about the actual relief or outcome they seek. It appears that Plaintiffs want the Department to provide person centered planning because they think that deprivation is keeping them in their current community setting. Plaintiffs' complaint, however, ignores that person-centered planning is not required by the ADA, and Defendants are unaware of any authority to suggest otherwise. *See also Doe v. Pfrommer*, 148 F.3d 73, 81-82 (2d Cir. 1998) (affirming dismissal of RA and ADA claims where plaintiff was challenging defendant's failure to provide him with certain services, *e.g.,* a "job coach," not defendant's alleged illegal discrimination); *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175, 198 (D. Conn. 2008) (dismissing ADA and

RA claims where plaintiffs challenged the adequacy of the services provided by defendant, not illegal disability discrimination).

If, however, Plaintiffs are actually seeking program funding that would allow them to live where they want, in the community they want, and with the person(s) they want (or by themselves, if they choose), the ADA and Rehabilitation Act provide no authority for such relief, and requiring such relief would constitute a fundamental alteration of MA, the State's healthcare program.[25]   Plaintiffs' request would ignore one of the central holdings of the *Olmstead* Court:  "we recognize, as well, the States' needs to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand."  527 U.S. at 597. Indeed, if every individual who receives waiver services were permitted to make such boundless choices at state expense, "relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities."[26]  *Id.* at 604.

---

[25] If this were, in fact, the case, in addition to having no basis in either the ADA or Rehabilitation Act, Plaintiffs' requested relief would also violate the Eleventh Amendment.  *Edelman v. Jordan*, 415 U.S. 651, 664-68 (1974) (reversing district court decision granting relief beyond requiring the named officials to act in accordance with their legal obligations going forward); *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 281 (1997) (Eleventh Amendment bars claims requesting relief that infringes on "special sovereignty interests").

[26] "Where community integration is accomplished through a Medicaid waiver program, a state could avoid having to modify its waiver program if it were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated."  *Bryson v. Stephen*, CIV 99-CV-558-SM, 2006 WL 2805238, at *4 (D.N.H. Sept. 29, 2006) (quoting (Footnote Continued on Next Page)

On either basis, Plaintiffs fail to state an ADA or Rehabilitation Act claim.

**V.   THE RELIEF PLAINTIFFS REQUEST WOULD IMPERMISSIBLY CONFER UPON THEM AND UPON THIS COURT UNLIMITED CONTROL OVER DECISIONS RESERVED FOR THE MINNESOTA LEGISLATIVE AND EXECUTIVE BRANCHES, IN VIOLATION OF PRINCIPLES OF FEDERALISM AND SEPARATION OF POWERS.**

Plaintiffs' claims would, if successful, confer upon them and this Court potentially unlimited control over budgetary and administrative decisions reserved for Minnesota's legislative and executive branches under principles of federalism and separation of powers. Plaintiffs' legal theories, as well as substance of the relief they request, would impermissibly deprive the Legislature of its discretion to allocate scarce funding between different groups of Minnesotans in need, and would deprive DHS of its discretion to administer its limited resources according to the judgment of its treatment and case management professionals. Further, enforcement of the injunctive relief Plaintiffs request would essentially require the Court to oversee the day-to-day minutiae of the State's operation of its waiver programs.

_____

(Footnote Continued from Previous Page)
527 U.S. at 605–06); *Karvelas v. Milwaukee Cty.*, 09-C-771, 2012 WL 3881162, at *4 (E.D. Wis. Sept. 5, 2012) (granting summary judgment because county had plan for placement in non-institutional setting that moved at reasonable pace); *Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1322 (M.D. Fla. 2011) (recognizing fundamental-alteration affirmative defense if state defendants could demonstrate comprehensive, effectively working plan to provide waiver services); *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 621 (9th Cir. 2005) ("So long as states are genuinely and effectively in the process of deinstitutionalizing disabled persons 'with an even hand,' [courts] will not interfere."); *Sanchez v. Johnson*, 416 F.3d 1051, 1068 (9th Cir. 2005)("[W]hen there is evidence that a State has in place a comprehensive deinstitutionalization scheme, which . . . is effectively working, the courts will not tinker with that scheme.") (citations omitted).

The Supreme Court has emphasized the "sensitive federalism concerns" implicated by what it terms "institutional reform litigation," or litigation based on federal statutory or constitutional claims that results in a district court "micromanag[ing] the day-to-day operation" of "areas of core state responsibility." *Horne v. Flores*, 557 U.S 433, 448 (2009); *id.* at n.3. In *Horne*, pursuant to a consent decree, "[f]or nearly a decade, the orders of a federal district court [had] substantially restricted the ability of the State of Arizona to make basic decisions regarding educational policy, appropriations, and budget priorities." *Id.* at n.3. The Supreme Court noted that "[f]ederalism concerns are heightened where . . . a federal court decree has the effect of dictating state or local budget priorities" because "[s]tates and local governments have limited funds." *Id.* at 448.

As a consequence of these limited funds, the *Horne* Court recognized that "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Id.* (citing *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) ("A structural reform decree eviscerates a State's discretionary authority over its own program and budgets and forces state officials to reallocate state resources and funds"); *see also Stanley v. Darlington Cty. Sch. Dist.*, 84 F.3d 707, 716 (4th Cir. 1996) ("It would be an unfathomable intrusion into a state's affairs—and a violation of the most basic notions of federalism—for a federal court to determine the allocation of a state's financial resources."). *Olmstead* itself recognizes that the ADA's "reasonable-modifications regulation" cannot be sensibly understood to require movement to a more integrated setting unless equitable

26

under the current "allocation of available resources."   527 U.S. at 604; *see also id.* at 612-13 (Kennedy, J., concurring) ("No state has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities . . . Grave constitutional concerns are raised when a federal court is given the authority to review the State's choices in basic matters such as establishing or declining to establish new programs.").

The Supreme Court has also repeatedly recognized the importance of deference to the judgments of state officials in administering state programs and laws.  "Where . . . the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (citations omitted).  "It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996).  Indeed, the plurality in *Olmstead* itself emphasized the importance of deference to state administrators and treatment professionals, limiting entitlement to a non-institutional setting to situations in which "the State's treatment professionals have determined that community placement is appropriate."  527 U.S. at 587; *see also id.* at 610 (Kennedy, J., concurring) ("It is of central importance . . . that courts apply today's decision with great deference to the medical decisions of the

27

responsible, treating physicians and, as the Court makes clear, with appropriate deference to the program funding decisions of state policymakers.").

The relief requested by Plaintiffs would contravene these principles. First, rather than requesting discrete relief, Plaintiffs appear to suggest a wholesale, Court-supervised redesign of Minnesota's disability waiver services and housing system. Compl., Doc. No. 1, pp. 37-38. Plaintiffs impermissibly ask the Court to "describe each of the activities that must be undertaken" in "modify[ing] [Defendants'] residential service system," including such minutiae as changes to state benefit programs, state "service definitions and regulations," "policies and procedures," "statewide planning related to the implementation of person-centered transition plans," "statewide planning and training" of various staff, "family and self-advocacy education," and "infrastructure modifications," presumably meaning the construction or procurement of an unspecified number of new residential settings. *Id.* This would deprive the Legislature of its fundamental ability to make "basic decisions regarding [] policy, appropriations, and budget priorities," *see Horne*, 557 U.S. 448 n.3, instead commandeering the State's funding apparatus for Plaintiffs' ends. By requiring Defendants to fund a fundamentally altered system and keep funding available, Plaintiffs' requested relief improperly removes from the State's executive and legislative branches questions of how the state spends its limited funds. *See Stanley*, 84 F.3d at 716; *Olmstead*, 527 U.S. at 604, 612-13.

Second, the Complaint's particularized illustrations of Plaintiffs' request for relief demonstrate their desire to remove all decision-making power from State legislative and executive officials, reducing them solely to a conduit for unlimited funding. The named

Plaintiffs, for example, variously plead entitlement to: unilateral control of the hiring and management of staff, and staffing patterns (Doc. 1, pp. 8-9 ¶31.e; *id*. at 12 ¶33.e and .f; *id*. at 14 ¶34.c); live-in caregivers for each Plaintiff (*Id*. at 11, ¶32.m); the ability to design their own individualized residence and have it paid for by the government (*Id*. at 8-14, ¶¶ 31-34 (describing the features of the named Plaintiffs' preferred residences). In addition to removing from the legislature its constitutional empowerment to weigh how to spend limited funds, Plaintiffs would remove from executive officials the fundamental ability to "shape the institutions of government," reserving all such discretion to Plaintiffs.  *See Lewis*, 518 U.S. at 349; *Olmstead*, 526 U.S. at 610.

Plaintiffs' Complaint should be dismissed because it violates fundamental principles of federalism and separation of powers.

## VI.   THE COURT SHOULD DISMISS DHS FROM THIS SUIT.

Plaintiffs assert their Rehabilitation Act Claim against DHS and the Commissioner in her official capacity.  Compl. ¶25.  Although Congress has abrogated state sovereign immunity to suits brought under the Rehabilitation Act, 42 U.S.C. § 2000d-7(a)(1), the waiver applies only to the individual state agency that receives federal funds, *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000).  Minnesota statutes designate the Commissioner of DHS as the "state agency" responsible for administering MA.  Minn. Stat. § 256B.02, subd. 5.  Therefore, DHS should be dismissed because Plaintiffs' Rehabilitation Act claim against DHS is redundant to their claim against the Commissioner in her official capacity.  *Guggenberger*, 2016 WL 4098562, at *22 (dismissing DHS from Rehabilitation Act claim also asserted against Commissioner)

(citing *Roberts v. Dillon*, 15 F.3d 113, 115 (8th Cir. 1994) ("An official-capacity suit is merely another way of pleading an action directly against the public entity itself.")).

## VII. MINNESOTA TRIBES AND COUNTIES ARE NECESSARY PARTIES.

"The purpose of Federal Rule of Civil Procedure 19 is to permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources." *Omega Demolition Corp. v. Hays Grp., Inc.*, 306 F.R.D. 225, 228 (D. Minn. 2015) (citations omitted). A party seeking "dismissal for failure to name a party carries the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Id.* at 227-28 (quotation marks and citations omitted).

Pursuant to Federal Rule of Civil Procedure 19(a)(1)(A), a required party must be joined if "in that person's absence, the court cannot accord complete relief among existing parties." "Whether a court could accord complete relief is determined by whether [t]he district court could grant [the] relief [sought] without impairing the absent parties ability to protect their interests." *Am. Dairy Queen Corp. v. Blume*, No. CIV. 11-358 RHK/TNL, 2011 WL 6994715, at *10 (D. Minn. 2011). If a required party cannot be joined, the Court must decide whether, "in equity and good conscience," the action should proceed or be dismissed. Fed. R. Civ. P. 19(b).

As Plaintiffs correctly state in their Complaint, Defendants require Lead Agencies to implement the person-centered planning practices identified in the Transition Protocol, Compl. ¶60, which include expectations about person-centered principles and practices, *id.* at ¶61. Should the Court deny Defendant's motion, this Court could not accord

30

complete relief because the Lead Agencies are the entities responsible for administering the allegedly denied services.

## CONCLUSION

For the above-stated reasons, Defendants respectfully ask the Court to grant their motion and dismiss Plaintiffs' Complaint in its entirety.

Dated:  September 14, 2016

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota


s/ Ian M. Welsh
IAN M. WELSH
Assistant Attorney General
Atty. Reg. No. 0396287
ian.welsh@ag.state.mn.us

SCOTT H. IKEDA
Assistant Attorney General
Atty. Reg. No. 0386771
scott.ikeda@ag.state.mn.us

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1385 (Voice)
(651) 296-1410 (TTY)

*Attorneys For Defendants Minnesota Department Of Human Services And Emily Johnson Piper*