# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Tenner Murphy, by his guardians Kay and Richard Murphy; Marrie Bottelson; Dionne Swanson; and on behalf of others similarly situated, | Civil No. 16-2623 (DWF/BRT) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| The Minnesota Department of Human Services, an agency of the State of Minnesota; and Emily Johnson Piper in her capacity as Commissioner of The Minnesota Department of Human Services, | |
| Defendants. | |

---

Joseph W. Anthony, Esq., and Peter McElligott, Esq., Anthony Ostlund Baer & Louwagie PA; Justin H. Perl, Esq., Mid-Minnesota Legal Aid; and Sean B. Burke, Esq., Mid-Minnesota Legal Aid, Minnesota Disability Law Center, counsel for Plaintiffs.

Ian M. Welsh, Janine Wetzel Kimble, Scott H. Ikeda, Assistant Attorneys General, Minnesota Attorney General's Office, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court on the Motion to Dismiss filed by Defendants the

Minnesota Department of Human Services ("DHS") and DHS Commissioner

Emily Johnson Piper ("Commissioner Johnson Piper") (collectively, "Defendants").

(Doc. No. 10.)  For the reasons set forth below, the Court grants in part and denies in part

the motion.

**BACKGROUND**

This case relates to an alleged denial of services under Minnesota's Medicaid

Disability Waivers and the resulting isolation and segregation of individuals with

disabilities who seek greater integration into their communities.  This case has been

designated as related to *Jensen v. Minnesota Department of Human Services*, Civ.

No. 09-1775 (D. Minn.).  (Doc. No. 6.)  *Mikkelson v. Johnson Piper*, Civ. No. 15-3439

(D. Minn.) (formerly *Guggenberger v. Minnesota*), is also related to the *Jensen* case.

(*See* Order, *Mikkelson v. Johnson Piper*, Civ. No. 15-3439 (D. Minn. Aug. 31, 2015),

Doc. No. 4.)  Many of the allegations, claims, and legal issues presented in this case are

similar to those previously considered by the Court in its July 28, 2016 Order in

*Mikkelson*.  *See Guggenberger v. Minnesota*, 198 F. Supp. 3d 973 (D. Minn. 2016).  The

Court will analyze the allegations and arguments specific to this case below, but also

directs readers to *Guggenberger* for additional background on the relevant law

underlying Plaintiffs' claims.

**I.     Minnesota's Residential Service System Under Medicaid Disability Waivers**

Minnesota participates in the federal Medicaid program, a jointly-operated federal

and state program that provides "healthcare and related services" to individuals with

disabilities.  (Doc. No. 33 ("Am. Compl.") ¶ 32.)[1]  In particular, Minnesota offers

---

[1]     Plaintiffs' original Complaint was filed on August 3, 2016.  (Doc. No. 1.)  On
September 14, 2016, Defendants filed the Motion to Dismiss presently pending before the
Court.  (Doc. No. 10.)  On January 20, 2017, the Court held a hearing on Defendants'
Motion to Dismiss.  (Doc. No. 29.)  On February 17, 2017, the parties filed a Stipulation
permitting Plaintiffs to file an Amended Complaint.  (*See* Doc. No. 31.)  Pursuant to
(Footnote Continued on Next Page)

Medicaid services to individuals with disabilities in the form of Medicaid Home and Community Based Disability Waivers ("Disability Waivers").[2] (*Id.* at 2, ¶¶ 21, 25.) According to Plaintiffs, states who participate in Medicaid must do so in accordance with federal law. (*Id.* ¶ 32.)

Plaintiffs allege that Disability Waivers in Minnesota "provide a comprehensive, cost-effective, home and community-based package of services," including "direct care staffing, vocational skills and employment assistance, environmental modifications and other assistive technology, transitional and housing assistance, and other services designed to help people with disabilities live in his or her own home and interact with the larger nondisabled community." (*Id.* ¶¶ 33-34.) Plaintiffs assert that "[t]he Disability Waivers can fund a variety of residential services, including individualized housing services." (*Id.* ¶ 25.) According to Plaintiffs, before individuals receive Disability Waiver services, they must be assessed and deemed qualified in order to be offered "Disability Waiver services as an alternative to services in an institution." (*Id.* ¶ 68.)

(Footnote Continued From Previous Page)
Magistrate Judge Becky R. Thorson's February 22, 2017 Order Granting Plaintiffs Leave to File Amended Complaint, "Defendants' Motion to Dismiss Plaintiffs' Complaint (Doc. No. 10) . . . serves as Defendants' response to Plaintiffs' First Amended Complaint." (Doc. No. 32.) On February 23, 2017, Plaintiffs filed their Amended Complaint. (Doc. No. 33 ("Am. Compl.").)

[2]     In their Amended Complaint, Plaintiffs refer to four separate waiver programs collectively as "Disability Waivers." (*Id.* ¶ 24.) These programs include the Developmental Disabilities Waiver, the Community Access for Disability Inclusion Waiver, the Community Alternative Care Waiver, and the Brain Injury Waiver. (*Id.*)

Plaintiffs allege that Disability Waivers may be used to fund residential services in a number of different settings. (*Id.* ¶ 64.) One possible setting is a Community Residential Setting ("CRS") facility. (*Id.* at 2, ¶ 64.) Plaintiffs explain that "CRS facilities contain up to five persons, all with disabilities, living in a residence that is owned, leased, operated, and/or controlled by the same organization that provides the services." (*Id.* ¶ 6.) Defendants oversee the licensure of CRS facilities pursuant to Minnesota Statute Chapter 245D. (*Id.* ¶ 64.) According to Plaintiffs, as of July 2016, nearly 13,800 Disability Waiver recipients in Minnesota resided in approximately 3,457 licensed CRS facilities. (*Id.* ¶ 65.)

Plaintiffs allege that an alternative model involving individualized housing services exists under the Disability Waivers that would permit individuals to achieve greater integration in the community. (*Id.* ¶ 7; *see also id.* ¶¶ 80-83.) According to Plaintiffs, "individualized housing uses Disability Waiver services, including person-centered planning, to design and implement a customized setting for the individual to live, work, and enjoy leisure time in the most integrated setting." (*Id.* ¶ 7.) Plaintiffs identify examples of services offered under Disability Waivers "that help individuals transition from less integrated settings into homes of their own." (*Id.* ¶ 84.) For example, Plaintiffs identify Consumer Training and Education and Family Training and Counseling "which allows individuals to hire trained person-centered planners to help develop self-advocacy skills and create more individualized service plans, including a personal housing transition plan that will lay the foundation for a move into a more

integrated setting." (*Id.* ¶ 84(a).)  Plaintiffs also identify Housing Access Coordination and Transitional Services to assist with moving logistics.  (*Id.* ¶ 84(b).)

Plaintiffs allege that DHS is the Minnesota state agency responsible for overseeing the state's provision of Medicaid, including "Disability Waivers and residential services for persons with intellectual and developmental disabilities, traumatic brain injury, mental illness, and other disabilities." (*Id.* ¶ 21.)  Plaintiffs further allege that Commissioner Johnson Piper administers and manages the Disability Waivers along with overseeing residential service providers such as those who operate CRS facilities.  (*Id.* ¶ 23.)

Plaintiffs assert that "Defendants direct and manage counties," otherwise known as "lead agencies," to administer Disability Waiver services throughout the state.  (*Id.* ¶ 27.)  Lead agencies are involved in the initial assessment for Disability Waiver services and are required by Defendants "to develop a support plan for the individual that identifies his or her needs and the types of services necessary and available to meet those needs." (*Id.* ¶¶ 68-69.)  According to Plaintiffs, "DHS regulates all individualized housing services for individuals with disabilities while primarily relying on individual counties and private service providers to provide such services." (*Id.* ¶ 88.)  Plaintiffs assert that Defendants permit counties to exercise discretion over "whether to offer individualized housing services." (*Id.* ¶ 27.)  According to Plaintiffs, most counties do not offer such services.  (*Id.*)

## II.     The Named Plaintiffs

Plaintiffs' Amended Complaint is brought by three named Plaintiffs representing a putative class including "individuals who are receiving a [Disability Waiver] and are living in a [CRS] facility, but want to live elsewhere and be integrated into their community." (*Id.* at 2.) Each named Plaintiff is an individual with one or more physical, developmental, or cognitive disabilities who receives a Disability Waiver. (*Id.* ¶¶ 1, 2, 29, 30, 31.)

Plaintiff Tenner Murphy ("Murphy") alleges he is "stuck in the CRS facility because of Defendants' failure to provide an informed choice of integrated alternatives." (*Id.* ¶ 29(m).) Murphy asserts that his living environment is a segregated setting and that he primarily interacts with other individuals with disabilities and staff. (*Id.* ¶ 29(k).) Murphy alleges he typically "spends most of his time alone, even though he would prefer to interact with other people." (*Id.* ¶ 29(g).) He asserts he is not able to control staff hiring or training and cannot decide who he will live with. (*Id.* ¶ 29(i).) He would prefer to select his own roommates. (*Id.* ¶ 29(j).) Murphy's guardian "has asked several people at the lead agency about accessing more individualized housing options." (*Id.* ¶ 29(k).) However, Murphy asserts that Defendants "have prevented [him] from choosing individualized housing services, such as a live-in caregiver that he can hire and train to help him more fully interact with his community and be as integrated as possible." (*Id.* ¶ 29(m).)

Plaintiff Marrie Bottelson ("Bottelson") "has lived in a CRS facility for about thirteen years" and "would like to hire her own staff and live in her own apartment." (*Id.*

¶¶ 30(c), 30(g).) Bottelson contends that her ability to spend time in the community is "severely limited" due to staffing in her current residential setting. (*Id.* ¶¶ 30(e), 30(f).) Specifically, Bottelson "does not get out into the community nearly as much as she would if she were able to create her own schedule." (*Id.*) According to Bottelson, "[f]or the past several years, she has asked . . . different case managers . . . to help her move into her own apartment." (*Id.* ¶ 30(d).) Bottelson alleges she has requested such help from her case managers to access individualized housing options since as early as 2013. (*Id.* ¶¶ 30(i), 30(j).) She has been told by case managers "that individualized housing is not a possibility for her," "that such housing was too hard to find," and "that there are no other options for her." (*Id.* ¶¶ 30(d), 30(i), 30(j).) Bottelson alleges she "needs person-centered planning to help her develop an individualized moving plan and other individualized housing services" to achieve her goals relating to her preferred living arrangement. (*Id.* ¶ 30(h).) She asserts that she met with a person-centered planner in July 2016 but "has not received all the necessary individualized housing services to help her find or develop alternatives to her current CRS facility." (*Id.* ¶ 30(k).)

Bottelson's current roommate and best friend, Plaintiff Dionne Swanson ("Swanson"), also alleges a need for "person-centered planning services, and other individualized housing services to help her create and execute a plan to live in the most integrated setting appropriate to her needs." (*Id.* ¶¶ 30(h), 31, 31(e).) She has asked for such services "for a long time," but "has not received them." (*Id.* ¶ 31(f).) Swanson alleges she has been told by case managers that "she is not 'independent enough' for individualized housing," even though Defendants have no such criteria. (*Id.* ¶ 31(b).)

As noted above, Plaintiffs assert that they want access to services offered under the Disability Waivers "to help them transition to more integrated settings." (*Id.* ¶ 85.) Despite not receiving the requested individualized housing services described above, each Plaintiff alleges he or she "has not received a notice of denial or information regarding [their] due process rights in regards to [their] request for these services." (*Id.* ¶ 29(n); *see also id.* ¶¶ 30(l), 31(f).)

## III.    Plaintiffs' Claims

Notwithstanding the alleged availability of individualized housing services that would permit greater integration into the community, Plaintiffs state that "Defendants have failed to inform all persons receiving a Disability Waiver of individualized housing service options and have failed to explain how to access such services." (*Id.* ¶ 28.) Similarly, Plaintiffs assert that "Defendants have . . . failed to provide transition planning and support for such services." (*Id.*) Finally, Plaintiffs contend that "Defendants have further failed to provide notices of denial or information regarding due process rights in regards to requests for these services." (*Id.*) These collective failures form the basis of Plaintiffs' claims, outlined below.

Plaintiffs assert that Defendants disproportionately rely on CRS facilities through their management of Disability Waiver services, leading Plaintiffs to reside in segregated settings. (*Id.* ¶ 4; *see also id.* ¶ 26.) According to Plaintiffs, "Defendants' administration, operation, and oversight (or lack thereof) has led to a pervasive overreliance on segregated CRS facilities." (*Id.* ¶ 13.) Plaintiffs allege that many CRS facilities are segregated settings according to DHS's own definition. (*Id.* ¶¶ 5-6.) Under this

definition, a segregated setting is one "populated exclusively or primarily with individuals with disabilities . . . [and] characterized by regimentation in daily activities [and] limits on individuals' ability to engage freely in community activities." (*Id.* ¶ 5 (quoting Minnesota Olmstead Plan: Demographic Analysis, Segregated Settings Counts, Targets and Timelines, September 20, 2014, p. 8).) Plaintiffs assert that many CRS facilities sanctioned by Defendants meet this definition because they limit individual choices regarding free time, daily schedules, interaction with individuals outside of the facility, and who to live with. (*Id.* ¶ 6.) According to Plaintiffs, "staffing patterns, CRS house rules, and other administrative restrictions limit the scope and duration individuals can actually participate in everyday community activities." (*Id.* ¶ 76.) In addition, Plaintiffs allege, "[m]any CRS residents are frequently forced to spend their time secluded in CRS facilities," separated from their communities. (*Id.* ¶ 78.) Plaintiffs allege that "[t]his lack of interaction with the larger community can be harmful." (*Id.* ¶ 79.) In particular, Plaintiffs allege that "[f]or many residents, an unchanging daily routine causes their social and independent living skills to atrophy, leading to an even lower likelihood that they will ever transition to living and working in the community." (*Id.*) According to Plaintiffs, these circumstances "also lead[] to lower self-esteem and lowered expectations of themselves." (*Id.*)

In contrast with these settings, Plaintiffs allege that "[i]ndividuals who develop and live in individualized housing settings are given greater opportunities to interact and integrate themselves in the greater community" based on increased flexibility in schedules, roommate choices, staff hiring, and social opportunities with non-disabled

individuals. (*Id.* ¶ 81.) In particular, Plaintiffs assert that "[p]ersons receiving individualized housing services experience greater opportunities to interact with neighbors, meet and develop relationships with persons without disabilities, and build or maintain basic living skills in a manner that often is not possible in CRS facilities." (*Id.* ¶ 83.)

According to Plaintiffs, "Defendants have created, maintained, and over-relied on a residential service system that limits individual autonomy, choice, and integration" in violation of the integration mandate of the Americans with Disabilities Act ("ADA"). (*Id.* ¶ 3.) Plaintiffs allege that Defendants have failed "to reasonably modify its residential service system" in a manner that would permit Plaintiffs to live in the most integrated setting. (*Id.* ¶ 12.) According to Plaintiffs, "Defendants currently approve some limited individualized alternatives for a small number of Disability Waiver recipients." (*Id.* ¶ 67.) However, Plaintiffs assert, "they have failed to recognize Plaintiffs' individual choice and circumstances and have thus refused to ensure the residential service system provides services in the most integrated setting." (*Id.*) In particular, Plaintiffs assert that "Defendants provide impermissible discretion to each lead agency" instead of "requir[ing] statewide access to individualized housing services." (*Id.* ¶ 27.) Plaintiffs also assert that Defendants "have failed to directly inform persons in CRS facilities about person-centered planning services and other individualized housing services that would allow them to move to a more integrated setting." (*Id.* ¶ 57.) According to Plaintiffs, they "are capable of and want to live in the most integrated

setting appropriate to their needs and Defendant Piper can reasonably accommodate their requests." (*Id.* ¶ 121.)

In 2009, Plaintiffs allege, the number of CRS facility beds available statewide was capped by a legislative moratorium on the development of any new CRS facilities. (*Id.* ¶ 66.) Thus, Plaintiffs contend that Defendants have been aware since as early as 2009 "that individuals receiving Disability Waiver services need access to individualized housing as an alternative to CRS facilities." (*Id.*) Plaintiffs assert that Disability Waiver recipients receive information about available CRS facilities and case managers may take steps to locate CRS facility openings if none are available. (*Id.* ¶¶ 71-73.) However, Plaintiffs allege, "[c]ase managers rarely discuss integrated alternatives to CRS facilities." (*Id.* ¶ 74.) Further, Defendants purportedly fail to inform Disability Waiver recipients "about more integrated alternatives to CRS facilities or information about how to access individualized housing services" or require case managers to provide this information. (*Id.* ¶¶ 71, 74.) Plaintiffs also contend that "Defendants approve the funding of Disability Waiver services in CRS facilities while failing to ensure that such a setting is the most integrated setting appropriate for the individual." (*Id.* ¶ 70.)

Plaintiffs allege that they are entitled to use Disability Waiver services to hire a person-centered planner "in order to develop a comprehensive individualized transition plan to move to more integrated housing." (*Id.* ¶ 10; *see also* ¶ 106.) According to Plaintiffs, Commissioner Johnson Piper "has failed to establish administrative procedures that ensure individuals who are qualified for and requesting services to help transition to a more integrated setting will actually receive those services." (*Id.* ¶ 107.) In particular,

Plaintiffs assert, Commissioner Johnson Piper has not required counties "to obtain, respond to, and act upon individual requests to use Disability Waiver services in more integrated settings." (*Id.*) Plaintiffs allege that Defendants "have denied [them] the opportunity to find trained person-centered planners, to receive services from a person-centered planner in a timely fashion, or to receive any such services in order to develop and implement comprehensive individualized transition plans." (*Id.* ¶ 11.) Plaintiffs assert that "Defendants fail to ensure individuals have notice of, information regarding, or access to" services available under the Disability Waivers to facilitate a transition to a more integrated setting. (*Id.* ¶¶ 84-85.) Plaintiffs also allege that Commissioner Johnson Piper has not provided or required lead agencies to provide "notice of adverse action and opportunity to challenge the failure to provide . . . individualized housing services." (*Id.* ¶ 112.) According to Plaintiffs, "[b]ecause these services are never offered or provided, Plaintiffs have no means of appealing or otherwise challenging DHS's actions." (*Id.* ¶ 85.)

Plaintiffs describe measures undertaken by Defendants in the areas of person-centered planning and integrated residential settings under Minnesota's *Olmstead* Plan and Defendants' Person-Centered, Informed Choice and Transition Protocols ("Protocols"). (*See id.* ¶¶ 53-62.) However, Plaintiffs assert that "[n]othing in the Protocols, the *Olmstead* Plan, or the [*Olmstead*] Work Plans indicates how DHS will reduce its overreliance on CRS facilities by providing appropriate services to people entitled to more integrated alternatives than CRS facilities." (*Id.* ¶ 61; *see also id.* ¶ 53.) In particular, Plaintiffs contend that the Protocols "only provide generalized suggestions,

rather than enforceable requirements," so they are insufficient to ensure Plaintiffs have access to the individualized housing services they seek. (*Id.* ¶¶ 58-59; *see also id.* ¶ 88.) Plaintiffs also state that prior versions of the *Olmstead* Plan identified "specific individualized housing services" referred to as Individualized Housing Options, but assert that the current *Olmstead* Plan contains no such information. (*Id.* ¶ 60.)

Plaintiffs further allege that "Defendants have promised . . . to move 5,547 people into more integrated settings" in the *Olmstead* Plan, but fail to specify "how or when this will happen, where these persons will come from (including whether or not they will come from CRS settings), or how and if they will be informed of the purported options." (*Id.* ¶ 62.) In short, Plaintiffs assert that "Defendants lack a working plan with accurate data, details, and measurable goals to . . . fix its residential service system that over-relies on CRS facilities to the detriment of integrated alternatives such as individualized housing services . . . and . . . [e]nsure [Plaintiffs] are receiving services in the most integrated settings." (*Id.* ¶ 63.)

Plaintiffs allege that Defendants' lack of management, planning, and oversight relating to individualized housing services has denied Plaintiffs access to such services and has resulted in "a severe shortage of individualized housing providers in the state." (*Id.* ¶¶ 89-90.) According to Plaintiffs, "Defendants have failed to implement individualized housing services as alternatives to CRS, or to ensure that its current service planning system requires even the consideration of alternatives to CRS." (*Id.* ¶ 91.) Relatedly, Plaintiffs assert, Defendants have not "ensure[d] there is a sufficient capacity or planning for individualized housing services to allow persons with disabilities

to find individualized housing and support to live in a setting more integrated than CRS facilities." (*Id.*)

Plaintiffs assert the following claims against Commissioner Johnson Piper: (1) failure to furnish Medicaid services with reasonable promptness under 42 U.S.C. § 1396a(a)(8), enforced under 42 U.S.C. § 1983 (Count I); (2) violation of Plaintiffs' Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements, enforced under 42 U.S.C. § 1983 (Count II); and (3) violation of Title II of the ADA (Count III). (*Id.* ¶¶ 102-25.) Plaintiffs assert the following claim against all Defendants: violation of § 504 of the Rehabilitation Act ("RA") (Count IV). (*Id.* ¶¶ 126-32.)

Plaintiffs assert their claims on behalf of themselves and a putative Class of similarly situated individuals. (*See id.* ¶¶ 92-101.) Plaintiffs assert that they and the Class "have a common remedy: modifications to Defendants' residential service system to provide individuals with choices and prevent needless segregation of individuals in segregated residential settings." (*Id.* ¶ 101.) Plaintiffs seek "an informed choice and realistic opportunity to receive residential services in the most integrated setting." (*Id.* ¶ 4.) Plaintiffs seek declaratory and injunctive relief to remedy Defendants' alleged violations of the law, attorney fees and costs, and other relief deemed necessary to protect the rights of Plaintiffs and the Class. (*See id.* at Prayer for Relief ¶¶ 2-6.)

Specifically, Plaintiffs seek a declaratory judgment that: (1) Commissioner Johnson Piper is violating the Medicaid Act by not providing services with reasonable promptness and violating Plaintiffs' Constitutional and Medicaid due process rights; and

(2) Commissioner Johnson Piper is violating the ADA and Defendants are violating the RA by segregating Plaintiffs "while failing to provide them with individualized housing services for which they are eligible." (*Id.* at Prayer for Relief ¶¶ 2-3.)

Plaintiffs seek injunctive relief requiring Defendants to: (1) "[p]romptly ensure every Disability Waiver recipient living in a CRS facility receives notice about eligibility for and access to individualized housing services, including person-centered planning;" (2) "[s]pecifically provide access and take prompt steps to make individualized housing services, including person-centered planning, available to Plaintiffs in a reasonable amount of time . . ."; and (3) "[t]ake such other steps as necessary to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs . . . ." (*Id.* at Prayer for Relief ¶ 4.) Under items (2) and (3), above, Plaintiffs identify in detail the proposed relief they seek to modify the state's residential service system. (*Id.* at Prayer for Relief ¶¶ 4(b)-4(c).) Defendants move to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Doc. No. 10.)

## DISCUSSION

### I.     Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject matter jurisdiction. To survive a motion to dismiss for lack of subject matter jurisdiction, the party asserting jurisdiction has the burden of proving jurisdiction. *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000) (citation omitted). "Subject-matter jurisdiction is a threshold requirement which must be

assured in every federal case." *Kronholm v. F.D.I.C.*, 915 F.2d 1171, 1174 (8th

Cir. 1990).

A motion to dismiss for lack of subject matter jurisdiction may challenge a

plaintiff's complaint either on its face or on the factual truthfulness of its averments.

*Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted). When

a defendant brings a facial challenge—a challenge that, even if truthful, the facts alleged

in a claim are insufficient to establish jurisdiction—a court reviews the pleadings alone,

and the non-moving party receives the same protections as it would defending against a

motion brought pursuant to Rule 12(b)(6). *Id.* (citation omitted). In a factual challenge

to jurisdiction, the court may consider matters outside the pleadings, and the non-moving

party does not benefit from the safeguards of Rule 12(b)(6). *Id.* at 728-30 n.4 (citations

omitted) (holding that on a Rule 12(b)(1) motion challenging subject-matter jurisdiction,

the court "has authority to consider matters outside the pleadings").

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all

facts in the complaint to be true and construes all reasonable inferences from those facts

in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th

Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory

allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th

Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v.

City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the

complaint, matters of public record, orders, materials embraced by the complaint, and

exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the United States Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

## II.     Justiciability

Defendants argue that Plaintiffs' claims are non-justiciable for two reasons. First, Defendants assert that Plaintiffs lack standing to bring their claims. Second, with respect to Plaintiffs' claim under the Medicaid Act's reasonable promptness requirement, Defendants argue that this claim is not ripe for review.

### A.     Standing

Defendants argue that Plaintiffs lack standing because they do not have a legally-protected interest in the provision of dedicated, trained, person-centered planners and therefore they fail to allege an injury in fact. Defendants also note that the Medicaid Act does not prohibit the provision of services in a congregate setting. Because the

Secretary of the Department of Health and Human Services ("HHS") has not determined that Plaintiffs' residences are not home and community-based settings under applicable federal regulations, Defendants argue that Plaintiffs cannot establish an imminent injury. In addition, Defendants argue that because one of the plaintiffs did receive person-centered-planning, she has no actual, concrete injury. Finally, Defendants argue that Plaintiffs cannot demonstrate redressability because it is wholly speculative that the services they seek will remedy the harm they allege.

Plaintiffs, on the other hand, argue that they have alleged a concrete injury—segregation—which is caused by Defendants and which can be redressed by the requested relief. According to Plaintiffs, the relief they seek includes: (1) reasonably prompt payment authorization and provision of services to develop individualized plans to move out of CRS facilities; and (2) reasonable modifications to the state's residential service system so that they will have an opportunity to implement these plans. Plaintiffs contend that Defendants' arguments regarding standing ignore Plaintiffs' fundamental injury of segregation.

"[S]tanding is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). "The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The burden corresponds with the degree of evidence required at the relevant stage of litigation. *Id.* "Where . . . a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547

18

(2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  However, at this stage, "general factual allegations of injury . . . may suffice."  *Lujan*, 504 U.S. at 561; *see also Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).  If a plaintiff lacks standing, a district court has no subject matter jurisdiction over the matter and must dismiss the case.  *Young Am. Corp. v. Affiliated Comp. Servs., Inc.*, 424 F.3d 840, 843 (8th Cir. 2005).

Article III of the Constitution limits the power of the federal courts to deciding only actual "cases" and "controversies."  U.S. Const., art. III, § 2, cl. 1.  To establish constitutional Article III standing, a plaintiff must demonstrate:  (1) an injury-in-fact; (2) a causal connection between that injury and the challenged conduct; and (3) the likelihood that a favorable decision by the court will redress the alleged injury.  *Lujan*, 504 U.S. at 560.  These constitutional requirements of standing limit federal courts to deciding only cases where the plaintiffs can show a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The injury-in-fact requirement requires the plaintiff to demonstrate that he has experienced "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).  With respect to statutory violations, "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'"  *Spokeo, Inc.*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S. at 578); *see also Lujan*, 504 U.S. at 578 (noting as an

example "injury to an individual's personal interest in living in a racially integrated community").

Where the plaintiff alleges a statutory violation, a concrete injury must still be established. *Spokeo, Inc.*, 136 S. Ct. at 1549. However, the Supreme Court has explained that, "[a]lthough tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete." *Id.* A procedural violation may also meet the injury-in-fact requirement "'so long as the procedures in question are designed to protect some threatened concrete interest of [the petitioner] that is the ultimate basis of his standing.'" *Iowa League of Cities*, 711 F.3d at 870-71 (quoting *Lujan*, 504 U.S. at 573 n.8).

A plaintiff seeking injunctive relief must show that he "faces a threat of ongoing or future harm." *Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037 (8th Cir. 2000). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Likewise, a plaintiff's speculation that a future injury may occur is not sufficient to warrant injunctive relief. *Id.* at 497. A plaintiff must show that the threat of injury is "real and immediate." *Id.* at 496.

The Supreme Court has explained that "[w]hen the suit is one challenging the legality of government action or inaction" and "the plaintiff is himself an object of the action (or forgone action) at issue . . ., there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action

will redress it." *Lujan*, 504 U.S. 561-62; *see also Iowa League of Cities*, 711 F.3d at 871. However, establishing redressability requires the plaintiff to show that it is "more than merely speculative that the relief requested would have any effect to redress the harm to the plaintiff." *Young Am. Corp.*, 424 F.3d at 845 (quoting *Hall v. LHACO, Inc.*, 140 F.3d 1190, 1196 (8th Cir. 1998)).

The primary injury Plaintiffs allege they are facing is segregation. While perhaps not tangible, this injury is indeed concrete and particular to Plaintiffs. Through the ADA and the RA, Congress has elevated the segregation of individuals with disabilities "to the status of [a] legally cognizable injur[y]." *See Spokeo, Inc.*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S. at 578); *see also Guggenberger*, 198 F. Supp. 3d at 1023-24 (providing an overview of relevant ADA and RA provisions). In the Amended Complaint, Plaintiffs allege particular and personal examples of segregation. For example, Murphy asserts he "spends most of his time alone," despite wishing "to interact with other people." (Am. Compl. ¶ 29(g).) Bottelson asserts that she "does not get out into the community nearly as much as she would if she were able to create her own schedule." (*Id.* ¶ 30(f).) Swanson alleges that she has been told "she is not 'independent enough' for individualized housing," and asserts a need for services so that she can "live in the most integrated setting appropriate to her needs." (*Id.* ¶¶ 31(b), 31(e).) Plaintiffs also allege that the injury of segregation can itself result in further harm for many individuals residing in CRS facilities, including diminished "social and independent living skills," decreased likelihood of "living and working in the community" in the future, and "lower self-esteem and lowered expectations of themselves." (*Id.* ¶¶ 78-79.) These allegations

sufficiently establish an injury-in-fact to support Plaintiffs' claims under the ADA and the RA.

Plaintiffs' concrete injury of segregation also supports standing to pursue their Medicaid Act and Due Process claims. As further discussed below, the Medicaid Act's reasonable promptness and fair hearing requirements create privately enforceable rights that can be asserted in a § 1983 claim. Plaintiffs' Amended Complaint illustrates how the alleged statutory violations of these provisions and the alleged violations of Plaintiffs' Fourteenth Amendment Due Process rights correlate with the concrete injury they are facing through their ongoing segregation. In particular, Plaintiffs allege that they each receive a Disability Waiver to fund certain services. (*Id.* ¶ 2.) Plaintiffs allege that the services available under the Disability Waivers are "designed to help people with disabilities live in his or her own home and interact with the larger nondisabled community." (*Id.* ¶¶ 33-34.) Plaintiffs also allege that specific Disability Waiver services, described as "individualized housing services," exist that would permit them "to design and implement a customized setting for [them] to live, work, and enjoy leisure time in the most integrated setting." (*Id.* ¶¶ 7, 82.) According to Plaintiffs, they are presently experiencing the concrete harm of segregation from their community because they are not receiving these services in a reasonably prompt manner (or at all) and have

not received notice or information necessary to exercise their due process rights.  Thus, Plaintiffs have standing to pursue these claims.[3]

In light of the Court's conclusions regarding Plaintiffs' injury-in-fact, the Court concludes there is "little question" that Plaintiffs have adequately established causation and redressability at this stage.  *Lujan*, 504 U.S. 561-62; *see also Iowa League of Cities*, 711 F.3d at 871.  Plaintiffs allege numerous actions and inactions undertaken by Defendants that are causally connected to Plaintiffs' failure to receive individualized housing services and their resulting segregation.  For example, Plaintiffs contend that "Defendants approve the funding of Disability Waiver services in CRS facilities while failing to ensure that such a setting is the most integrated setting appropriate for the individual."  (Am. Compl. ¶ 70.)  Plaintiffs also allege that Commissioner Johnson Piper "has failed to establish administrative procedures that ensure individuals who are qualified for and requesting services to help transition to a more integrated setting will actually receive those services."  (*Id.* ¶ 107.)  Based on the detailed allegations in the Amended Complaint relating to Defendants' role in overseeing the provision of Disability Waiver services throughout the state, Plaintiffs have established causation to support standing.

---

[3]     The Court reaches this conclusion with respect to all named Plaintiffs, notwithstanding the fact that Bottelson alleges receiving some person-centered-planning services in the past.  (*See id.* ¶ 30(k).)  According to the Complaint, Bottelson has nonetheless "not received all the necessary individualized housing services to help her find or develop alternatives to her current CRS facility."  (*Id.*)  Thus, the Court concludes that Bottelson has standing to challenge Defendants' failure to ensure she has received all such services.

At the pleading stage, Plaintiffs have also adequately alleged that it is likely that their alleged injury will be redressed by the relief sought. Plaintiffs request declaratory and injunctive relief tied to Defendants' purported violations of the Medicaid Act, the Fourteenth Amendment, the ADA, and the RA. In particular, Plaintiffs request an injunction that would require Defendants to provide prompt notice regarding the availability of individualized housing services to Disability Waiver recipients living in CRS facilities. (Am. Compl. at Prayer for Relief ¶ 4(a).) Plaintiffs also seek an order directing Defendants to "provide access and take prompt steps to make individualized housing services, including person-centered planning, available to Plaintiffs in a reasonable amount of time." (*Id.* at Prayer for Relief ¶ 4(b).) In addition, Plaintiffs request injunctive relief requiring Defendants to take the necessary steps "to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs." (*Id.* at Prayer for Relief ¶ 4(c).) The Court is persuaded at this stage that these measures would likely redress Plaintiffs' alleged harms. To be sure, Plaintiffs must ultimately provide evidence to support their allegations relating to the effectiveness of individualized housing services in leading to greater integration in the community. At this stage, however, Plaintiffs' factual allegations suffice to establish standing.

In sum, the Court concludes that Plaintiffs have adequately established standing. With respect to each claim, Plaintiffs allege particular, concrete harms to their legally-protected interests which are caused by Defendants and likely to be redressed by the requested relief. In particular, the Court concludes that Plaintiffs have adequately established standing to pursue injunctive relief by alleging "ongoing . . . harm" and

"continuing, present adverse effects" of Defendants' prior conduct. *See Park*, 205 F.3d at 1037; *O'Shea*, 414 U.S. at 495-96.

**B.**      **Ripeness**

Defendants also question the justiciability of Plaintiffs' Amended Complaint with respect to Count I, Plaintiffs' Medicaid Act's reasonable promptness claim. According to Defendants, this claim is not ripe because federal regulations relating to the provision of home and community-based waiver services have established a transition period for states to come into compliance with new regulations defining what constitutes a community-based setting. Defendants assert that Plaintiffs' reasonable promptness claim is not ripe because the state is in the process of implementing a transition plan to come into compliance with these regulations, and the state does not need to establish compliance until the transition period is over.

Plaintiffs counter that their claims are ripe. Plaintiffs assert that they have alleged a direct injury, and the issues presented are fit for judicial review. Plaintiffs argue that Defendants' violations of the reasonable promptness provision result in actual ongoing harms and do not depend on contingent future events. In addition, Plaintiffs suggest that Defendants have not articulated how further factual developments relating to the new federal regulations will address Plaintiffs' claims under the reasonable promptness provision. Plaintiffs contend that their harms will continue to exist even if the HHS Secretary determines that the settings in which they reside are "community-based" under the 2014 rule.

As with standing, the ripeness doctrine ensures that a court's exercise of jurisdiction meets both the constitutional requirements of Article III and prudential limitations. *See Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1037 (8th Cir. 2000). The Supreme Court has explained:

> [The ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967).

Under the fitness factor, "[t]he case is more likely to be ripe if it poses a purely legal question and is not contingent on future possibilities." *Pub. Water Supply Dist. No. 10 of Cass Cty. v. City of Peculiar, Mo.*, 345 F.3d 570, 573 (8th Cir. 2003); *see also Parrish v. Dayton*, 761 F.3d 873, 875-76 (8th Cir. 2014). Even if a dispute raises some contingencies, however, a court may properly exercise review "where an issue is largely legal in nature, may be resolved without further factual development, or where judicial resolution will largely settle the parties' dispute." *Neb. Pub. Power*, 234 F.3d at 1038 (citations omitted).

Under the hardship factor, a court may consider both financial harm and harm caused by "uncertainty-induced behavior modification in the absence of judicial review." *Iowa League of Cities*, 711 F.3d at 867. The immediacy and directness of the harm is also relevant. *See Abbott Labs.*, 387 U.S. at 152. The ripeness factors "are weighed on a

sliding scale, but each must be satisfied 'to at least a minimal degree.'" *Iowa League of Cities*, 711 F.3d at 867.

The Eighth Circuit has previously identified "the extent to which judicial intervention would interfere with administrative action" as a third relevant factor in the ripeness inquiry. *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 692-93 (8th Cir. 2003). An assertion of ongoing agency action, however, will not always prevent the court's exercise of jurisdiction. *See* 13B Charles Alan Wright et al., *Federal Practice & Procedure* § 3532.6 (3d ed. Apr. 2017 Update) ("[A]ny agency attempt to defeat review by the bare assertion that the agency position may some day change should be summarily rejected."). In addition, "protracted inaction by state officials may itself be a wrong, or at least defeat any claim that a federal court should await further state developments." *Id.* § 3532.3; *see also Groome Resources Ltd., L.L.C. v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000). Further, ripeness is not automatically defeated by ongoing revision or implementation of an administrative agency's regulatory plan, *see Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Oh., E. Div.*, 565 F.2d 393, 397-98 (6th Cir. 1977), or by the possibility of future regulatory changes, *see Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency*, 906 F.2d 729, 739-40 (D.C. Cir. 1990).

The Court concludes that Plaintiffs' reasonable promptness claim is presently ripe for review. Under this claim, Plaintiffs present issues that are fit for judicial review, and the Court is not persuaded that further factual developments will materially impact the Court's analysis of this claim. Even if the CRS facilities in which Plaintiffs reside are eventually determined not to run afoul of the home and community-based service

regulations regarding congregate settings, Plaintiffs presently have a viable claim based on Defendants' failure to ensure prompt provision of individualized housing services under the Disability Waivers. Plaintiffs allege that Disability Waiver funds can be utilized "to design and implement a customized setting for the individual to live, work, and enjoy leisure time in the most integrated setting." (Am. Compl. ¶ 7.) Such a setting may also include "homes of their own." (*Id.* ¶ 84.)

Notwithstanding the ultimate determination under new federal regulations regarding whether the CRS facilities in which Plaintiffs reside are determined to be proper settings in which Disability Waiver funding can be utilized, Plaintiffs assert that these facilities are not the most integrated setting for them at this time. (*Id.* ¶¶ 29(m), 30(f), 31(e).) The resolution of Plaintiffs' claims, therefore, does not depend on further factual developments relating to the new federal regulations. In addition, as the Court detailed above, Plaintiffs have adequately alleged that they are presently facing direct, ongoing harms based on Defendants' alleged failure to provide reasonably prompt access to Disability Waiver services that could facilitate their transition to more integrated settings. Plaintiffs acknowledge that Defendants have implemented certain plans and protocols in these areas, but allege that these measures are inadequate to remedy their alleged harms. (*See id.* ¶¶ 53-63.) Although Defendants are implementing a transition plan that may impact the Court's evaluation of Plaintiffs' reasonable promptness claim, the Court concludes this claim is ripe.

### III.    Plaintiffs' Claims

#### A.    Count I:  Reasonable Promptness Under the Medicaid Act

Count I of Plaintiff's Amended Complaint alleges a violation of 42 U.S.C. § 1983 through failure to furnish services with reasonable promptness in violation of 42 U.S.C. § 1396a(a)(8).  Defendants argue that Plaintiffs have failed to state a claim with respect to Count I.

The reasonable promptness requirement provides that "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).  Payment for home and community-based Disability Waiver services is deemed "medical assistance" under the Medicaid Act.  See 42 U.S.C. § 1396n(c)(1). Regulations also require the state to establish time standards to determine an individual's eligibility for Medicaid in no more than ninety days and to "[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures." *See* 42 C.F.R. § 435.912; *id.* § 435.930; *see also Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 717 (11th Cir. 1998); *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 72-73 (D. Mass. 2000).

Plaintiffs assert their reasonable promptness claim under 42 U.S.C. § 1983. Before proceeding to Defendants' particular challenges to Plaintiffs' reasonable promptness claim, the Court incorporates and adopts its analysis and holding in *Guggenberger* and concludes that the reasonable promptness provision is privately enforceable under § 1983 for eligible individuals.  *See Guggenberger*, 198 F. Supp. 3d at

1006-07.  Plaintiffs, current Disability Waiver recipients, may privately enforce their right to reasonably prompt medical assistance via § 1983 in this case.

Defendants raise numerous challenges to Plaintiffs' claim alleging a violation of the Medicaid Act's reasonable promptness requirement.  First, Defendants assert that Plaintiffs' reasonable promptness claim is inadequately pled because Plaintiffs have failed to allege facts regarding how long they have waited for services.  Defendants point to cases in which plaintiffs alleged waiting several years for waiver services.  Here, however, Defendants argue that Plaintiffs have made no such factual allegations.  Second, Defendants assert that waiver services are not an entitlement, and guidance from the Center for Medicare and Medicaid Services ("CMS") suggests states cannot be held responsible for delays resulting from a lack of available providers.  Defendants also reference the five-year transition period for bringing state Medicaid plans into compliance with the new federal regulations relating to home and community based services and person-centered planning.  Third, Defendants argue that Plaintiffs have failed to allege that "individualized housing services" were requested by Plaintiffs or authorized by counties.  Defendants assert that "[w]ithout more detailed allegations regarding determination of need and prior authorization," Plaintiffs' reasonable promptness claim fails.  (Doc. No. 24 at 5-6.)  Fourth, Defendants acknowledge that the Medicaid Act defines "medical assistance" to include payment or provision of services or both, but argue that states need not provide all services.

Plaintiffs argue that they have pled a viable reasonable promptness claim.  First, Plaintiffs argue that "Defendants' inconsistent management of the [Disability Waiver

program] . . . prevents Plaintiffs from being authorized for receiving these services, let alone in a timely manner (and sometimes at all)."  (Doc. No. 22 at 26.)  Plaintiffs contend that they have adequately alleged that they made requests for services and have not received such services for varying periods of time or indefinitely.  Second, Plaintiffs argue that the reasonable promptness requirement applies to both payment for and provision of services.  Third, Plaintiffs argue that there is no particular time frame required to state a reasonable promptness claim.  Plaintiffs also suggest that the deadline to comply with new federal regulations governing Disability Waivers does not make Defendants' delay in this case reasonably prompt.  Fourth, Plaintiffs argue that the reasonable promptness provision applies to Disability Waiver services even if they are not an absolute entitlement.

The Court again finds its prior analysis and reasoning in *Guggenberger* to be instructive.  *See generally Guggenberger*, 198 F. Supp. 3d at 1007-14.  The plaintiffs in *Guggenberger* asserted a § 1396a(a)(8) reasonable promptness claim based on being placed on waiting lists for Disability Waiver services when funds were allegedly available to provide them with services.  *Id.* at 1013.  The Court summarized relevant caselaw pertinent to the reasonable promptness inquiry and identified multiple relevant "principles courts should consider when applying § 1396a(a)(8)'s requirement that medical assistance 'shall be furnished with reasonable promptness to all eligible individuals' in the context of Waiver Services."  *Id.* at 1012.

First, "individuals who qualify for Waiver Services do not have an absolute entitlement to such services."  *Id.*  As numerous courts have determined, some limits on

the allocation of Disability Waiver services may be appropriate and reasonable. *See id.* (citing *Bertrand v. Maram*, 495 F.3d 452, 457 (7th Cir. 2007); *Bryson v. Shumway*, 308 F.3d 79, 86 (1st Cir. 2002); *Susan J. v. Riley*, 254 F.R.D. 439, 448 (M.D. Ala. 2008); *Makin ex rel. Russell v. Hawaii*, 114 F. Supp. 2d 1017, 1021-23 (D. Haw. 1999)).  At the same time, "with respect to otherwise eligible individuals . . . for whom funding is available, a state's failure to fill available waiver slots or use funding appropriated for Waiver Services may violate the reasonable promptness requirement or at least raise questions as to whether such a violation has occurred." *Guggenberger*, 198 F. Supp. 3d at 1012 (citing *Bryson*, 308 F.3d at 89; *Lewis v. New Mexico Dep't of Health*, 275 F. Supp. 2d 1319, 1345 (D.N.M. 2003); *Boulet*, 107 F. Supp. 2d at 78-89; *Makin*, 114 F. Supp. 2d at 1028, 1031).  In particular, "[b]ecause Medicaid regulations require the state to '[f]urnish Medicaid promptly to beneficiaries without any delay caused by the agency's administrative procedures,' *see* 42 C.F.R. § 435.930, a state's mismanagement of allocated funding, which leads to an unreasonable delay in the provision of services, may establish a violation of the reasonable promptness requirement." *Guggenberger*, 198 F. Supp. 3d at 1012.  In *Guggenberger*, the Court determined under these principles that the plaintiffs plausibly stated a reasonable promptness claim based on the state defendants' alleged mismanagement of available Waiver Services funding. *Id.* at 1013.

In this case, Plaintiffs are not on waiting lists but rather are actually enrolled recipients of a Disability Waiver.  Their reasonable promptness claim rests on the allegedly unwarranted delay in receiving access to certain services available under the Disability Waivers.  Along with the principles summarized above and discussed in

*Guggenberger*, Defendants have identified relevant HHS Guidance that provides additional principles to illuminate the Court's analysis of this claim. *See* U.S. Dep't of Health & Human Services, *Olmstead Update No: 4, HCFA Update* (Jan. 10, 2001) ("2001 HHS Guidance"), available at Doc. No. 13-1 at 36. According to this guidance, "[a] State is obliged to provide all people enrolled in the waiver with the opportunity for access to all needed services covered by the waiver and the Medicaid State plan." *Id.* at 5. As with the placement of individuals onto Disability Waivers itself, however, states may reasonably limit access to services available under a waiver. Specifically, "[t]he State may impose reasonable and appropriate limits or utilization control procedures based on the need that individuals have for services covered under the waiver." *Id.* at 5-6.

Thus, whether an individual has a right to receive a certain service "is dependent on a finding that the individual needs the service, based on appropriate assessment criteria that the State develops and applies fairly to all waiver enrollees." *Id.* at 6. In addition, the HHS guidance acknowledges that states may be limited in their ability to timely provide certain services based on constraints such as "supply of providers, or similar factors." *Id.* While recognizing these limits, the 2001 HHS Guidance also notes the following important principle: "Once in the waiver, an enrolled individual enjoys protection against arbitrary acts or inappropriate restrictions, and the State assumes an obligation to assure the individual's health and welfare." *Id.* Ultimately, "the question of reasonable promptness is a difficult one," and many variables must be considered to evaluate whether a state is providing needed Disability Waiver services in a reasonably

prompt manner.  *See id.* (noting variables including "[t]he urgency of an individual's need, the health and welfare concerns of the individual, the nature of the services required, the potential need to increase the supply of providers, [and] the availability of similar or alternative services").

At this stage, the Court concludes that Plaintiffs have stated a viable reasonable promptness claim based on Defendants' alleged failure to ensure reasonably prompt access to the individualized housing services they seek.  Defendants acknowledge that the particular services Plaintiffs identify in their Amended Complaint—Housing Access Coordination and Transition Services and Family Training and Counseling—are available under the Disability Waivers.  (Doc. No. 12 at 4-5.)  Specifically, Defendants agree that "waiver services will cover the cost of a dedicated, professional person-centered planner."  (Doc. No. 12 at 12.)  However, Defendants simply assert that they cannot be required to provide these services upon request.  In particular, Defendants argue that Plaintiffs fail to state a claim because they have not alleged the particular lengths of time they have been waiting and have not alleged that they were authorized by local agencies to receive the requested services.

First, the Court disagrees that individuals must allege a particular length of delay to adequately state a violation of the reasonable promptness provision.  Here, Plaintiffs assert that they have made requests for services and yet remain "stuck" in their current living arrangements.  (*See* Am. Compl. ¶¶ 29(k), 29(m), 29(n), 30(d), 30(k), 30(l), 31(e), 31(f).)  Murphy asserts his guardian "has asked several people at the lead agency about accessing more individualized housing options."  (*Id.* ¶ 29(k).)  Bottelson has similarly

made requests of multiple case managers since at least 2013. (*Id.* ¶¶ 30(i), 30(j).) Swanson alleges she has asked for individualized housing services "for a long time" without receiving any. (*Id.* ¶ 31(f).) Plaintiffs also allege that "Defendants currently approve some limited individualized alternatives for a small number of Disability Waiver recipients." (*Id.* ¶ 67.) The Court concludes that Plaintiffs' allegations of seemingly arbitrary and inexplicable failures to adequately respond to requests for services adequately support a reasonable promptness claim.

Second, to the extent there remains any disagreement between the parties on this issue, the Court concludes that the reasonable promptness provision applies to both the payment for services and the provision of services themselves. The Medicaid Act defines "medical assistance" as "payment of part or all of the cost of . . . care and services or the care and services themselves, or both . . . ." 42 U.S.C. § 1396d(a). The Court joins the numerous other courts interpreting this statutory provision who have determined that "Congress intended to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them." *O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) (quoting *A.H.R. v. Washington State Health Care Auth.*, 2016 WL 98513, at *12 (W.D. Wash. Jan. 7, 2016)); *see also Leonard v. Mackereth*, 2014 WL 512456, at *6-7 (E.D. Penn. Feb. 10, 2014) (explaining how the legislative history underlying the amended definition of "medical assistance" supports this interpretation). While numerous factors must be evaluated to determine whether certain services are being provided in a

reasonably prompt manner, the statutory language clearly covers both funding and services.

Finally, the Court concludes that Plaintiffs' failure to allege prior authorization for individualized housing services is not fatal to their claim. Critically, Plaintiffs appear to agree that they have not been previously authorized for the services they seek. However, the Court concludes that this lack of authorization supports rather than undermines the sufficiency of Plaintiffs' reasonable promptness claim in this case. Plaintiffs cannot allege facts to show that they have been previously authorized for individualized housing services because their county case managers have failed to even offer such services as a viable alternative to their current placement in CRS facilities. This failure, Plaintiffs allege, is due to Defendants' lack of oversight to ensure that individualized housing services are offered and ultimately authorized by counties statewide. (*See* Am. Compl. ¶ 107.) Although states may limit the provision of Waiver Services to enrolled individuals "based on appropriate assessment criteria" which are "applie[d] fairly to all waiver enrollees," a state may not engage in "arbitrary acts" and cannot impose "inappropriate restrictions" on the provision of services once an individual is enrolled in a Disability Waiver. *See* 2001 HHS Guidance.

At this stage, Plaintiffs have adequately alleged that they are not being offered services in a reasonably prompt manner based on arbitrary or nonexistent assessment criteria. According to Plaintiffs, counties either fail to adequately assess their need for individualized housing services or fail to even mention the availability of such services, resulting in an unreasonable delay in the provision of services covered under the

Disability Waivers.  In light of the complex, fact-specific inquiry required to evaluate a reasonable promptness claim, the Court concludes that Plaintiffs have adequately stated a viable claim.  Thus, the Court denies Defendants' Motion to Dismiss Plaintiffs' reasonable promptness claim.[4]

### B.    Count II:  Due Process

In Count II of their Amended Complaint, Plaintiffs allege a violation of their due process rights under both the Fourteenth Amendment's Due Process Clause and the Medicaid Act's fair hearing requirements.  Defendants assert that Plaintiffs have failed to state a claim for a violation of their due process rights.  Defendants specifically challenge this claim under the Fourteenth Amendment and do not directly challenge Plaintiffs' allegations relating to the Medicaid Act.  However, the Court will address this claim under both sources below to evaluate whether Plaintiffs have stated a claim.

#### 1.    Fourteenth Amendment Due Process

With respect to Plaintiffs' Due Process claim, Defendants first argue that Plaintiffs do not have a legally protected interest in the services they seek.  According to Defendants, Plaintiffs claim they have been denied "individualized housing services," but

---

[4]      The Court also concludes that the transition period to come into compliance with new federal regulations relating to Disability Waiver services does not require dismissal of Plaintiffs' reasonable promptness claim.  Defendants appear to be raising the CMS Regulations and the corresponding transition period as a defense to Plaintiffs' reasonable promptness claim.  While such a defense may impact the Court's ultimate analysis of Plaintiffs' claims, the Court concludes this argument is premature.  *Cf. Wagner v. Dept. of Health Servs.*, 2013 WL 3776327, at *7 (W.D. Wis. July 17, 2013) ("At best, this argument is premature.  At this stage, defendants cannot seek to dismiss the complaint for failure to state a claim by invoking the specter of arguments that they may later raise in defense or, at least, on a more complete record.").

fail to define what this means. Accordingly, Defendants argue, the Court cannot

determine whether Plaintiffs have a legitimate claim of entitlement to these services to

support their Due Process claim. Further, Defendants assert that this Court has held that

Disability Waiver services are not an entitlement. Defendants also argue that Disability

Waivers provide payment for services not the services themselves. Second, Defendants

argue that even if Plaintiffs have a protectable interest, they have an opportunity to appeal

an adverse determination under Minnesota law. Defendants argue that because Plaintiffs

admit that they receive notice during the MnCHOICES assessment process and because

Minnesota law provides for an opportunity to be heard, their claim fails as a matter of

law. In addition, Defendants assert that Plaintiffs must exhaust available state remedies

before asserting a § 1983 Due Process claim.

Plaintiffs, on the other hand, argue that they have a legally protected property

interest in Disability Waiver services as enrolled Disability Waiver recipients based on

federal and state law governing Disability Waivers. Plaintiffs note that Defendants admit

that several of the services Plaintiffs seek are covered under the Disability Waivers. With

respect to available state remedies, Plaintiffs argue that the legal right to appeal under

state law is not sufficient to resolve their Due Process claim because Plaintiffs have not

been given adequate notice outlining the reasons for the denial or services or how to

challenge these denials. Plaintiffs argue that Defendants have routinely failed to provide

proper written notice in violation of their Due Process rights. Plaintiffs also point to the

Court's recent decision in *Guggenberger* to suggest that Defendants' exhaustion

argument does not preclude their Due Process claim.

The Due Process Clause of the Fourteenth Amendment prohibits the states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a procedural due process claim, a plaintiff must demonstrate: (1) the existence of a constitutionally protected liberty or property interest; and (2) that the defendant deprived the plaintiff of that interest without constitutionally adequate process. *See Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013); *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817 (8th Cir. 2011). The Court concludes Plaintiffs have adequately stated a claim for a violation of their procedural due process rights.

First, Plaintiffs have a legally protected property interest in Disability Waiver services as Disability Waiver recipients. "To have a property interest in a benefit, a person . . . must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). Property interests arise not from the Constitution itself, but from "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*

In *Guggenberger*, this Court explained "that Waiver Services are not an absolute entitlement given the limited nature of the Waiver Services program." 198 F. Supp. 3d at 1020. At the same time, however, the Court concluded that "state and federal statutes create a legitimate claim of entitlement to Waiver Services for eligible individuals who meet the state's priority criteria and for whom there is sufficient funding available." *Id.*

39

Thus, the Court concluded that the plaintiffs in *Guggenberger*—eligible individuals on waiting lists for Disability Waiver services—adequately established that they had a legally protected property interest to support a due process claim by alleging that there was funding available to provide them with services. *Id.*

Here, the Court concludes that Plaintiffs have an even clearer entitlement to the services they seek as they are already enrolled Disability Waiver recipients. Under Minnesota law, "[t]he commissioner shall apply for the home and community-based waivers in order to . . . promote the support of persons with disabilities in the most integrated settings." Minn. Stat. § 256B.49, subd. 11(a)(1). Services under the Disability Waivers "shall promote consumer choice, community inclusion, self-sufficiency, and self-determination." *Id.* § 256B.49, subd. 16(a). The commissioner is directed to "simplify and improve access to home and community-based waivered services, to the extent possible, through the establishment of a common service menu that is available to eligible recipients regardless of age, disability type, or waiver program." *Id.* § 256B.49, subd. 16(b).

Disability Waiver recipients must be provided "case management services" which provide assistance in accessing services. *Id.* § 256B.49, subd. 13; *see also id.* § 256B.092, subd. 1a. For example, case management includes "assisting the recipient to access services and assisting with appeals" as well as "coordinating, evaluating, and monitoring of the services identified in the service plan." *Id.* § 256B.49, subd.13(a)(4)-(5). Case managers exercise "professional judgment" and may not delegate their responsibility over certain aspects of their duties, including the "ongoing

assessment and monitoring of the person's needs and adequacy of the approved coordinated service and support plan" and "adjustments to the coordinated service and support plan." *Id.* § 256B.49, subd. 13(b)(2)-(3). In addition, Minnesota law requires Commissioner Johnson Piper to "take the necessary safeguards to protect the health and welfare of individuals provided services under the waiver." *Id.* § 256B.49, subd. 19.

Consistent with these state law provisions, Plaintiffs allege that the Disability Waivers are designed to ensure access to a variety of services which enable individuals with disabilities to be integrated into their communities. (Am. Compl. ¶¶ 33-34.) Further, Plaintiffs allege that individualized housing services are available under the Disability Waivers. (*Id.* ¶ 7, 25, 84.) At this stage and in light of Plaintiffs' allegations regarding the availability of the services they seek under the Disability Waivers, Plaintiffs have plausibly established that they have a "legitimate claim of entitlement to" individualized housing services. *See Roth*, 408 U.S. at 577.

Second, Plaintiffs have plausibly alleged that they have not received adequate procedural protections. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The opportunity to be heard must be coupled with "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The requirements of notice and an opportunity to be heard are necessarily intertwined and dependent upon one another: "Adequate notice is integral to

the due process right to a fair hearing, for the 'right to be heard has little reality or worth unless one is informed.'" *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir. 1997) (quoting *Mullane*, 339 U.S. at 314).

Ultimately, the requirements of due process are flexible and depend upon the particular situation involved and the interests at stake. *See Mathews*, 424 U.S. at 334. In evaluating the sufficiency of the available procedures, courts consider three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

Plaintiffs allege they have received no notice or information about their due process rights in connection with the determinations by lead agencies to deny them individualized housing services. (*See id.* ¶¶ 29(n); 30(l); 31(f).) In particular, Plaintiffs allege that Commissioner Johnson Piper has "failed to provide Plaintiffs notice of adverse action and opportunity to challenge the failure to provide these individualized housing services" and has also failed to require lead agencies to do so. (*Id.* ¶¶ 112-13.) According to Plaintiffs, "[t]hese failures have resulted in ongoing harm and Plaintiffs' continued inability to receive individualized housing services." (*Id.* ¶ 114.)

At this stage, the Court concludes that Plaintiffs have plausibly alleged inadequate procedural protections under the *Mathews* factors. As in *Guggenberger*, "Plaintiffs have a legitimate and important interest in the services they seek which would enable them to

more fully integrate into their communities and achieve independence in their lives like individuals without disabilities." *See* 198 F. Supp. 3d at 1021. Also like in *Guggenberger*, "the risk of erroneous deprivation is significant if individuals have no knowledge of the factual basis underlying the decision to [deny them services] and no meaningful opportunity to challenge that decision." *See id.* Finally, "the government would not be unduly burdened by a requirement that Defendants ensure counties provide a detailed notice explaining the reasons for [denying individualized housing services] and explaining that such [denial] can be appealed under existing state administrative procedures." *See id.*

Third, although exhaustion of state administrative remedies is required prior to asserting a § 1983 due process claim challenging the adequacy of postdeprivation procedures, such exhaustion is not required when a plaintiff challenges predeprivation procedures such as inadequate notice. *See Raymond v. Bd. of Regents*, 847 F.3d 585, 590 (8th Cir. 2017) ("[I]t is not necessary for a litigant to have exhausted available *postdeprivation* remedies when the litigant contends that he was entitled to *predeprivation* process." (quoting *Keating v. Neb. Pub. Power Dist.*, 562 F.3d 923, 929 (8th Cir. 2009))). Notwithstanding the availability of state appeal rights by which individuals with disabilities can purportedly challenge improper service denials, *see* Minn. Stat. § 256.045, subd. 3, Plaintiffs here allege inadequate predeprivation process in the form of specific notices that would facilitate a meaningful right to be heard. *See Bliek*, 102 F.3d at 1476 ("A plainly written, informative notice is imperative . . . to make the hearing to which the plaintiffs are entitled meaningful."). Thus, Plaintiffs' § 1983

claim is not subject to dismissal for failure to exhaust state appeal rights. The Court

concludes that Plaintiffs' Fourteenth Amendment Due Process claim should proceed.

### 2. Medicaid Act Fair Hearing Requirement

Plaintiffs' § 1983 Due Process claim also rests on the Medicaid Act's notice and

hearing requirements outlined in 42 U.S.C. § 1396a(a)(3) and corresponding regulations.

Defendants have not raised specific arguments to challenge the adequacy of Plaintiffs'

claim on this basis. The Court will nonetheless address the Medicaid Act's requirements

as they support and reinforce Plaintiffs' Fourteenth Amendment Due Process claim.

The Medicaid Act requires state plans to "provide for granting an opportunity for a

fair hearing before the State agency to any individual whose claim for medical assistance

. . . is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3).

Further, when "the agency denies an individual's claim for eligibility, benefits or

services," the agency must provide the beneficiary with written notice of the right to a

hearing, the method of obtaining a hearing, and the right to represent oneself or use a

representative. 42 C.F.R. § 431.206. Such notice must include "[a] statement of what

action the agency . . . intends to take" along with "[a] clear statement of the specific

reasons supporting the intended action." *See id.* § 431.210. Plaintiffs assert a § 1983

claim against Defendants based on their purported violation of these fair hearing and

notice requirements.

The Court hereby adopts and incorporates its analysis and holding in

*Guggenberger* that the Medicaid Act's fair hearing requirements under § 1396a(a)(3) are

enforceable in a § 1983 claim by "any individual whose claim for medical assistance . . .

is denied or is not acted upon with reasonable promptness." *See* 42 U.S.C. § 1396a(a)(3). In light of Plaintiffs' allegations of being denied reasonably prompt access to individualized housing services without adequate notice or an opportunity to be heard in connection with such denials, the Court concludes Plaintiffs have plausibly alleged violations of their due process rights under the Medicaid Act's fair hearing requirements.

In sum, Plaintiffs have adequately alleged violations of their due process rights under both the Fourteenth Amendment and the Medicaid Act's fair hearing requirements. Thus, the Court denies Defendants' Motion to Dismiss on this basis.

### C.     Counts III & IV:  Violation of the Americans with Disabilities Act and § 504 of the Rehabilitation Act

Counts III and IV of Plaintiff's Amended Complaint allege violations of Title II of the ADA, 42 U.S.C. § 12132, and § 504 of the RA, 29 U.S.C. § 794(a).  Defendants argue that Plaintiffs have failed to state viable claims under either provision.

First, Defendants argue that Plaintiffs' RA claim must fail because Plaintiffs have not pled that their disabilities were the sole impetus for adverse action against them. Second, Defendants assert that Plaintiffs have failed to allege that they have been institutionalized or face a risk of institutionalization which Defendants argue is necessary to support an integration mandate claim.  Defendants also assert that Plaintiffs' integration mandate claims are inadequately pled under the Supreme Court's *Olmstead* decision because Plaintiffs have not alleged that the State's treatment professionals have determined their placement is inappropriate or that their requested relief can be reasonably accommodated taking into account the State's resources and the needs of

other individuals with disabilities. Third, Defendants contend that Plaintiffs' requested relief would impermissibly require a fundamental alternation to the state's provision of Disability Waiver services. Defendants assert that it is not clear precisely what Plaintiffs seek, but argue that if they are seeking the provision of person-centered planning, that is not required by the ADA. Defendants also suggest that if Plaintiffs are seeking funding to permit them to live wherever they choose, such relief would require a fundamental alteration to the state's Medicaid program.[5] Ultimately, Defendants argue, Plaintiffs' requested relief is impermissible based on the face of the Complaint because Plaintiffs seek relief which would not give leeway to the State in administering its programs.

Plaintiffs dispute each of Defendants' arguments for dismissal. First, Plaintiffs deny that they need to allege disability as the sole impetus for Defendants' conduct to state a viable RA claim. Second, Plaintiffs argue that they need not allege that they are institutionalized or at imminent risk of institutionalization to advance an integration mandate claim. According to Plaintiffs, their integration mandate claims are adequately pled in light of their allegations that they are living in a setting that is not the most integrated setting for their needs. Plaintiffs also argue that they have adequately alleged that their requested accommodations are reasonable. Third, Plaintiffs suggest that Defendants' fundamental alteration defense is premature. In particular, Plaintiffs argue

---

[5] Defendants also assert that if Plaintiffs are seeking funding to live wherever they want, such relief would violate Eleventh Amendment sovereign immunity. The Court does not construe Plaintiffs' Amended Complaint to seek such relief and therefore need not reach this argument.

that whether the requested relief will cost more or less than the existing services is a question that cannot be properly resolved at this stage.

Title II of the ADA, applicable to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Further, an implementing regulation referred to as the "integration mandate" states: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The preamble to these regulations describes "the most integrated setting" as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B, Subp. B., § 35.130. In addition, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," but can avoid this obligation by "demonstrat[ing] that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

The RA includes similar provisions, including its own "integration mandate." *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."); 28 C.F.R. § 41.51(d)

("Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.").  Given the similarities between the ADA and § 504 of the RA, "cases interpreting either are applicable and interchangeable."  *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) (citation omitted).

In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Supreme Court analyzed the ADA's integration mandate and its relationship to claims of discrimination under 42 U.S.C. § 12132.  In the context of claims brought by two women who were institutionalized despite their treatment providers' opinions that they could be appropriately treated in the community, the Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability."  *Id.* at 593-94, 597.  A plurality of the Court explained:

> Under Title II of the ADA, States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

*Id.* at 607.  Further, the court determined that a state may successfully assert a fundamental alteration defense to an integration mandate claim if it could demonstrate it had "a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace . . . ."  *Id.* at 605-06.  While it is Plaintiffs' burden to establish that their requested modifications would be a reasonable remedy to Defendants' alleged violations of the

integration mandate, Defendants bear the burden of establishing that the requested relief would fundamentally alter its programs or services. *See* 28 C.F.R. § 35.130(b)(7); *see also Gorman*, 152 F.3d at 912 (describing the fundamental alteration argument as an affirmative defense).

In *Guggenberger*, this Court recently evaluated many of the specific arguments Defendants have raised as a basis to dismiss Plaintiffs' ADA and RA claims. First, the Court determined "that the Rehabilitation Act's 'solely by reason of . . . disability' requirement need not be separately analyzed in cases alleging a violation of the integration mandate because the alleged discrimination—undue isolation—stems from a failure to satisfy an affirmative duty, regardless of discriminatory intent." *Guggenberger*, 198 F. Supp. 3d at 1032. The Court adopts its analysis and holding in *Guggenberger* on this issue, *id.* at 1031-33, and concludes that the Plaintiffs' failure to allege that their disabilities were the sole impetus underlying Defendants' alleged discrimination against them does not undermine their RA claim.

If Plaintiffs ultimately prevail in establishing a violation of the integration mandate based on Defendants' implementation of the Disability Waiver programs, Plaintiffs will have established that they were subject to discrimination based on their disabilities. *See Olmstead*, 527 U.S. at 597. It is immaterial to the Court's analysis whether such discrimination is considered to be "by reason of . . . disability" as required by the ADA, 42 U.S.C. § 12132, or "solely by reason of . . . disability" as required by the RA, 29 U.S.C. § 794(a). Thus, Plaintiffs' integration mandate claims under the ADA and the RA can be analyzed together.

Turning to Defendants' next argument for dismissal, Plaintiffs' failure to plead a risk of institutionalization, the Court again adopts its prior reasoning in *Guggenberger*. After considering the language of the integration mandate, Congress's extensive findings in enacting the ADA, the *Olmstead* Court's rationale, persuasive Department of Justice ("DOJ") authority interpreting the integration mandate, and analogous interpretations in recent caselaw, the Court concluded that "'[u]njustified isolation . . . is properly regarded as discrimination based on disability' beyond the limited scope of institutionalization." *See Guggenberger*, 198 F. Supp. 3d at 1026-28 (quoting *Olmstead*, 527 U.S. at 597). Thus, the Court concluded that the *Guggenberger* plaintiffs' integration mandate claims could proceed notwithstanding their failure to allege that they were presently institutionalized or at risk of institutionalization. *Id.* at 1029-30. The Court hereby incorporates its holding and analysis in *Guggenberger* on this issue, *id.* at 1026-30, and determines that Plaintiffs' integration mandate claims under the ADA and RA may proceed although Plaintiffs are residing in CRS facilities and have not alleged that they are at risk of institutionalization.[6]

---

[6] Defendants appear to question the Court's reliance in *Guggenberger* on the Seventh Circuit's recent decision in *Steimel v. Wernert*, 823 F.3d 902, 910-14 (7th Cir. 2016), because the plaintiffs in *Steimel* alleged that they faced a risk of institutionalization. To the extent *Guggenberger* suggests otherwise, the Court acknowledges that the *Steimel* plaintiffs made such allegations. However, the Seventh Circuit's holding in *Steimel* indicates that it would have recognized a viable *Olmstead* claim even in the absence of these allegations. In particular, the Seventh Circuit explained, "the integration mandate is implicated where the state's policies have either (1) segregated persons with disabilities in their own homes, or (2) put them at serious risk of institutionalization." *Id.* at 914. It also determined that the integration mandate "bars unjustified segregation of persons with disabilities, wherever it takes place." *Id.* at 911;

(Footnote Continued on Next Page)

Defendants also challenge Plaintiffs' failure to plead that the state's treatment professionals have determined that the individualized housing options they seek are appropriate to meet their needs. The Court does not find this to be a material pleading deficiency in this case. As noted above, the Supreme Court in *Olmstead* explained that whether community-based treatment for individuals with disabilities is required is based in part on whether "the State's treatment professionals [have] determine[d] that such placement is appropriate." *See Olmstead*, 527 U.S. at 607. However, as one court recently noted, "[t]he language in *Olmstead* concerning determinations by the state's treatment professionals appears to be based on the particular facts at hand and not fundamental to the Court's holding." *See Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1318 n.8 (W.D. Wash. 2015).

Like their reasonable promptness claim, Plaintiffs' integration mandate claims rest in large part on Defendants' failure to ensure that Plaintiffs are fairly offered and provided individualized housing services. Thus, Defendants' alleged actions have prevented Plaintiffs from being evaluated for the services they seek, precluding an allegation that the state's treatment professionals have determined that any alternate placements are appropriate. *See id.* at 1318-19 & n.8 (noting that the plaintiff "alleges that he has been denied the evaluation necessary to determine whether [a community-based] placement is appropriate" and concluding that the failure to include allegations

(Footnote Continued From Previous Page)
*see also Guggenberger*, 198 F. Supp. 3d at 1028 (discussing *Steimel* and identifying these holdings). The Court once again concludes that *Steimel* supports a broad application of the integration mandate even where no risk of institutionalization is alleged.

relating to a state treatment professional's determination was not fatal to his ADA and RA claims).

Plaintiffs allege that an assessment process is required before individuals receive Disability Waiver services. (Am. Compl. ¶ 68.) According to Plaintiffs, "[i]f [individuals] qualify, the lead agency should offer the individual Disability Waiver services as an alternative to services in an institution." (*Id.*) Plaintiffs allege they are presently receiving Disability Waivers and residing in CRS facilities. Although lead agencies are required to create plans for Disability Waiver recipients "that identif[y] his or her needs and the types of services necessary and available to meet those needs," Plaintiffs allege that "Defendants do not ensure . . . that individuals are receiving services in the most integrated setting appropriate to their needs." (*Id.* ¶ 69.) Under the facts of this case, therefore, Plaintiffs' integration mandate claims are adequately pled notwithstanding their failure to allege facts relating to placement determinations by the state's treatment professionals.[7]

---

[7] To be sure, the views of the state's treatment professionals will ultimately be relevant to determine whether Plaintiffs can appropriately be treated in more integrated settings as they allege. As noted in Justice Kennedy's concurring opinion in *Olmstead*, "it would be a tragic event . . . were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." 527 U.S. at 610 (Kennedy, J., concurring). As a result, "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference." *Id.* Where a plaintiff's integration mandate claim is based in part on the *failure to be assessed*, however, it would be unreasonable to dismiss such a claim for failure to allege facts relating to the (nonexistent) determinations of the state's treatment professionals.

Plaintiffs have adequately pled integration mandate claims under the ADA and the RA based on their allegations of being unduly segregated in CRS facilities and not receiving Disability Waiver services "in the most integrated setting appropriate to [their] needs." 28 C.F.R. § 35.130(d); *see also* 28 C.F.R. § 41.51(d). Plaintiffs allege that they are individuals with disabilities entitled to protection under the ADA and the RA. (*See* Compl. ¶¶ 29, 30, 31, 119, 127.) According to Plaintiffs, they are presently receiving Disability Waiver services in settings that segregate them from their communities. (*Id.* ¶¶ 2, 29(k), 30(f), 31(e). Plaintiffs allege that alternative Disability Waiver services exist "that help individuals transition from less integrated settings into homes of their own." (*Id.* ¶¶ 84-85.) However, Plaintiffs contend that "Defendants fail to ensure individuals have notice of, information regarding, or access to these services." (*Id.* ¶ 85.) Specifically, Plaintiffs allege that, "[r]ather than require statewide access to individualized housing services, Defendants provide impermissible discretion to each lead agency to choose whether to offer individualized housing services." (*Id.* ¶ 27.) As a result, Plaintiffs assert, Disability Waiver recipients are prevented "from receiving an informed choice and opportunity to live in the most integrated setting." (*Id.*) In light of these allegations and considering the Complaint as a whole, Plaintiffs plausibly assert viable integration mandate claims against Defendants in this case.

Finally, the Court considers the requirement that individuals with disabilities request only "reasonable modifications" and the affirmative defense available to states that "the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). These regulatory provisions underlie the Supreme

Court's assertion in *Olmstead* that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless" and the Supreme Court's requirement that the requested placements "can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 603, 607.

At this stage, the Court concludes that Plaintiffs have adequately alleged that they have requested only reasonable modifications that would not fundamentally alter the state's Disability Waiver services programs. Importantly, Plaintiffs identify examples of the specific services they seek to transition to more integrated settings, and they allege that these services are already available under the Disability Waivers. (Am. Compl. ¶¶ 10, 84.) Plaintiffs also assert that "Defendants currently approve some limited individualized alternatives for a small number of Disability Waiver recipients." (*Id.* ¶ 67.) Plaintiffs also note that Defendants previously "identified some specific individualized housing services, such as Individualized Housing Options ('IHO'), as assistance to help people move into and remain in the most integrated setting" in draft versions of the state's *Olmstead* Plan. (*Id.* ¶ 60.) In addition, Plaintiffs point out that Defendants have already committed in the *Olmstead* Plan to moving 5,547 individuals into more integrated settings. (*Id.* ¶ 62.) In short, they allege that "Plaintiffs are capable of and want to live in the most integrated setting appropriate to their needs and Defendant Piper can reasonably accommodate their requests." (*Id.* ¶ 121.)

The Court acknowledges that this case presents a closer question on the reasonable modification inquiry than *Guggenberger*. *See* 198 F. Supp. 3d at 1030. Along with

seeking access to existing services, Plaintiffs also note a "shortage of individualized housing providers" and appear to potentially seek an increase in the actual capacity of providers available. (*Id.* ¶¶ 90-91.) Whether such a modification would be a reasonable modification and an appropriate remedy to Plaintiffs' integration mandate claim will require careful scrutiny as this case proceeds. At this stage, however, the Court declines to dismiss Plaintiffs' integration mandate claims on this basis.

Further, as the Court concluded in *Guggenberger*, it would be premature to resolve Defendants' fundamental alteration defense in their favor at the pleading stage. *See Guggenberger*, 198 F. Supp. 3d at 1030-31 ("Given Plaintiffs' allegations and the complexity of the issues involved in Defendants' administration of a statewide Waiver Services program, determining whether Plaintiffs' request would constitute a fundamental alternation of Defendants' programs is a fact-specific inquiry that the Court cannot presently resolve in Defendants' favor."); *see also id.* (collecting cases to support this conclusion).

The Court concludes that Plaintiffs have plausibly alleged integration mandate claims under both the ADA and the RA, and the Court denies Defendants' Motion to Dismiss these claims.[8]

---

[8] Defendants cite caselaw to suggest that the ADA does not require the provision of particular services or a certain level of services to be provided. (*See* Doc. No.12 at 23-24 (citing *Doe v. Pfrommer*, 148 F.3d 73, 81-82 (2d Cir. 1998); *M.K. ex rel. Mrs. K. v. Sergi*, 554 F. Supp. 2d 175, 198 (D. Conn. 2008)).) The Court does not find these cases to be persuasive. *Pfrommer* did not involve an integration mandate claim, and the court noted that "plaintiff is in essence challenging the adequacy of his [Vocational Educational Services for Individuals with Disabilities] services, not illegal disability discrimination."

(Footnote Continued on Next Page)

## IV. Federalism and Separation of Powers

Along with challenging the adequacy of Plaintiffs' claims, Defendants argue that Plaintiffs' complaint seeks relief which is barred by principles of federalism and the separation of powers. According to Defendants, imposing the relief Plaintiffs seek would deprive the state legislature of its discretion to allocation scarce funding resources. Defendants also argue that the Plaintiffs seek relief which would deprive Defendants of discretion to administer resources according to its treatment and case management professionals' expertise. In addition, Defendants argue that Plaintiffs seek relief which would require the Court to improperly oversee the day-to-day workings of the State's Disability Waiver programs. According to Defendants, "Plaintiffs appear to suggest a wholesale, Court-supervised redesign of Minnesota's disability waiver services and housing system." (Doc. No. 12 at 28.) Defendants direct the Court to evaluate Plaintiffs' actual Amended Complaint because Plaintiffs' briefing ignores what they really seek.

---

(Footnote Continued From Previous Page)
*See* 148 F.3d at 82. Although *M.K.* involved the integration mandate, the court followed *Pfrommer* and explained that "plaintiffs here are attempting to invoke the anti-discrimination provisions of the ADA and the [RA] to challenge the adequacy of the services provided by [the state agency], not illegal disability discrimination." *See* 554 F. Supp. 2d at 198.

In this case, Plaintiffs are challenging illegal discrimination based on the state's alleged failure to ensure they are served in the most integrated setting appropriate to their needs. *See Olmstead*, 527 U.S. at 597 ("Unjustified isolation, we hold, is properly regarded as discrimination based on disability."). Although states are not required to "provide a certain level of benefits to individuals with disabilities" under *Olmstead*, they "must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." *See id.* at 603 n.14. In light of Plaintiffs' allegations that they are being unduly segregated based on Defendants' administration of the state's Disability Waiver programs, the Court finds *Pfrommer* and *M.K.* to be distinguishable and unpersuasive with respect to this case.

According to Defendants, the Amended Complaint describes in detail the micromanagement of the State's Disability Waiver services program that Plaintiffs seek. In short, Defendants argue, Plaintiffs request unlimited services and an unlimited funding mandate which a federal Court cannot order.

According to Plaintiffs, federal courts may properly order and oversee the administration of state programs as long as they do not dictate the precise course a state should follow and leave it the state to develop the program. Plaintiffs argue that the Court can properly order that the state provide the Disability Waiver services deemed required under federal law. Plaintiffs point out that principles of federalism and the separation of powers are meant to protect individual liberty not to benefit state governments. Plaintiffs argue that they properly ask the Court to hold Defendants accountable by requiring them to administer their state program as required by federal law. Contrary to Defendants' arguments, Plaintiffs contend that they are not asking the Court to micromanage or oversee the day-to-day operation of the state's Disability Waiver services program.

In *Olmstead*, the Supreme Court emphasized that states do not have "boundless" obligations to provide community-based treatment to individuals with disabilities. 527 U.S. at 603. Courts must ensure that they give sufficient "leeway" to states seeking "[t]o maintain a range of facilities and to administer services with an even hand." *Id.* at 605. Indeed, there are certain "federalism costs inherent in referring state decisions regarding the administration of treatment programs and the allocation of resources to the reviewing authority of the federal courts." *Id.* at 610 (Kennedy, J., concurring).

The Supreme Court has also explained that "[f]ederalism concerns are heightened when . . . a federal court decree has the effect of dictating state or local budget priorities." *Horne v. Flores*, 557 U.S. 433, 448 (2009). In crafting appropriate relief, courts must "give adequate consideration to the views of state . . . authorities" and "refrain[] from dictat[ing] precisely what course the State should follow." *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (internal quotation marks and citation omitted). Notwithstanding these important limitations, however, "federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *Horne*, 557 U.S. at 450.

As previously described, in the Amended Complaint, Plaintiffs seek declaratory relief and injunctive relief directing Defendants to: (1) "[p]romptly ensure every Disability Waiver recipient living in a CRS facility receives notice about eligibility for and access to individualized housing services, including person-centered planning;" (2) "[s]pecifically provide access and take prompt steps to make individualized housing services, including person-centered planning, available to Plaintiffs in a reasonable amount of time . . ."; and (3) "[t]ake such other steps as necessary to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs . . . ." (*Id.* at Prayer for Relief ¶ 4.) These three requests directly parallel Plaintiffs' claims relating to Defendants' alleged due process violations, violations of the Medicaid Act's reasonable promptness requirement, and integration mandate violations under the ADA and the RA.

In challenging Plaintiffs' requested relief, Defendants primarily take issue with the detailed proposed relief Plaintiffs identify under items (2) and (3). For example, under item (2), Plaintiffs seek:

> Access to person-centered planning services that ensure an individual receives a comprehensive personal transition plan with enforceable timelines, identifiable tasks, persons responsible for such tasks, descriptions of the integrated housing options from which to choose, and any other information necessary to facilitate a transition and subsequent life in the most integrated setting.

(*Id.* at Prayer for Relief ¶ 4(b).) Under item (3), Plaintiffs identify the steps they request the Court to order, "including, but not limited to" a list of multiple proposed modifications to the state's residential service system.[9] (*Id.* at Prayer for Relief ¶ 4(c).)

---

[9] Specifically, the Amended Complaint identifies the following requested steps:

    i.    Administering and operating their residential service system in a manner which actively promotes individualized housing services;

    ii.    Modifying their residential service system, making such changes as approved by the Court, that describe each of the activities that must be undertaken to permit timely access to available individualized housing services, including but not limited to:

        A.    Changes to benefit programs that ensure an individual has adequate notice of, access to, and support to enable a proper transition into the most integrated setting for which they are eligible;

        B.    Changes to applicable service definitions and regulations;

        C.    Changes to policies and procedures and lead agency requirements regarding person-centered transition planning;

        D.    Statewide planning related to the implementation of person-centered transition plans;

        E.    Statewide planning and training, including the proper development of direct service professionals, case managers, and lead agency staff to provide individualized housing services and to support service recipients in the most integrated setting;

        F.    Family and self-advocacy education regarding housing options for individuals;

(Footnote Continued on Next Page)

The Court acknowledges that the requested relief Plaintiffs identify is both detailed and broad. However, the Court declines to conclude at this early stage that any such relief is categorically precluded by federalism or separation of powers concerns.

First, the Plaintiffs do not appear to be seeking to improperly dictate local funding priorities or direct the state's allocation of funds. Plaintiffs allege that the services they seek are offered under the Disability Waivers, and they seek access to those services in a reasonably prompt amount of time so that they can transition to the most integrated setting appropriate to their needs. To the extent Plaintiffs seek the creation of new services or residential settings or the allocation of additional state funding, the Court can evaluate the propriety of such requests as this case proceeds.

Second, at this stage, the Court does not construe the requested relief to require an unwarranted intrusion into state agency affairs. As the Court determined in declining to dismiss Plaintiffs' Amended Complaint in response to Defendants' fundamental alteration defense, the Court again concludes that dismissal based on concerns over the scope of Plaintiffs' requested relief would be premature.

---

(Footnote Continued From Previous Page)

       G.     Infrastructure modifications such as changes to the statewide individualized housing networking process; and

       H.     Planning and interagency coordination to ensure that integrated alternatives to CRS facilities are available to those who want to live in the most integrated setting.

   iii.    Developing a periodic auditing process that ensures people in CRS facilities are enabled to develop personal transition plans and implement such plans so as to live in the most integrated setting appropriate to their needs.

(Am. Compl. at Prayer for Relief ¶ 4(c).)

If the Court determines that Defendants are liable for the claims Plaintiffs have plausibly alleged in their Amended Complaint, the relief the Court ultimately imposes can be properly tailored in light of constitutional limitations at a later stage. Importantly, such relief can also be crafted based on recommendations from the state itself. The Court is aware of the important limitations on its authority imposed by federalism and separation of powers principles. However, the Court concludes that these limitations do not require dismissal of Plaintiffs' Amended Complaint.

## V.     Necessary Parties

Defendants make two arguments relating to the proper parties in this case. First, Defendants argue that the lead agencies (Minnesota tribes and counties) are necessary parties because they administer Disability Waivers and implement person-centered planning practices in the State. Because lead agencies are responsible for developing individuals' service plans, Defendants argue, the Court could not afford the relief the Plaintiffs seek in their absence. Second, Defendants argue that the Court should dismiss DHS as a party because the claims against DHS are redundant of the claims against Commissioner Johnson Piper in her official capacity.

Plaintiffs argue that the lead agencies are not necessary parties because the Court could provide meaningful relief to Plaintiffs in their absence and Defendants have ultimate responsibility for the Disability Waiver programs throughout the State. Plaintiffs do not oppose dismissal of DHS as a party in light of the claims against Commissioner Johnson Piper in her official capacity.

Defendants' arguments with respect to lead agencies are substantially similar to those presented in *Guggenberger*. As a result, the Court concludes that Minnesota counties and tribes are not necessary parties in accordance with its analysis and holdings in *Guggenberger*, which it adopts herein. *See Guggenberger*, 198 F. Supp. 3d at 1033-35. Notwithstanding the individual counties' role in coordinating the provision of Disability Waiver services, Plaintiffs sufficiently allege that Defendants have oversight responsibilities and authority such that the Court can afford complete relief in the counties' absence. Further, Defendants have not established that the counties have any interest in this litigation which would be practically impeded or impaired through their absence.

The Court also adopts its reasoning in *Guggenberger* regarding the duplicative RA claims against DHS and Commissioner Johnson Piper in her official capacity. *See id.* at 1003-04 & n.12. Thus, the Court shall dismiss DHS as a party to this lawsuit. For all practical purposes, the claims against Commissioner Johnson Piper shall be treated as claims against the state agency itself, and allegations in the Amended Complaint directed at either DHS or Commissioner Johnson Piper shall be deemed interchangeable. *See id.* at 1004 n.12.

## CONCLUSION

The Court concludes that Plaintiffs have standing to assert their claims based on being denied particular Disability Waiver services and being segregated from their communities. Plaintiffs' claim for denial of reasonably prompt provision of services under the Medicaid Act is also ripe for review. Further, the Court concludes that

Plaintiffs have plausibly alleged claims for violations of the Medicaid Act's reasonable promptness requirement, 42 U.S.C. § 1396a(a)(8); due process requirements under the Fourteenth Amendment and the Medicaid Act, 42 U.S.C. § 1396a(a)(3); Title II of the ADA, 42 U.S.C. § 12132; and § 504 of the RA, 29 U.S.C. § 794(a).

In light of the relief Plaintiffs seek to remedy Defendants' alleged violations of law, the Court declines to dismiss Plaintiffs' Amended Complaint based on federalism or separation of powers principles.  Finally, Minnesota tribes and counties are not necessary parties because the Court can order meaningful relief in an action solely against Commissioner Johnson Piper.  However, the Court shall dismiss DHS as a party and grants Defendants' Motion to Dismiss on this basis.  Defendants' Motion to Dismiss is otherwise denied.

## ORDER

Based on the files, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dismiss (Doc. No. [10]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. The motion is **GRANTED** to the extent it seeks dismissal of the Minnesota Department of Human Services as a party.  The Minnesota Department of Human Services is thus **DISMISSED** as a party to this action.

   b. The motion is **DENIED** in all other respects.

2.     The Minnesota Department of Human Services is **DISMISSED** as a party to this action.  All claims against Commissioner Johnson Piper, Commissioner of the Minnesota Department of Human Services, in her official capacity shall proceed.

Dated:  May 18, 2017                    s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge