# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tenner Murphy, *by his guardian*
*Kay Murphy*; Marrie Bottelson; Dionne
Swanson; *and on behalf of others*
*similarly situated*,

Civil No. 16-2623 (DWF/BRT)

Plaintiffs,

**MEMORANDUM**
**OPINION AND ORDER**

v.

Jodi Harpstead, *in her capacity*
*as Commissioner of The*
*Minnesota Department of*
*Human Services*,

Defendant.

---

Joseph W. Anthony, Esq., Peter McElligott, Esq., and Steven M. Pincus, Esq., Anthony
Ostlund Baer & Louwagie PA; Laura Farley, Esq., and Steven Andrew Smith, Esq.,
Nicholas Kaster PLLP; Barnett I. Rosenfeld, Esq., and Justin H. Perl, Esq., Mid-
Minnesota Legal Aid; Eren Ernest Sutherland, Esq., Justin M. Page, Esq., and
Steven C. Schmidt, Esq., Mid-Minnesota Legal Aid, Minnesota Disability Law Center,
counsel for Plaintiffs.

Aaron Winter, Brandon L. Boese, Janine Wetzel Kimble, and Scott H. Ikeda, Assistant
Attorneys General, Minnesota Attorney General's Office, counsel for Defendant.

Pari McGarraugh, Esq., and Samuel D. Orbovich, Esq., Fredrikson & Byron, counsel
for amicus ARRM.

---

## INTRODUCTION

This matter is before the Court on Plaintiffs' motion for partial summary judgment

(Doc. No. 495), and Defendant's motion for summary judgment (Doc. No. 480).  For the

reasons set forth below, the Court grants in part and denies in part Plaintiffs' motion, and denies Defendant's motion.

## BACKGROUND

### I. Factual Background

The Court previously detailed the background of this case in its May 18, 2017 Memorandum Opinion and Order (Doc. No. 54 ("May 2017 Order")) and the Court only briefly summarizes the facts here.[1]  In short, Plaintiffs are individuals with disabilities and Medicaid recipients who receive Home and Community Based Disability Waivers ("Disability Waivers") from the State of Minnesota under the direction of Defendant Jodi Harpstead ("Defendant"), Commissioner of the Minnesota Department of Human Services ("DHS").[2]  Plaintiffs reside, or did reside[3], in Community Residential Setting ("CRS") facilities, known as corporate adult foster care ("CFC")[4]—and wish to access

---

[1]     The Court directs readers to its May 2017 Order and otherwise assumes familiarity with the facts and law elaborated therein.  *See Murphy by Murphy v. Minn. Dep't of Human Servs.*, 260 F. Supp. 3d 1084 (D. Minn. 2017).  To the extent necessary, the Court supplements the facts with new or different information obtained subsequent to discovery.  The Court's analysis is based on the entire record before it; it is not limited to the facts available at the time of its May 2017 Order.

[2]     Defendant delegates certain Disability Waiver operational functions to Minnesota counties and tribal entities (henceforth, "Lead Agencies").  (Doc. No. 578 ("Schmidt Aff. 3") ¶ 2, Doc. No. 578-1, Ex. 1 ("Bartolic Dep.") at 3; *see also* Minn. Stat. § 256B.05, subd. 1.)

[3]     Two of the named plaintiffs who lived in CFC facilities when this Court granted class certification subsequently moved out of CFC facilities.  (*See* Doc. No. 423 ¶ 6, Ex. 5 at 230;  Doc. No. 494 ¶ 29, Ex. 28, Doc. No. 535 at 110-11.)

[4]     CFC facilities are "licensed foster care setting[s] where the license holder does not
(Footnoted continued on next page.)

various individualized housing services available under the Disability Waivers to pursue more integrated housing options ("IHO").[5]  Plaintiffs assert that CFC facilities isolate and segregate them from their communities in violation of federal law.

Plaintiffs assert the following claims against Commissioner Jodi Harpstead in her official capacity:  (1) failure to furnish Medicaid services with reasonable promptness under 42 U.S.C. § 1396a(a)(8), enforced under 42 U.S.C. § 1983 (Count I); (2) violation of Plaintiffs' Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements, enforced under 42 U.S.C. § 1983 (Count II); (3) violation of Title II of the ADA (Count III); and (4) violation of § 504 of the RA (Count IV).  (Doc. No. 33 ("Am. Compl.")  ¶¶ 1-32.)

---

(Footnoted continued from previous page.)
reside."  (Doc. No. 503 ("Schmidt Aff. 1") ¶ 3, Doc. No. 503-1, Ex. 2 at 253; *see also* Minn. Stat. § 245D.02, subd. 4a.)  Plaintiffs assert that CFC facilities typically contain four or five unrelated Disability Waiver recipients who all receive similar services from the same provider.  (*See* Schmidt Aff. 1 ¶ 4, Doc. No. 503-1, Ex. 3 ("Pl. Resp. to Interrog.") at 263-64.)

[5]     Defendant claims that the term "IHO" is neither a Disability Waiver service or setting classification, but a concept independently advanced by Plaintiffs which includes a requirement that a Disability Waiver recipient rent or own their residence.  (Doc. No. 482 ("Def. Memo.") at 10, n.10.)  Plaintiffs contend that Defendant only recently abandoned the term after previously stating in a document related to their *Olmstead* Plan that IHOs "help more persons with disabilities live in community setting[s] of their choice."  (Doc. No. 573 ("Pl. Opp.:) at 9, n.9.)  The Court adopts Plaintiffs' definition of IHO:  residential settings that are not provider controlled, and are purchased, rented, or built with the intention of providing a home for a specific individual who has chosen that specific setting.  (*Id.* at 9.)  The Court observes that the definition of IHO does not itself *require* that a Disability Waiver recipient actually rent or own their residence as Defendant contends, but simply states what an IHO is.

3

Plaintiffs assert their claims on behalf of themselves and a Class of similarly situated individuals. (*See id.* ¶¶ 92-101.) Plaintiffs assert that they and the Class "have a common remedy: modifications to Defendant's residential service system to provide individuals with choices and prevent needless segregation of individuals in segregated residential settings." (*Id.* ¶ 101.) Plaintiffs seek "access to Waiver services that will allow them to plan, explore options, and ultimately move out of their CFC facilities and into the most integrated setting appropriate to their needs." (Doc. No. 499 ("Pl. Memo.") at 3-4 (citing Pl. Resp. to Interrog. at 266-269).) Plaintiffs seek declaratory and injunctive relief to remedy Defendants' alleged violations of the law, attorney fees and costs, and other relief deemed necessary to protect the rights of Plaintiffs and the Class. (*See* Am. Compl. at Prayer for Relief ¶¶ 2-6.)

Specifically, Plaintiffs seek declaratory judgment that: (1) Defendant is violating the Medicaid Act by not providing services with reasonable promptness and violating Plaintiffs' Constitutional and Medicaid due process rights; and (2) Defendant is violating the ADA and RA by segregating Plaintiffs "while failing to provide them with individualized housing services for which they are eligible." (*Id.* at Prayer for Relief ¶¶ 2-3.)

Plaintiffs seek injunctive relief requiring Defendant to: (1) "[p]romptly ensure every Disability Waiver recipient living in a CRS facility receives notice about eligibility for and access to individualized housing services, including person-centered planning;" (2) "[s]pecifically provide access and take prompt steps to make individualized housing services, including person-centered planning, available to Plaintiffs in a reasonable

amount of time . . ."; and (3) "[t]ake such other steps as necessary to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs . . ." (*Id.* at Prayer for Relief ¶ 4.)  Under items (2) and (3), above, Plaintiffs identify in detail the proposed relief they seek to modify the state's residential service system.  (*Id.* at Prayer for Relief ¶¶ 4(b)-4(c).)

Defendant contends that of the 45,438 Disability Waiver recipients in 2018, only 31% lived in CFC facilities, and only 1.3% of those living in CFC facilities are putative class members.[6]  (Def. Memo. at 9, 48.)  Accordingly, she argues that she is not over-relying on CFC facilities, nor do her policies prevent individuals from moving to their preferred setting.  She further contends that her policies and practices comply with federal law, and to the extent any alleged harm has occurred, she may not be held liable in her official capacity.

## II.    Procedural History

Plaintiffs filed an initial complaint against Defendant and Minnesota Department of Human Services ("DHS) (collectively, "Defendants") on August 3, 2016.  (Doc. No. 1.)  Defendants filed a motion to dismiss Plaintiffs' complaint on September 14, 2016.  (Doc. No. 10.)  On May 18, 2017, the Court granted Defendants' motion to

---

[6]    Defendant further alleges that the proportion of Disability Waiver recipients who live in CFC facilities has continued to decline since 2015.  (*See* Def. Memo. at 9.)

dismiss insofar as it sought dismissal of DHS as a party and denied the motion in all other respects.[7]  (May 2017 Order.)

Plaintiffs filed an Amended Complaint on February 23, 2017.  (Am. Compl.)  On February 27, 2017, Plaintiffs filed a motion for class certification.  (Doc. No. 35.)  On September 29, 2017, the Court granted Plaintiffs' motion for class certification, certifying the following class:  "All individuals age 18 and older who are eligible for and have received a Disability Waiver, live in a licensed Community Residential Setting, and have not been given the choice and opportunity to reside in the most integrated residential setting appropriate to their needs."  (Doc. No. 99 at 35.)

On November 15, 2018, Plaintiffs moved for partial summary judgment on Count II of their Amended Complaint, asking the Court to declare that Defendant's current notice policy for Disability Waiver recipients violates federal law.  (*See* Pl. Memo.)  On the same day, Defendant also moved for summary judgment, asking the Court to grant summary judgment in her favor on all of Plaintiffs' claims.  (*See* Def. Memo.)  Also on November 15, 2018, Defendant filed a motion to decertify the class (Doc. No. 418), and both parties moved to exclude expert testimony (Doc. Nos. 468, 488).  The Court held a hearing on the motions on January 25, 2019.  (Doc. No. 623.)

---

[7]      Plaintiffs alleged that the Minnesota Department of Human Services ("DHS") also violated § 504 of the RA (Am. Compl. ¶¶ 126-32); however, the Court found that the same claim against both DHS and the Commissioner of DHS in her official capacity was duplicative.  (May 2017 Order at 2.)  Accordingly, the Court dismissed DHS as a party on May 18, 2017.  (*Id.* at 63.)

The Court delayed ruling on the motions pending settlement discussions that ultimately proved unsuccessful. (Doc. No. 636.)

On July 26, 2019, the Court denied Defendants' motion to decertify the class. (Doc. No. 640 ("July 2019 Order").) On August 6, 2019, Defendants requested permission for leave to file a motion for reconsideration of the July 2019 Order. (Doc. No. 642 ("Request").) The Court denied Defendant's Request on August 14, 2019. (Doc. No. 646.)

On August 7, 2019, the Court granted Plaintiffs' motion to exclude the expert testimony of John Patterson, and denied Defendant's motion to exclude the expert testimony of David Michael Mank, Ph.D., and Dennis F. Price. (Doc. No. 644.)

The Court now considers Plaintiffs' motion for partial summary judgment (Doc. No. 495) and Defendant's motion for summary judgment (Doc. No. 480).

## DISCUSSION

## I.    Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment on Count II of their Amended Complaint and ask the Court to declare that Defendant's current notice policy for Disability Waiver recipients violates federal law. (Pl. Memo. at 2.) Specifically, Plaintiffs allege that Defendant's policy violates their due process rights under both the Fourteenth Amendment's Due Process Clause and the Medicaid Act's fair hearing requirements.

Plaintiffs argue that federal law requires Defendant to provide a legally sufficient written notice ("Notice of Action") to Disability Waiver recipients when Defendant denies access to Waiver Services or fails to act on a request for Waiver Services with

reasonable promptness.[8] (*Id.* at 13-16.) Plaintiffs claim that while Defendant has a formal written policy that instructs Lead Agencies to send a Notice of Action Form "each time [the case manager/planer] takes action in the support plan that denies, terminates, or reduces the person's service," the policy does not explain what constitutes an action that denies, terminates, or reduces the person's service, nor does it set forth any instructions that must be sent if a request for services is not acted upon within a certain timeline or with reasonable promptness. (Schmidt Aff. 1 ¶ 7, Doc. No. 503-1, Ex. 6 ("Notice of Action Policy") at 288.) Plaintiffs contend that because "Defendant has not provided a clear and objective standard to the Lead Agencies that she is legally obligated to direct, the denial process has been handled inconsistently and unlawfully throughout the State." (Pl. Memo. at 8.)

Plaintiffs argue that under Defendant's current policy, Lead Agencies are only required to provide a Notice of Action when they have made a formal, final decision that they will not authorize specific Disability Waiver services and that no Notice of Action is required while the Lead Agency purportedly attempts to assist Disability Waiver recipients in some way with their request for services, regardless of how long their attempt lasts. (*See id.* at 12.) Citing Black's Law Dictionary, Plaintiffs argue that every time Lead Agencies deprive or withhold individualized housing services from a Disability Waiver recipient, or fail to act on a request in a reasonably prompt manner, the services are effectively "denied" and Notice of Action is required. (*Id.* at 15-16.)

---

[8]     A Notice of Action complies with the requirements set forth in 42 C.F.R. § 431.210. *See* 42 C.F.R. § 431.210 (detailing required content of notice).

Plaintiffs allege that Defendant's amorphous policy leaves the decision of what constitutes a "denial" entirely within the discretion of individual Lead Agencies, and that Defendant's lack of guidance causes Lead Agencies to believe they are not required to provide Notice of Action as long as they think that they are working on a Disability Waiver recipient's case and believe that progress is being made. (*Id.* at 18.)

Plaintiffs argue that the practical effect of Defendant's policy is that Plaintiffs go months and sometimes years without services or explanatory notice of a denial in violation of their federal rights.[9] (*Id.* at 12-14; 19-29.)

Plaintiffs ask the Court to direct Defendant to issue a new policy that requires a timely, written Notice of Action to be issued whenever a Lead Agency denies any individualized housing services or fails to act on a request for individualized housing services with reasonable promptness. (*Id.* at 2.)

Defendant first contends that Plaintiffs' claim for violation of the Medicaid Act must be denied because the Medicaid Act contains no private right of action.[10] (Doc. No. 550 ("(Def. Opp.") at 14-15.) Defendant relies on *Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017), to argue that "nothing short of an unambiguously conferred right will

---

[9]    In relevant part, 42 C.F.R. § 431.206(c) requires that a Notice of Action be provided at the time: (1) an individual applies for Medicaid; and (2) the agency denies an individual's claim for eligibility, benefits or services; or denies a request for exemption from mandatory enrollment in an Alternative Benefit Plan; or takes other action, and defined at § 431.201; or whenever a hearing is otherwise required in accordance with § 431.220(a). The parties dispute Defendant's compliance with § 431.206(c)(2).

[10]    Defendant incorporates the argument in her motion for summary judgment that there is no private right of action under the reasonable promptness section of the Medicaid Act. (Def. Opp. at 15; *see also* Def. Memo. at 30-31).)

support a cause of action under § 1983," and that the Medicaid Act is "phrased as a directive to the federal agency charged with approving state Medicaid plans, not as a conferral of the right to sue upon the beneficiaries of the State's decision to participate in Medicaid."[11]  (Doc. No. 482 ("Def. Memo.") at 31 (citing *Does*, 867 F.3d at 1040-41).)  Defendant further contends that Congress did not intend to create a private right "because other sections of the [Medicaid] Act provide mechanisms to enforce the State's obligation under § 23(A)," and "statues with an 'aggregate' focus do not give rise to individual rights." (*Id.* (citing *Does*, 867 F.3d at 1041-42).)

Defendant next argues that even if the Medicaid Act was privately enforceable, her policies comply.  (Def. Opp. at 15.)  Defendant contends that the plain language of the Medicaid Act requires only that an opportunity for a fair hearing must exist and that she provides such an opportunity through routine notices about the right to appeal.[12]  (*Id.* at 1, 14-15.)

---

[11]     *Does* specifically addressed § 1396a(a)(23)(A), the "free choice provision," of the Medicaid Act. *See generally* 42 U.S.C. § 1396a(a)(23)(A).

[12]     Defendant contends that she provides notice about the opportunity for a fair hearing when a Disability Waiver recipient is initially assessed or reassessed for service eligibility, and when an action is taken in the recipient's support plan that denies, terminates, or reduces the recipient's services. (Def. Opp. at 5.)  She cites the following forms:  (1) DHS-1941-ENG, entitled  "Your Appeal Rights" which states that "if you have applied for or are getting financial help, medical coverage or social services through the county or state agency," "you can appeal" if, among other things, "[t]he agency does not act quickly enough and you think it has gone beyond the legal time limit to act," "[t]he agency decides you cannot get help," "[t]he agency providing you with assistance or services reduces or stops them," "[t]he agency denies you a specific medical service," (Footnote continued on next page.)

Defendant contends that Plaintiffs misinterpret the notice requirements imposed by § 431.206(c)(2) of the Medicaid Act by using an improper definition of "denial," and for failing to recognize that short of denial, Notice of Action is only available to individuals who specifically ask for it. (*Id.* at 15-20.)

Defendant disputes Plaintiffs' definition of "denial" and contends that pursuant to the Medicaid Act, "[Notice of Action] is triggered by an objectively verifiable, decisional event: '[a]t the time the agency denies an individual's *claim* for eligibility, benefits or services.'" (*Id.* at 17 (citing 42. C.F.R. § 431.206(c)(2)).) Defendant argues that a "claim" for "medical assistance" requires an individual to "make[] application for assistance." (*Id.*) Accordingly, Defendant argues that Plaintiffs rely on an "an inapposite, freestanding concept of 'denial' unconnected to a 'claim,'" so no denial actually occurs when a simple request for services is deprived, withheld, or not acted upon in a reasonable amount of time. (*See id* at 17-19.)

Defendant further contends that short of a denial, the plain language in 42 C.F.R. 431.220(a)(1) triggers Notice of Action only upon specific request for a hearing by an

(Footnote continued from previous page.)
or "you disagree with these and other county or state agency actions;" (2) DHS-2727-Eng, entitled "Long-Term Services and Supports Assessment and Program Information and Signature Sheet," which asks whether the assessed person understands that they have the right to appeal a decision that results in a denial, termination, or reduction in services; (3) DHS-6791B-ENG, entitled "Community Support Plan with the Coordinated Services and Supports Plan," which includes the statement "[i]f you are dissatisfied with the county agency/tribe or managed care organization's action, or feel they have failed to act on [your] request for home and community based services, you have the right to appeal," and sets forth appeal instructions; (4) DHS-6791D-ENG, entitled "Coordinate Services and Supports Plan Signature Sheet" which also includes appeal information. (*See* Doc. No. 553 ("Winter Decl.) ¶¶ 3-6, Exs. 2-5.)

individual who believes the agency has denied his or her claim for eligibility, covered benefits or services, or has not acted upon the claim with reasonable promptness. (*Id.* at 19-20 (citing 42 C.F.R. 431.220(a)(1)).) Defendant argues that because Plaintiffs do not complain of any rejection of, or failure to act upon, any application for a Disability Waiver service, Plaintiffs' actual concern amounts to allegedly inadequate case manager performance in response to a general request to explore moving, or external events allegedly inhibiting a request to move. (*Id.* at 21-24.)

Moreover, Defendant contends that her policies already require notice of the right to challenge allegedly deficient case manager performance outside of the claim denial context so Disability Waiver recipients are not "left in limbo" as Plaintiffs contend. (*Id.* at 25.) Specifically, she contends that pursuant to Minn. R. 9525.0024, subp. 3, Disability Waiver recipients "must be informed—upon development of their required individual service plan and at least annually thereafter—of their right to a conciliation conference under [Minn. Stat.] section 256.045." (*Id.* at 25.)

Defendant contends that because her policies comply with the Medicaid Act, any alleged procedural due process violation also fails. (*Id.* at 27) Moreover, Defendant argues that Plaintiffs do not have a property interest in any "individualized housing service" not actually applied for, and that Plaintiffs do not identify any actual Disability Waiver service allegedly denied. (*Id.* at 28) She further contends that Plaintiffs do not have a property interest in "a guarantee" that they will move in response to a request to do so. (*Id.* at 29.) Notwithstanding, Defendant argues that the routine notice she

provides related to reasonable promptness and challenges to case manager performance satisfies procedural due process. (*Id.*)

Finally, Defendant argues that Plaintiffs' requested injunction violates Fed. R. Civ. P. 65 as impossibly vague because Plaintiffs: (1) do not identify which actual services available under Defendant's Waivers they believe qualify as "individualized housing services," leaving Defendant to guess whether a particular serviced allegedly denied is an "individualized housing service;" (2) do not explain how Defendant is to know when a case manager's assistance with an individual's request for moving assistance is sufficiently delayed or deficient to constitute a deprivation or withhold; and (3) only request notice related to moves to "a more integrated setting" which is a highly individualized determination. (*Id.* at 33.)

The Court first observes that it has already addressed Defendant's argument that the Medicaid Act does not provide a private right action. (*See* May 2017 Order at 29.) Specifically, the Court concluded that the reasonable promptness and fair hearing provisions are privately enforceable under § 1983 for eligible individuals. (*Id.* at 22) The Court again incorporates and adopts its analysis and holding in *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1006-07, 1022 (D. Minn. 2016), and continues to find that both §§ 1396a(a)(8) and 1396a(a)(3) are privately enforceable.[13] *Does* does nothing to change the Court's analysis. As the Court previously stated, "[t]he enforceability of a

---

[13]     As discussed in its May 2017 Order, many of the allegations and arguments specific to the above entitled matter are similar to those previously considered by the Court in *Guggenberger*. *See generally*, *Guggenberger*, 198 F. Supp. 3d 973.

particular Medicaid Act must be independently assessed by the Court; the fact that one provision fails to establish a private cause of action does not govern the enforceability of a separate and distinct provision." *Guggenberger*, 198 F. Supp. 3d at 1006. *Does* addressed only § 23(A) of the Medicaid Act, the "freedom of choice" provision. There, the Eighth Circuit stated, "we see significant difficulties with the contention that § 23(a) unambiguously creates an enforceable federal right," and ultimately concluded that it did not. *Does,* 867 F.3d at 1041, 1046. Accordingly, *Does* has no impact on the Court's holding that the "reasonable promptness" or "the fair hearing" provision of the Medicaid Act are privately enforceable.

The Court next addresses Defendant's interpretation of the Medicaid Act. In short, the Court finds Defendant's narrow reading of the Medicaid Act overly restrictive. 42 U.S.C. §1396a(a)(3) states, "[a] State plan for medical assistance must provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. §1396a(a)(3). While Defendant contends that Notice of Action is trigged only when a specific application for eligibility, benefits, or services is denied, this interpretation does not follow naturally from the plain language of the statute, nor does it comport with guidance from the Center for Medicaid and Medicare Services ("CMS") which construes "claim" more broadly. *See* 81 Fed. Reg. 86382-01, 86395.

CMS explains that a "'claim' in § 431.220(a)(1) . . . refers broadly to any claim by an applicant or beneficiary for Medicaid, whether such claim be for eligibility for coverage in general, or for a particular benefit or service . . ." 81 Fed. Reg. 86382-01,

86395.[14]  CMS also provides that "'denial' of a claim in § 431.220(a)(1) includes

situations in which the agency authorizes an amount, duration or scope of a service which

is less than that requested by the beneficiary or provider." (*Id.*)  The CMS guidance does

not tie "claim" to a "specific application," or to any specific service at all, nor does it

limit "denial" to simply rejecting an application.[15]

Defendant's interpretation is also illogical; it presupposes that Disability Waiver

recipients know exactly what services are available and to specifically apply for them

before due process requirements are triggered.  This "improperly places on the recipient

the burden of acquiring notice whereas due process directs [Defendant] to supply it."

*Schroeder v. Hegtsrom*, 590 F. Supp. 121, 128 (D. Or. 1984) (citation omitted.)  Further,

Defendant's interpretation fails to comport with the purpose of the Medicaid Act to

"provide medical benefits to those in greatest need."  *Hodson v. Bd. of Cty. Com'rs,*

*Hennepin Cty.*, 614 F.2d 601, 610 (8th Cir. 1980).  Contrary to Defendant's assertions,

the Court finds that the practical effect of her interpretation is that Disability Waiver

---

[14]  "Under *Auer v. Robbins*, 519 U.S. 452 (1997), an agency's interpretation of its
own regulations is 'controlling unless plainly erroneous or inconsistent with the
regulation.'"  *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1027 n.21 (D. Minn.
2016).  The Court finds that the CMS guidance is neither erroneous nor inconsistent with
its regulation.

[15]  The CMS Medicare and Medicaid Statistical Supplement defines "claim" as "a
request to a carrier, intermediary, Medicare Administrative Contractor, a State by a
beneficiary, or by a provider acting on behalf of a beneficiary for payment of benefits
under Medicare or Medicaid."  (Winter Decl. ¶ 31, Ex. 30.)  Accordingly, this definition
is not linked to a "specific application" either.

recipients could wait indefinitely for requested services, never receiving an explanation on the status of the request, and without an opportunity to appeal.

The Court finds that a denial under 42 C.F.R. § 431.206(c)(2) is not limited to rejection of an application for services; a denial also occurs—and a Notice of Action is required—when an agency does not authorize services that a beneficiary requests, and when an agency authorizes services but does not provide the type or amount of requested services. Pursuant to 42 C.F.R. § 431.210, a notice required under § 431.206(c)(2) must contain: (1) a statement of what action the agency. . . intends to take and the effective date of such action; (2) a clear statement of the specific reasons supporting the intended action; (3) the specific regulations that support, or the change in Federal or State law that requires, the action; (4) an explanation of the individual's right to request a local evidentiary hearing if one is available, or a State agency hearing; or in cases of an action based on a change in state law, the circumstances under which a hearing will be granted; and (5) an explanation of the circumstances under which Medicaid is continued if a hearing is requested. 42 C.F.R. § 431.210.

The Court has reviewed the forms that Defendant alleges satisfy the Medicaid Act fair hearing requirement. While they do include several references to appeal, they lack the components required pursuant to 42 C.F.R. § 431.210. Importantly, they fail to outline any reason for denial. General information about appeal rights unrelated to a specific request is insufficient. *See Daugherty v. Roob*, Civ. No. 1:06-878, 2009 WL 899771, at *7 (S.D. Ind. Mar. 31, 2009) (holding that explanatory documents and making caseworkers available to answer questions "fail[ed] to address the due process

requirement that the applicable standard be set forth in . . . its denial notices.").

Accordingly, the Court finds that Defendant's failure to provide proper notice violates the

Medicaid Act's notice and hearing requirements outlined in 42 C.F.R. § 431.210.

As the Court explained in its May 2017 Order, the Medicaid Act's fair hearing

requirements "support and reinforce Plaintiffs' Fourteenth Amendment Due Process

Claim."[16] (May 2017 Order at 44.) "The fundamental requirement of due process is the

opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v.*

*Eldridge,* 424 U.S. 319 at 333 (quoting, in part, *Armstrong v. Manzo,* 380 U.S. 545, 552

(1965)). The opportunity to be heard must be coupled with "notice reasonably

calculated, under all the circumstances, to apprise interested parties of the pendency of

the action and afford them an opportunity to present their objections." *Mullane v. Cent.*

*Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). The requirements of notice and an

opportunity to be heard are necessarily intertwined and dependent upon one another:

"Adequate notice is integral to the due process right to a fair hearing, for the 'right to be

heard has little reality or worth unless one is informed.'" *Bliek v. Palmer*, 102 F.3d 1472,

1475 (8th Cir. 1997) (quoting *Mullane*, 339 U.S. at 314, 70 S. Ct. 652). Accordingly,

Defendant's violation of the due process requirements under the Medicaid Act's fair

hearing requirements is coextensive with a procedural due process violation under the

Fourteenth Amendment. *See Guggenberger*, 198 F. Supp. 3d at 1022-23. Both the

---

[16] The Court hereby adopts and incorporates its analysis and holding in its May 2017 Order that the Medicaid Act's fair hearing requirements are enforceable in a § 1983 claim by "any individual whose claim for medical assistance . . . is denied or is not acted upon with reasonable promptness." *See* 42 U.S.C. § 1396a(a)(3).

timing and content of Defendant's routine notices fail to satisfy due process under the Medicaid Act, or under the Fourteenth Amendment.

While Defendant also contends that Plaintiffs' Fourteenth Amendment due process claim fails because Plaintiffs do not have a protected property interest in a "guarantee[] that they will move in response to a request to do so," (Def. Opp. at 29), the Court finds that this interpretation of Plaintiffs' requested relief misconstrues what they actually ask for.  (*See* Am. Compl. at 34-37.)  The Court has already concluded that Plaintiffs have a legitimate claim of entitlement to the services they actually seek.  (May 2017 Order at 40; *see also Guggenberger*, 198 F. Supp.3d at 1021 ("Plaintiffs have a legitimate and important interest in the services they seek which would enable them to more fully integrate into their communities and achieve independence in their lives like individuals without disabilities.").)  Nothing in discovery has altered the Court's previous analysis.

Finally, the Court finds little merit in Defendant's argument that Plaintiffs' requested injunction violates Federal Rule of Civil Procedure 65 as impossibly vague. Rule 65(d)(1) requires that every injunction must:  (1) state the reasons why it is issued; (2) state its terms specifically; and, (3) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.  Fed. R. Civ. P. 65(d)(1).  Plaintiffs' request for injunctive relief would enjoin Defendant to "issue a new policy that requires that a timely, written Notice of Action form be issued whenever a lead agency denies any individualized housing services or fails to act on a request for individualized housing services with reasonable promptness."  (Pl. Memo. at 2.)  The

Court finds Plaintiffs' request is clear, straightforward, and consistent with how other states operate their Medicaid appeal processes. *See, e.g.*, Me. Rev. Stat. tit. 22 § 3181; Ark. Code. Ann. § 20-77-121(b).

Nonetheless, the Court declines to grant an injunction at this time and encourages the parties to confer and settle upon revisions to the policy that is sufficiently clear and mutually satisfactory. To the extent the parties are unable to do so, the Court will require further evidence to determine the proper scope of the injunctive relief.

In summary, viewing the evidence and all reasonable inferences in the light most favorable to Defendant, the Court finds that Defendant's policy violates Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements, enforced under 42 U.S.C. § 1983. In lieu of issuing an injunction at this time, the Court encourages the parties to jointly settle upon revisions to the policy that are mutually satisfactory.

## B. Defendant's Motion for Summary Judgment

### 1. Standing and Mootness

Defendant first argues that she is entitled to summary judgment because Plaintiffs Tenner Murphy, by his guardian Kay Murphy; ("Murphy") Marrie Bottelson ("Bottelson"), and Dionne Swanson ("Swanson") (collectively, "Named Plaintiffs") lack standing to bring their claims, and because Plaintiffs Murphy and Bottelson's claims are moot.

Specifically, Defendant contends that Named Plaintiffs have no evidence that any of the relief they request would remedy an injury they personally suffered, as opposed to

allegedly affecting some unknown group of other people. She argues that Plaintiffs "simply believe themselves to have 'the status of being subject to a governmental institution that [i]s not organized or managed properly,' which is insufficient for standing." (Def. Memo. at 29 (citing *Lewis v. Casey*, 518 U.S. 343, 350 (1996)).) She argues further that because Plaintiffs Murphy and Bottelson have moved to their desired settings, their claims are moot. (*Id.* at 29-30.)

To establish Constitutional Article III standing, a plaintiff must demonstrate: (1) an injury-in-fact; (2) a causal connection between that injury and the challenged conduct; and (3) the likelihood that a favorable decision by the court will redress the alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). These requirements limit federal courts to deciding only cases where the plaintiffs can show a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). At the summary judgment stage, plaintiffs "must 'set' forth' by affidavit or other evidence 'specific facts' which for the purposes of the summary judgment motion will be taken as true." *Lujan*, 504 U.S. at 561. "While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Com'n*, 554 U.S. 724, 734 (2008).

When the Court found that Plaintiffs met the redressability requirement at the pleading stage, the Court observed that "Plaintiffs must ultimately provide evidence to support their allegations relating to the effectiveness of individualized housing services in

leading to greater integration in the community." (May 2017 Order at 24.) The Court finds that Plaintiffs have met their burden. In addition to the expert reports and sworn testimony of Plaintiffs' experts Dr. David Mank and Dennis Price, Named Plaintiffs' lived experiences indicate that effective individualized housing services leads to greater community integration. (*See* Doc. No. 310 ("Schmidt Aff. 2") ¶ 5, 310-1, Ex. 4 ("Price Report") at 57-75; Doc. No. 498, Ex. 40 ("Dr. Mank Report") at 23; Doc. No. 575 ("K. Murphy Decl.") ¶¶ 7, 9-16, 19-21, 32-39); Doc. No. 576 ("Bottelson Decl.") ¶¶ 8-13, 15-18, 21-23.) Taking this evidence as true, the Court finds that Plaintiffs' continue to have proper standing.

Defendant also contends that Plaintiffs Murphy and Bottelson's claims are moot because prospective injunctive relief is inappropriate when they have already moved to their desired settings and they cannot demonstrate that their claims are capable or repetition. (Def. Memo. at 30.) The Court is unpersuaded. First, this is a class action certified under Federal Rule of Civil Procedure 23(b)(2). It is well-established that "mootness of the named plaintiff's individual claim after a class has been duly certified does not render the action moot." *U.S. Parole Com'n v. Geraghty*, 445 U.S. 388, 397 (1980) (citing *Sosna v. Iowa*, 419 U.S. 393 (1980)). The Supreme Court specifically stated that an Article III case or controversy "may exist . . . between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot." *Sosna*, 419 U.S. at 402.

Here, the record reflects that Plaintiffs Murphy and Bottelson did not move until after the Class was certified, and that until they moved, their claims for systemic relief

were common to and typical of the members of the Class.  Notwithstanding, there is no

evidence that Plaintiff Swanson's claims are moot.  Accordingly, the Court declines to

grant Defendant's motion for summary judgment on this basis.

### 2. Reasonable Promptness (Count I)

Count I of Plaintiffs' Amended Complaint alleges a violation of 42 U.S.C. § 1983

through failure to furnish services with reasonable promptness in violation of 42 U.S.C.

§ 1396a(a)(8).  The reasonable promptness requirement provides that "[a] State plan for

medical assistance must . . . provide that all individuals wishing to make application for

medical assistance under the plan shall have opportunity to do so, and that such

assistance shall be furnished with reasonable promptness to all eligible individuals." 42

U.S.C. § 1396a(a)(8).

Payment for home and community-based Disability Waiver services is deemed

"medical assistance" under the Medicaid Act.  *See* 42 U.S.C. § 1396n(c)(1).  Regulations

also require the State to establish time standards to determine an individual's eligibility

for Medicaid in no more than ninety days and to "[f]urnish Medicaid promptly to

beneficiaries without any delay caused by the agency's administrative procedures."  *See*

42 C.F.R. § 435.912; *id.* § 435.930; *see also Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 717

(11th Cir. 1998); *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 72-73 (D. Mass. 2000).

Defendant first argues that she is entitled to summary judgment on Count I

because there is no private right of action under the "reasonable promptness" provision in

the Medicaid Act.  (Def. Memo. at 30.)  For the reasons discussed in section I(A) above,

the Court has already held—and continues to hold—that the "reasonable promptness"

provision of the Medicaid Act is privately enforceable. (*See infra.*) Accordingly, the Court declines to grant summary judgment on this basis.

Defendant next argues that even if there was a private right of action, Plaintiffs cannot meet the standard for official-capacity liability under § 1983 because any alleged injury was inflicted solely by [her] employees or agents. (Def. Memo. at 31.) Defendant contends that the government as an entity is responsible under § 1983 only when "execution of a government's policy or custom . . . inflicts the injury." (*Id.* at 32 (citing *Monell v. Dept't. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978)).) Defendant argues that because Plaintiffs allege only that she has failed to require and ensure that moving-related services are provided with reasonable promptness, and that they otherwise have no evidence that Defendant knew of and condoned any alleged deficiencies in the Disability Waiver service delivery, or that she has any policy preventing reasonably prompt service delivery, Plaintiffs' official liability theory is foreclosed by *Monell*. (*Id.* at 32.)

"To establish liability in an official-capacity suit under section 1983, a plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional governmental policy, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Nix v. Norman*, 879 F.2d 429, 433 (8th Cir. 1989) (internal citations omitted). Here, Defendant has "oversight authority and ultimate responsibility for administering the State's Medicaid plan," and "ultimate responsibility for the State's provision of Waiver Services under both federal Medicaid law and Minnesota statutes." *Guggenberger*, 198 F. Supp.

3d at 1034 (citing 42 C.F.R. §§ 431.10(b), 431.10(e), 435.903; Minn. Stat. §§ 256.01 subd. 2(a); 256B.04, subd. 1; 256B.05, subd. 1).

Defendant contends that regardless of her final authority, she can cannot be held liable under § 1983 unless her policy was the "moving" force behind any alleged violation. (Doc. No. 609 ("Def. Reply") at 5-6 (citing *Burlison v. Springfield Pub. Sch.*, 708 F. 3d 1034, 1041 (8th Cir. 2013).) She contends that because "it is either undisputed or indisputable that Defendant requires waiver services to be provided both reasonably prompt services and multiple forms of notice," Plaintiffs' claim that she "fails to ensure" that her subordinates act accordingly cannot sustain an official-capacity claim. (*Id.* at 6.)

As discussed in section I(A) above, the Court finds that Defendant's policy violates federal law. While the Court addressed the policy only with respect to the Medicaid Act's fair hearing requirement, a similar analysis applies with respect to reasonable promptness. Specifically, because the policy does not clearly define what constitutes "denial," the policy itself is potentially the moving force behind a failure to provide Disability Waiver services with "reasonable promptness." Accordingly, the Court finds that Defendant may be held liable in her official capacity.

Finally, Defendant argues that the Court should grant summary judgment in her favor on Count I because Plaintiffs cannot prove that Disability Waiver services were not provided with reasonable promptness. (Def. Memo. at 32.) Specifically, she contends that: (1) Plaintiff Bottelson admitted that she received all necessary services for her move, her case manager responded to these requests reasonably promptly, and she has no evidence that any delay in moving was caused by Defendant's administrative procedures;

(2) Plaintiff Swanson never asked for a Disability Waiver service that was not provided quickly enough and has no evidence that her continued residence in a CFC is caused by Defendant's administrative procedures; and, (3) Plaintiff Murphy has no evidence that any delay in moving was caused by Defendant's administrative procedures, or that he failed to receive any service quickly enough.  (*Id*.)

Plaintiffs refute these assertions and maintain that Defendant's description of the facts is "inaccurate, misleading, and ignores relevant pieces of the record."  (Pl. Opp. at 36.)  Plaintiffs contend that Plaintiff Bottelson made clear that she was confused when she responded to the question about whether she received all necessary services for her move, and that she does not actually know if she received them.  (*Id.*)  Plaintiffs further allege that despite asking for services to help move as early as 2013, Plaintiff Bottelson was unable to finalize her move until September 2018.  (*Id.*)  Similarly, Plaintiffs contend that Plaintiff Swanson began asking to move in 2013 but remains in her CFC facility. (*Id.*)  Plaintiffs also allege that Plaintiff Murphy did not receive any formal Disability Waiver service to help him move.  (*Id.*)

As the Court previously recognized, "'the question of reasonable promptness is a difficult one,' and many variables must be considered to evaluate whether a state is providing needed Disability Waiver services in a reasonably prompt manner."[17]  (May 2017 Order at 33-34 (citing U.S. Dep't of Health and Human Services, *Olmstead Update*

---

[17]    These variables include "[t]he urgency of an individual's need, the health and welfare concerns of the individual, the nature of the services required, the potential need to increase the supply of providers, [and] availability of similar or alternative services." (May 2017 Order at 34 (citing HHS Guidance at 6).)

*No: 4, HCFA Update* (Jan. 10, 2001) ("HHS Guidance"), available at Doc. No. 13-1 at 36).) Upon careful review of the record and consideration of each parties' argument, the Court finds that there are disputes over several key issues of material fact. The Court cannot conclude as a matter of law whether Defendant's Disability Waiver Services were provided with reasonable promptness. Accordingly, the Court declines to grant summary judgment on Count I of Plaintiffs' Amended Complaint.

### 3.  Due Process (Count II)

In Count II of their Amended Complaint, Plaintiffs allege a violation of their due process rights under both the Fourteenth Amendment's Due Process Clause and the Medicaid Act's fair hearing requirements. As discussed above, the Court finds that Defendant's policy violates Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements, enforced under 42 U.S.C. § 1983.[18]

### 4.  ADA & RA (Counts IV & V))

Counts III and IV of Plaintiffs' Amended Complaint allege violations of Title II of the ADA, 42 U.S.C. § 12132, and § 504 of the RA, 29 U.S.C. § 794(a), respectively. The Court addresses Counts III and IV together, as the same analysis applies. *See Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir.1998) ("The ADA . . . is [ ] similar in substance to the

---

[18]     Because Defendant has final authority over the policy, and the policy is a moving force behind federal due process violations, Defendant may be held liable in her official capacity. (*See supra* Section B(2).)

Rehabilitation Act, and cases interpreting either are applicable and interchangeable." (internal quotation marks and citation omitted)).

Title II of the ADA, applicable to public entities, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Further, an implementing regulation referred to as the "integration mandate" states: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) ("Integration Mandate").[19]

Defendant first argues that the Integration Mandate does not apply to individuals who are not institutionalized or at risk of imminent institutionalization. (Def. Memo. at 35-37.) The Court again observes that it has already addressed this argument. Defendant raises many of the same arguments that the Court previously considered and rejected. In its May 2017 Order, the Court found that under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), "[u]njustified isolation . . . is properly regarded as discrimination based on disability beyond the limited scope of institutionalization." (May

---

[19]    The Rehabilitation Act includes similar provisions, including its own "integration mandate." *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance "); 28 C.F.R. § 41.51(d) ("Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.").

2017 Order (citing *Guggenberger*, 198 F. Supp. 3d at 1026-28).)  The Court finds no

reason to deviate from its prior holding.[20]

Defendant argues further that even if the Integration Mandate applied to

intracommunity moves, it still does not require states to provide benefits ensuring

housing availability or moves to available housing.  (Def. Memo. at 37-40.)  She

contends that the plain language of the Integration Mandate requires only that a state

cannot provide existing benefits in one setting but not another and that *Olmstead*

explicitly rejects "that the ADA imposes on the States a 'standard of care' for whatever

medical services they render, or that the ADA requires States to 'provide a certain level

---

[20]    The Court has thoughtfully considered the finding in *Brown v. District of Columbia* that plaintiffs did not have a valid *Olmstead* claim because "*Olmstead* drew the line between 'institutions' and 'community settings'" and both group homes and private homes were community settings.  928 F.3d 1070, 1087 (D.C. Cir. 2019).  Recognizing that the circuits are split on this issue, the Court respectfully disagrees with *Brown* on this issue.  The Court continues to agree with the Seventh Circuit's analysis in *Steimel v. Wernet* :

> *Olmstead* dealt only with the problem of unjustified institutional segregation.  Its rationale, however, reaches more broadly . . .  The Court had no occasion to consider whether the same evils it had identified for institutional placements might exist in some settings outside of an institution.  This case presents that question: whether isolation in the home for a person 'who can handle and benefit from' time out in the general community is also inconsistent with the integration mandate.  We see no reason why the same analysis should not apply.

823 F.3d 902, 910-11 (7th Cir. 2016).  The Seventh Circuit ultimately concluded the Integration Mandate "bars unjustified segregation of persons with disabilities, wherever it takes place."  (*Id.*)

of benefits to individuals with disabilities'" (*Id.* at 38 (citing *Olmstead*.)  She contends that Plaintiffs require "a host of new programs, services, and benefit levels," that are foreclosed by *Olmstead* and subsequent caselaw.  (*Id.* at 38-39.)

In its May 2017 Order, the Court recognized that "[a]lthough states are not required to 'provide a certain level of benefits to individuals with disabilities' under *Olmstead*, they 'must adhere to the ADA's nondiscrimination requirement to the services they in fact provide.'"  (May 2017 Order at 56 n. 8 (citing *Olmstead*, 527 U.S. at 603 n. 14).)  Other Courts have found that failing to provide existing services in a more integrated setting is a violation of the ADA.  *See, e.g.*, *Steimel*, 823 F.3d at 913 (finding that a state violates the ADA when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting); *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) (finding that "states could avoid compliance with the ADA by characterizing services offered in one isolated location as a program distinct from the provision of the same services in an integrated location").

After a careful review of Plaintiffs' requested relief, the Court finds that Plaintiffs do not seek new services or a "certain level" of benefits.  The Court finds that Plaintiffs' requested relief does not include the "requirement" that Plaintiffs actually move, but modifications to Defendant's current system that will increase their opportunity to move, will, and access to Disability Waiver services if they do.  (*See* Doc. No. 291-1 at 61, 80-84, 155-159).)  "When a state's policies discriminate against the disabled in violation of the ADA, the ADA's regulations mandate reasonable modifications to those policies in order to avoid discrimination on the basis of disability, at least when such modification

would not fundamentally alter the nature of the services provided by the state."

*Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003). As discussed below, the Court cannot conclude as a matter of law whether Plaintiffs' requested modifications are reasonable; however, the request itself does not exceed the limits of the Integration Mandate.[21]

Defendant next argues that Plaintiffs ADA and RA claims fail because they cannot show that their CFC facilities cause segregation. (Def. Memo. at 40.) Defendant contends that the Integration Mandate should be construed narrowly and only relates to Plaintiffs' opportunities to interact with non-disabled persons. (*Id.* at 40 n.20.) She contends that while Plaintiffs may not like some things about their CFC facilities, they have failed to show that anything unique about CFC facilities limits their ability to access the community.[22] (*Id.* at 40-41.)

The Court first observes that Defendant's narrow interpretation of the Integration Mandate does not square with other statements she has made with respect to the definition of an integrated setting. (*See, e.g.*, Bartolic Dep. at 166 (stating that

---

[21] Defendant later argues that Plaintiffs' request that she "ensure access" or provide "unlimited staffing" is an unlawful interpretation of the Integration Mandate. (Def. Memo. at 43.) This similarly misconstrues Plaintiffs' requested relief. Plaintiffs' requested relief does not include "ensuring access" to IHOs or "unlimited staffing." The Court finds that Plaintiffs' request for modifications to Defendant's existing Disability Waiver system fall within the scope of the Integration Mandate.

[22] Defendant suggests that Named Plaintiffs' integration-related complaints are actually just complaints over staff availability for community outings, TV-access, distaste for housemates, and other aspects of CFC facilities they simply do not care for. (Def. Memo. at 40 n.20.)

determining whether a setting is the most integrated is based on a number of factors, including whether a person has friendships and feels valued in the community); Schmidt Aff. 3 ¶ 35, Doc. No. 578-2, Ex. 34 at 171 (defining an integrated settings as "settings that provide people the opportunity to live, work and receive services in the greater community," that "offer access to community activities when and with whom the person chooses," and "offer people choices in daily life activities and encourage interaction with people who do not have disabilities . . .").)  Plaintiffs' expert, Dr. Mank also provides a broader definition of the Integration Mandate:  "[I]ntegration is about making informed and free choices about with whom one lives and about where and with whom one spends their time," and "means that an individual is a part *of* the community rather than simply *in* the community."  (Dr. Mank Report at 11 (emphasis in original).)

Even if the Court were to accept Defendant's narrow interpretation of the Integration Mandate, the Court finds that there are disputes over issues of material fact with respect to whether CFC facilities actually enable individuals to interact with non-disabled persons to the fullest extent possible.  (*See, e.g.*, Dr. Mank Report at 15-16; K. Murphy Decl. ¶¶ 7, 9-16, 19-21, 32-39; Bottelson Decl. ¶¶ 8-13, 15-18, 21-23.)  While Defendant suggests that Plaintiffs' complaints about CFC facilities do not relate to their ability to interact with non-disabled persons, Plaintiffs' evidence conveys isolation, limited choice, and lesser quality of life in CFC facilities as compared to IHOs. Accordingly, disputes of material fact regarding the level of integration at CFC facilities precludes summary judgment on this issue.

Defendant next argues that Plaintiffs ADA and RA claims fail because Plaintiffs do not have evidence that Defendant prevented them from moving, or from moving sooner. (Def. Memo. at 41-43.) She cites other reasons for why Named Plaintiffs failed to move or did not move sooner. (*Id.*)

The Court is unpersuaded. Plaintiffs need not show that Defendant was the "but-for" cause of their failure to move, or from failing to move sooner. Indeed, numerous issues outside of Defendant's control ultimately impact Plaintiffs' ability to move. Plaintiffs need only show that Defendant's conduct was a substantial cause in Plaintiffs' ability to move. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 278 (2d Cir. 2003) (finding that "the existence of additional factors causing an injury does not necessarily negate the fact that defendant's wrong is also the legal cause of the injury"); *see also M.R. v. Dreyfus*, 697 F.3d 706, 730 (9th Cir. 2012) (finding that plaintiff was not required to show that a state regulation was "the exclusive cause of her injury").

The determination as to whether Defendant's conduct is a substantial cause of Plaintiffs' inability to obtain Disability Waiver services necessary to live in the most integrated setting appropriate to their needs is a fact intensive inquiry. Here, the record reflects multiple disputes of material fact, including Defendant's policies and management of the Disability Waiver program, that prevent the Court from concluding as a matter of law whether or not Defendant's conduct is a substantial cause.[23]

---

[23] Specifically, Plaintiffs contend that Defendant's use of the MnCHOICES Assessment, the Person Center, Informed Choice and Transition Protocol, and the LAR process have been a substantial cause of Plaintiffs' inability to receive services. (Pl. Opp. at 54.)

Similarly, Defendant argues that even if Plaintiffs' ADA and RA claims are cognizable, Plaintiffs have failed to request a reasonable modification because they lack proof that the accommodations they request would cause Named Plaintiffs to move—or to have moved sooner. (Def. Memo. at 43.) Accordingly, Defendant argues that Plaintiffs have failed to show that their request is necessary to avoid discrimination on the basis of disability. (*Id.* at 44.)

Again, Plaintiffs need not show that their requested accommodation will overcome every single barrier Plaintiffs face in moving. *See Henrietta D.*, 331 F.3d at 279. It is sufficient that Plaintiffs' requested accommodation will lead only to an increased opportunity to move. *Id.*; *see also Brown*, 928 F.3d 1082. Notwithstanding, as discussed above, there are disputes of material fact regarding whether Named Plaintiffs would have moved, or would have moved sooner, if their request was implemented. Accordingly, the Court cannot grant summary judgment on these issues.

Defendant next argues that the State's *Olmstead* Plan ("Plan") is a complete defense to Plaintiffs' ADA and RA claims. (Def. Memo. at 44-46.) Defendant contends that it would be unjust for the Court to find that she may have discriminated against Plaintiffs by implementing a comprehensive and effective Plan that the Court helped to develop, and continues to oversee. (*Id.* at 46.) She also contends that it would be a fundamental alteration to the Integration Mandate. (*Id.*).

In *Olmstead*, the Supreme Court held that a state may successfully assert a fundamental alteration defense to an Integration Mandate if it could demonstrate that it had "a comprehensive, effectively working plan for placing qualified persons with mental

disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace." *Olmstead*, 527 U.S at 605-606. While it is Plaintiffs' burden to establish that the modifications they seek are reasonable, it is Defendant's burden to establish whether any reasonable modifications fundamentally alter the nature of the services she provides. *See* 28 C.F.R. § 35.130(b)(7); *see also Gorman*, 152 F.3d at 912 (describing the fundamental alteration argument as an affirmative defense).

Defendant argues that her Plan is both comprehensive and effective because: (1) the Court found that the Plan complies with *Olmstead* approved and approved it in 2015; and (2) the Plan includes goals related to the relief Plaintiffs' seek and she is meeting or exceeding those goals.[24] (Def. Memo. at 6-7, 45-46.)

Plaintiffs argue that Defendant's plan is neither comprehensive nor effectively working. (Pl. Opp. at 57-59.) Plaintiffs cite their expert's report to contend that the Plan is not comprehensive because: (1) Defendant fails to track individual moves from CFC facilities to IHOs; and (2) the Plan fails to include concrete and reliable commitments to fill existing services gaps necessary to ensure that individuals can move to more integrated IHO settings. (*Id.* at 58 (citing Price Report at 26-39).) Plaintiffs further contend that because DHS employees are unfamiliar with aspects of the Plan, and

---

[24] Defendant cites "Transition Services Goal One" that targets moves "from segregated to more integrated settings" and "Housing and Services Goal One" that targets "the number of people with disabilities who live in the most integrated housing of their choice where they have a signed lease and receive financial support." (Def. Memo. at 44.) Defendant states that she met 98% of the Housing Services "stretch" goal in 2017, and expected to meet 96% of the "stretch" goal in 2018. (*Id.* at 7.) She also states that her Transition Services Goals are on track. (*Id.*)

because "housing" was one of the top three service gaps identified by Lead Agencies in 2017, there are questions as to whether the Plan is truly effective. (*Id.* at 58-59.)

To the extent that Defendant argues it would be "unjust" for the Court to find that the Plan the Court approved is no longer comprehensive or effective, the Court reiterates that merely implementing an *Olmstead* Plan is not a bar to Plaintiffs' claims, or any other future claims, that the Plan fails to provide a complete solution to the harms they assert. *See, e.g.*, *Guggenberger*, 198 F. Supp. 3d  at 1031.  As only time and lived experience can reveal, an *Olmstead* Plan at one point deemed comprehensive and effective may prove otherwise over time.

Notwithstanding, the Court acknowledges and commends the progress that Defendant has made towards meeting the goals in its Plan.  While this is laudable, whether Defendant's Plan is sufficiently comprehensive or effectively working such that it serves as a total defense to Plaintiffs' claims is a fact intensive inquiry that the Court cannot resolve as a matter of law.  Plaintiffs have raised questions of material fact over the content and implementation of the Plan.  While Defendant disagrees with Plaintiffs' expert, and argues that her data should speak for itself, these are the very disputes that preclude summary judgment.

In short, despite Defendant's various arguments about the interpretation, requirements, and exceptions to the Integration Mandate, the Court declines to grant summary judgment in her favor on Counts IV or V.

### 5. Permissibility of Requested Relief

Finally, Defendant contends that the relief Plaintiffs seek is impermissible because it would not solve any integration issue, and even if it did, Plaintiffs cannot prove that any integration issue is widespread. (Def. Memo. at 47-49.)

Defendant first argues that because only one of Plaintiffs' experts opined that Plaintiffs' requested relief would have some aggregate effect, and that both of their experts conceded that a person may be segregated in any setting, the redesign of her Disability Waiver system that Plaintiffs propose would not solve any integration issue. (*Id.* at 47.) Plaintiffs again cite the Price Report and Defendant's own statements to raise questions of material fact with respect to whether their request for relief would remedy their perceived flaws and inefficiencies of Defendant's services. (Pl. Opp. at 61-62.)

As set forth above, the Court cannot conclude as a matter of law whether the relief Plaintiffs seeks is reasonable because there are disputes over whether Plaintiffs would have moved, or would have moved sooner, if the modifications they seek to Defendant's Disability Waiver system were implemented. Whether or not Plaintiffs' request is permissible is derivative of whether it is reasonable. Accordingly, the same disputes over material fact that preclude summary judgment on whether Plaintiffs' requested relief is reasonable also preclude summary judgment on whether it is permissible.

Defendant next argues that even if Plaintiffs' relief could provide a remedy, Plaintiffs have no evidence that the State's Disability Waiver Recipients do not live in the most integrated setting on a widespread basis. She argues that "a class seeking systemic relief must show violations are 'widespread enough to justify systemwide relief.'" (Def.

Memo. at 47 (citing *Lewis*, 518 U.S. at 359).) She alleges that "there must be proof that the law has been violated as to all persons subject to the challenged system, not just general allegations some unknown persons may have been harmed." (*Id.* at 48.) Defendant alleges that Plaintiff cannot meet this burden because after 18 months of discovery, Plaintiffs can only prove that 0.4% of the State's Disability Waiver population and only 1.3% of the its CFC population are allegedly harmed by any alleged violation. (*See id.* at 8-9, 47 (citing *Lewis*, 518 U.S. at 360).) Accordingly, Defendant argues that Plaintiffs' claims are meritless because they are little more than a "vague allegation that any nonzero error rate at a system level entitles a litigant to a wholesale redesign of that system." (*Id.* at 48.) Defendant further contends that requiring such a wholesale redesign of her Disability Waiver System would render her system subject to "judicial takeover." (*Id.* at 49.)

Despite Defendant's reliance on *Lewis*, Plaintiffs argue that the *Lewis* decision does not stand for the proposition that there must be proof that the law has been violated as to all persons in a challenged system in order to obtain relief. (Pl. Opp. at 63.) Plaintiffs contend that if such a requirement did exist, it would mean that the numerosity requirement of Fed. R. Civ. P. 23(a) would require classes to contain every single person in the challenged system. Accordingly, Plaintiffs argue that Defendant's position is incorrect and unsupported. (*Id.*)

With respect to injury, the relevant inquiry before the Court is how many people must suffer alleged harm to require systemwide relief? Defendant argues that 1.3%, or 192 individuals, of the 13,971 Disability Waiver recipients living in CFC facilities is not

enough.  In *Lewis,* the United States Supreme Court concluded that "two instances [of alleged injury in a state's entire population of prisoners] were a patently inadequate basis for conclusion of systemwide violation and imposition of systemwide relief." *Lewis*, 518 U.S. at 359.  Indeed, the Supreme Court found that "granting a remedy beyond what was necessary to provide relief to two individuals was improper." *Id.* at 360.

Here, there are purportedly nearly 192 human beings who have suffered alleged harm resulting from Defendant's policies and practices.  While a systemwide remedy may not be necessary to provide relief to two individuals, it surely is when it has the potential to improve the lives of at least 200 of the State's most marginalized citizens. This finding is not one of "judicial takeover" but a recognition that a large number of actual people have allegedly suffered actual harm caused by Defendant.  A systemwide remedy is the only way to provide relief.  Accordingly, the Court declines to grant summary judgment on this basis.

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Plaintiffs' motion for partial summary judgment.  The Court finds that Defendant's policy violates Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements, enforced under 42 U.S.C. § 1983. This being said, the Court declines to issue an injunction at this time.  The Court encourages the parties to jointly establish revisions to the policy that are mutually satisfactory.

With respect to Defendant's motion, the Court finds that disputes over issues of material fact preclude summary judgment. Notwithstanding, the Court finds that Plaintiffs continue to have standing, their claims are not moot, Defendant may be held liable in her official capacity, and Plaintiffs' alleged injury is sufficiently widespread to justify widespread relief.

The Court is mindful that the parties worked diligently to reach a settlement agreement prior to its rulings. The Court hopes that the parties may now redouble their efforts, as continued litigation will do little to serve the interests of either party.

## ORDER

Accordingly, based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. [495]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a. Defendant's policy violates Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements, enforced under 42 U.S.C. § 1983.

    b. In lieu of granting an injunction at this time, the Court encourages the parties to jointly establish revisions to Defendant's policy that are sufficiently clear and mutually agreeable.

2. Defendant's Motion for Summary Judgment (Doc. No. [480]) is **DENIED**.

Dated: September 27, 2019
                     /sDonovan W. Frank
                     DONOVAN W. FRANK
                     United States District Judge