## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tenner Murphy, by his guardian Kay
Murphy; Marrie Bottelson; Dionne
Swanson; and on behalf of others
similarly situated,

               Plaintiffs,

v.

Jodi Harpstead, in her Capacity as
Commissioner of the Minnesota
Department of Human Services,

               Defendant.

Civil No. 16-2623 (DWF/LIB)

**MEMORANDUM
OPINION AND ORDER**

## INTRODUCTION

This matter is before the Court on the parties' joint motion for final approval of
settlement (Doc. No. 924) and joint motion for attorney's fees (Doc. No. 848). For the
reasons outlined below, the Court grants both motions.

## BACKGROUND

In August 2016, Plaintiffs brought this action against Defendant, the
Commissioner of the Minnesota Department of Human Services ("DHS"), asserting that
Defendant's overreliance on Community Residential Setting ("CRS") facilities to serve
people with disabilities results in segregation. (Doc. No. 33 ("Am. Compl.") ¶ 4.)
Plaintiffs are individuals with disabilities and Medicaid recipients who receive a Home
and Community-Based Disability Waiver from the State of Minnesota under the direction

of Defendant. (*Id.* ¶¶ 1-2.) Plaintiffs reside, or did reside[1], in CRS facilities and wish to access various individualized housing services available under the Disability Waivers to pursue more integrated housing options. (*Id.* ¶¶ 93, 99-101.)

Plaintiffs allege that Defendant fails to inform persons receiving a Disability Waiver of individualized housing service options and further fails to explain how to access such services. (*Id.* ¶ 28.) Moreover, Plaintiffs allege that Defendant "provide[s] impermissible discretion to each lead agency to choose whether to offer individualized housing services" and, as a result, many counties in the state of Minnesota do not offer individualized housing services at all. (*Id.* ¶ 27.) Additionally, Plaintiffs claim that Defendant fails to provide notice when individuals are denied services or provide information about "due process rights in regards to requests for these services." (*Id.* ¶ 28.)

Plaintiffs brought four claims against Defendant: (1) failure to furnish Medicaid services with reasonable promptness; (2) violation of Plaintiffs' Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements; (3) violation of Title II of the Americans with Disabilities Act ("ADA"); and (4) violation of § 504 of the Rehabilitation Act ("RA").

---

[1] Two of the Named Plaintiffs who lived in CRS facilities when this Court granted class certification subsequently moved out of these facilities. (*See* Doc. No. 423 ¶ 6, Ex. 5. at 230; Doc. No. 494 ¶ 29, Ex. 28; Doc. No. 535 at 110-11.)

## I.    Requested Relief

From the beginning, this case has been about individual choice.  (*See id.* at 1.)
The Named Plaintiffs in this case—Tenner Murphy, Marrie Bottelson, and Dionne
Swanson—allege that Defendant failed to provide them with an informed choice about
accessing more individualized housing options.  (*Id.* ¶ 28.)

Murphy alleges that he wanted to move out of his CRS facility and into a more
integrated setting, but Defendant "prevented [him] from choosing individualized housing
services, such as a live-in caregiver that he can hire and train to help him more fully
interact with his community and be as integrated as possible."  (*Id.* ¶ 29(m).)  In addition,
he received "no information from Defendant[] about [his] right to live in his own home."
(*Id.* ¶ 29(l).)  Similarly, Bottelson alleges that she requested help from her case manager
to access individualized housing options but was told that "individualized housing is not
a possibility for her" and "such housing was too hard to find."  (*Id.* ¶ 30(i)-(j).)  And
Swanson was told that she "is not 'independent enough' for individualized housing."
(*Id.* ¶ 31(b).)  She requested, but was denied, "person-centered planning services, and
other individualized housing services to help her create and execute a plan to live in the
most integrated setting appropriate to her needs."  (*Id.* ¶ 31(e)-(f).)

Plaintiffs sought declaratory judgment and injunctive relief requiring Defendant
to:  (1) "[p]romptly ensure every Disability Waiver recipient living in a CRS facility
receives notice about eligibility for and access to individualized housing services,
including person-centered planning;" (2) "[s]pecifically provide access and take prompt
steps to make individualized housing services, including person-centered planning,

available to Plaintiffs in a reasonable amount of time;" and (3) "[t]ake such other steps as necessary to enable Plaintiffs to receive residential services in the most integrated setting appropriate to their needs."  (*Id.* at Prayer for Relief ¶¶ 3-4.)

## II.    Procedural History

Plaintiffs filed their initial complaint in August 2016.  (Doc. No. 1.)  The following month, Defendant filed a motion to dismiss, which the Court later denied.[2] (Doc. Nos. 10, 54.)  Plaintiffs then filed an Amended Complaint in February 2017.  (Am. Compl.)  Around that time, Plaintiffs filed a motion for class certification, which Defendant opposed.  (Doc. Nos. 35, 45.)  The Court granted Plaintiffs' motion for class certification, certifying the following class:

> All individuals age 18 and older who are eligible and have received a Disability Waiver, live in a licensed Community Residential Setting, and have not been given the choice and opportunity to reside in the most integrated residential setting appropriate to their needs.

(Doc. No. 99 at 35.)

Initial discovery occurred between July 2017 and September 2018.  Then in November 2018, Defendant moved for summary judgment.  (Doc. No. 480.) Plaintiffs opposed the motion and filed their own motion for partial summary judgment.  (Doc. Nos. 495, 573.)  Defendant also moved to decertify the class (Doc. No. 418), and both parties moved to exclude expert testimony (Doc.

---

[2]    The Court dismissed Minnesota Department of Human Services as a party and denied the motion to dismiss in all other respects.  (Doc. No. 54 at 63.)

Nos. 468, 488). The Court delayed ruling on the motions pending settlement negotiations that ultimately proved unsuccessful. (Doc. No. 636.)

In July 2019, the Court denied Defendant's motion to decertify the class. (Doc. No. 640.) Defendant requested permission for leave to file a motion for reconsideration (Doc. No. 642), which the Court also denied (Doc. No. 646).

In August 2019, the Court granted Plaintiffs' motion to exclude the expert testimony of John Patterson and denied Defendant's motion to exclude the expert testimony of David Michael Mank, Ph.D., and Dennis F. Price. (Doc. No. 644.) The following month, the Court granted in part and denied in part Plaintiffs' partial motion for summary judgment, concluding that Defendant's policy violates Plaintiffs' Due Process rights under the Fourteenth Amendment and the Medicaid Act's advance notice and fair hearing requirements and encouraging the parties to jointly establish revisions to Defendant's policy that are sufficiently clear and mutually agreeable. (Doc. No. 661 at 40.) The Court also denied Defendant's motion for summary judgment. (*Id.*)

The parties engaged in supplemental discovery from February 2021 to April 2022, and this matter was set for trial to begin on July 11, 2022. (Doc. No. 823.) In June 2022, the parties engaged in a two-day mediation with the Honorable James M. Rosenbaum (Ret.), where the parties reached an Agreement. The Agreement was executed on June 27, 2022, and the Court granted preliminary approval of the Agreement on July 27, 2022. (Doc. No. 835-1 ("Agreement"); Doc. No. 840.)

### III.    Settlement Agreement

The Agreement provides for injunctive relief.  The parties have broken down the Agreement into five categories that they describe as follows:  (1) inform and educate; (2) train; (3) assess; (4) provide services; and (5) measure outcomes.

### A.    Inform and Educate

The first category is related to education.  The Agreement provides that Defendant will add language to her Community-Based Services Manual ("CBSM").  (Agreement § 2.A.)  The CBSM will instruct case managers to discuss service and housing options with people who indicate that they would like to move out of their current home or would like more information about moving.  (*Id.*)  The CBSM will further provide that if a person chooses Housing Stabilization Services, the case manager will assist that person with accessing the service.  (*Id.*)

The Agreement also requires MnCHOICES assessors to provide people with information about Housing Stabilization Services if they inform the assessor that they are interested in moving or learning about moving to their own home.  (*Id.* § 2.B.)  The assessors are required to provide the person with resources, including DB101.org, HB101.org, the ARC Minnesota, the Ombudsman for Mental Health and Developmental Disabilities, the Centers for Independent Living, and the Minnesota Disability Law Center.  (*Id.*)  The assessor is required to inform the person that if they are denied Housing Stabilization Services, they have a right to appeal.  (*Id.*)

Finally, the Agreement requires Defendant to provide Disability Waiver recipients with a completed Housing Stabilization Services Eligibility Denial Notice if Defendant denies a waiver recipient authorization for Housing Stabilization Services. (*Id.* § 2.C.)

**B.    Train**

The second category is about training. The Agreement adds training instructions for the MnCHOICES assessors that requires the assessor to "determine whether the person would prefer to live in a non-provider controlled setting." (*Id.* § 2.D.) For those interested in moving or learning more information, the Agreement requires assessors to include details about the person's wishes and to complete the "Supporting a Person's Move" section. (*Id.*) The Agreement further requires that all Disability Waiver case managers participate in a training course, entitled "Supporting my move: A case manager's role." (*Id.* § 2.E.) Case managers are required to report compliance with the training requirement. (*Id.* § 2.F.)

**C.    Assess**

Assess is the third category. All MnCHOICES assessors will be required to ask individuals who reside in a CRS facility whether they are interested in moving or learning about moving to an "own home" setting. (*Id.* § 2.G.) Defendant will generate a report that identifies each Disability Waiver recipient who indicated that they are interested in moving or would like more information. (*Id.* § 2.H.) The report will note recipients who (1) do not have a "Housing" category goal in the "Support Plan Goals" section of their Coordinated Services and Supports Plan or (2) have not been authorized for Housing Stabilization Services. (*Id.*)

### D.      Provide Services

Services is the fourth category.  For individuals identified in the report, the

Agreement requires Defendant to instruct their case managers to provide those

individuals with information about Housing Stabilization Services.  (*Id.* § 2.I.)  Defendant

is also required to annually review each of the individuals identified in the report to

determine whether they have moved.  (*Id.*)  For those who have not moved, Defendant

will require the individual's Lead Agency to provide Defendant with a Lead Agency

Report that states "whether each individual continues to reside in a [CRS], and if so

explains why each individual has not moved from a licensed [CRS]." (*Id.*)  Defendant's

staff are required to reach out to those identified on the Lead Agency Report to discuss

barriers that are preventing them from moving.  (*Id.*)

### E.      Measure Outcomes

The last category is about measuring outcomes.  The Agreement requires

Defendant to make a variety of related data publicly available, including the number of

people in CRS facilities who have applied for Housing Stabilization Services, the number

of people in CRS facilities who have been approved for such services, the number of

people who have moved out of CRS facilities, the number of people on the original

MnCHOICES report, and the number of people for whom DHS reached out to a Lead

Agency.  (*Id.* § 2.J.)

## IV.    Fairness Hearing

The Court held a fairness hearing on May 12, 2023.  Prior to the hearing, class

members were given an opportunity to object to the Agreement.  The Court received

eight objections.[3]  Because more people requested to speak at the hearing than the Court

was able to accommodate, the Court allowed class members an additional week to mail

their personal statements to the Court.  The Court received six additional objections.[4]

The objectors raise a number of issues that the Court will explore in more detail below.

The parties responded to the objections at the hearing and in their joint motion for final

approval of settlement.  (Doc. No. 926.)  Plaintiffs also submitted a response to the post-

hearing submissions.  (Doc. No. 950.)

## DISCUSSION

### I.    Final Approval of Settlement

Settlement of this action requires Court approval.  Fed. R. Civ. P. 23(e).  The

Court may approve a settlement "only after a hearing and only on finding that it is fair,

reasonable, and adequate."  *Id.*  "The court's role in reviewing a negotiated class

settlement is to [] ensure that the agreement is not the product of fraud or collusion and

that, taken as a whole, it is fair, adequate, and reasonable to all concerned."  *Marshall v.*

*Nat'l Football League*, 787 F.3d 502, 509 (8th Cir. 2015) (internal quotations and citation

omitted).

---

[3]    The Court also received a letter of support for the Agreement from the
Ombudsman for Mental Health and Developmental Disabilities.

[4]    One of the original eight objectors filed an additional objection after the fairness
hearing.  While the Court considered the additional submission, the Court does not count
the submission as a new objection.  In total, fourteen individuals and organizations
objected to this Agreement.

When determining whether a settlement agreement is fair, reasonable, and

adequate, the Court must consider whether:

> (A)   the class representatives and class counsel have adequately represented the class;
>
> (B)   the proposal was negotiated at arm's length;
>
> (C)   the relief provided for the class is adequate, taking into account:
>
>> (i)    the costs, risks, and delay of trial and appeal;
>>
>> (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and
>>
>> (iv)   any agreement required to be identified under Rule 23(e)(3); and
>
> (D)   the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

These factors were added to the Federal Rules of Civil Procedure in 2018. Prior to

their addition, the Eighth Circuit created its own list of factors for courts to use when

determining whether a settlement was fair, reasonable, and adequate: (1) "the merits of

the plaintiff's case"; (2) "the defendant's financial condition"; (3) "the complexity and

expense of further litigation"; and (4) "the amount of opposition to the settlement." *Van

Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988). The 2018 amendments to the Rules

were "not [intended] to displace any factor," but instead were created to "focus the court

and the lawyers on the core concerns of procedure and substance that should guide the

decision whether to approve the proposal." Fed. R. Civ. P. 23(e) advisory committee's

note to 2018 amendment.  Thus, the Court finds it appropriate to consider the

Rule 23(e)(2) factors along with additional factors laid out in *Van Horn*—namely, the

fourth factor:  the amount of opposition to the settlement.  The Court will also consider

the substance of the objections.

### A.    Adequacy of the Class Representatives and Class Counsel

The Court first considers whether "the class representatives and class counsel have

adequately represented the class."  Fed. R. Civ. P. 23(e)(2)(A).  The focus of this factor is

on whether "(1) the class representatives have common interests with members of the

class, and (2) whether the class representatives [have] vigorously prosecute[d] the

interests of the class through qualified counsel."  *In re Resideo Techs., Inc., Sec. Litig.*,

No. 19-cv-2863, 2022 WL 872909, at *2 (D. Minn. Mar. 24, 2022) (quoting *Paxton v.*

*Union Nat'l Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982)).

Tenner Murphy, Marrie Bottelson, and Dionne Swanson have served as class

representatives since the class was certified in September 2017.  (*See* Doc. No. 99.)  They

assert the same injuries as the rest of the class:  unjustified isolation and segregation in

CRS facilities and the denial of available individualized housing services.  Moreover,

they share the common goal of obtaining individualized housing services in a reasonably

prompt manner and the opportunity to pursue appropriate integration into their

communities.  As Plaintiffs note, the class representatives have "produced thousands of

pages of documents about their lives, sat for multiple depositions over several years,

attended numerous hearings, [and] participated in settlement negotiations."  (Doc.

No. 926 at 7.)  Although two class representatives have moved into individualized and

11

integrated homes during the pendency of this litigation, they have continued to participate in this action and have vigorously represented the interests of the class.

Additionally, Plaintiffs' counsel are experienced attorneys and have worked on this case since the beginning. They have put in over 17,000 hours of work on this case, totaling approximately $5 million. (Doc. No. 850 at 3; Doc. No. 851 ¶ 6.) The attorneys representing Plaintiffs in this case have extensive experience working on federal class actions and were prepared to proceed to trial on this matter. Overall, the record reflects that the class representatives and class counsel have adequately represented the class.

## B.  Arm's Length Negotiations

The next factor the Court must consider is whether the settlement was negotiated at arm's length. Fed. R. Civ. P. 23(e)(2)(B). Here, the record reflects that the parties zealously litigated this matter over the course of nearly seven years. Negotiations began in 2015, prior to the commencement of the lawsuit. (Doc. No. 851 ¶ 4.) The parties engaged in settlement negotiations again in 2017, 2019, and 2022. (*Id.*) In addition, the parties participated in two rounds of discovery, where Plaintiffs served forty-four document requests and thirty-eight interrogatories and Defendant served nineteen document requests and twenty-nine interrogatories. (*Id.* ¶ 5.) The parties produced millions of pages of documents, eleven expert reports, and conducted eighty-three depositions. (*Id.*) The parties filed twenty-nine contested motions and thirteen appeals of decisions by the Magistrate Judge. (*Id.*) In short, nearly every phase of the litigation has been hotly contested, resulting in a lengthy procedural history.

Moreover, there is no evidence of collusion.  The Honorable James M.

Rosenbaum presided over the mediation that resulted in this Agreement, and the parties

were represented by competent counsel, with years of experience working on this case.

*See Netzel v. W. Shore Grp., Inc.*, No. 16-cv-2552, 2017 WL 1906955, at *6 (D. Minn.

May 8, 2017) ("In cases where all parties are represented by counsel during the litigation

and during the settlement discussion, [c]ourts have almost unilaterally found that the

settlement was the product of arm's length negotiations.").  This factor therefore favors

approval.

### C.    Adequacy of the Relief Provided for the Class

The third factor the Court must analyze is whether the relief provided for the class

is adequate.  Fed. R. Civ. P. 23(e)(2)(C).  Specifically, the Court must consider:

> (i)     the costs, risks, and delay of trial and appeal;
>
> (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>
> (iii)   the terms of any proposed award of attorney's fees, including timing of payment; and
>
> (iv)    any agreement required to be identified under Rule 23(e)(3).

*Id.*

### 1.    The costs, risks, and delay of trial and appeal

In this case, the cost, risks, and delay of trial and appeal are enormously high.

This case has already been open nearly seven years.  As outlined in detail above, the case

has been hotly contested from the beginning.  Without settlement, it is likely that this

case would continue to drag on for years and require millions of additional dollars in

attorney's fees.  Defendant has indicated that if she lost at trial, she would appeal the case (*see* Doc. No. 926 at 45), which would result in further delay.  It is also possible that after trial and appeal a third discovery period would be necessary, which would be both costly and time consuming.  In the meantime, the class would receive nothing.  Given the length of time that this case has gone on and the complexity of the issues, the Court finds that this sub-factor weighs in favor of approval.

### 2.    Proposed method of distributing relief

The method of distributing relief also favors settlement.  In this case, there are no proceeds to distribute and thus the class members will not have to submit claims.  Rather, the relief provided in the Agreement will be implemented by Defendant according to the terms of the Agreement.  And as Plaintiffs note, some of the terms of the Agreement will also benefit Disability Waiver recipients who fall outside of the class.

### 3.    Terms of any proposed award of attorneys's fees

The Agreement provides that Defendant will pay Plaintiffs' attorneys $1,138,000.00 for costs and attorney's fees.  Plaintiffs assert that this number represents about 20% of the total costs and fees that Plaintiffs' attorneys have incurred in this case.  As the Court explains in more detail below, this amount is reasonable, given the time and effort that Plaintiffs' counsel has expended during this case.  Moreover, because the Agreement provides for injunctive relief, the attorney's fees award does not impact the relief that the Agreement provides.  For these reasons, the Court concludes that this sub-factor weighs in favor of approval.

### 4.      Additional agreements

There are no additional agreements "made in connection with the proposal." Fed. R. Civ. P. 23(e)(3).  Accordingly, there are no "related undertakings that, although seemingly separate, may have influenced the terms of the settlement." Fed. R. Civ. P. 23(e) advisory committee's note to 2003 amendment.  This sub-factor favors approval.

### D.      Equitable Treatment

The final factor that the Court must analyze is whether "the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  In this case, aside from Plaintiff Swanson, the injunctive relief provided in the Agreement affects all class members equally.  Thus, the Court concludes that the Agreement treats the class members equitably relative to each other.

### E.      Other Considerations

The Court now turns to the *Van Horn* factors.  Specifically, the Court believes it is important to discuss the number of objections and the substance of the objectors' arguments.

The Court received eight objections prior to the fairness hearing and an additional six objections after the hearing.  Even assuming that each objector is a member of the class, these objections make up less than 1% of those who received notice in this case. Still, the Court takes each objection seriously and will address the objectors' major concerns below.

15

As a separate matter, the parties dispute whether some of the objectors are class members in this case. The Court agrees that a number of the objectors do not appear to live in a licensed CRS facility and others have not demonstrated that they have been denied the choice and opportunity to reside in the most integrated setting. Still, the objectors have brought up certain issues that the Court believes are necessary to address. Ultimately, the Court's analysis of these issues with help clarify the scope of the lawsuit and the nature of the Agreement. Thus, the Court will discuss below the most pertinent issues brought up in the objections.

### 1. Direct care services

The objectors focus mainly on the Agreement's failure to ensure access to direct care services. Several objectors assert that direct care services have always been an essential component of this case. They argue that even with access to housing services, many Disability Waiver recipients will be unable to move into more integrated settings because they will not have access to necessary direct care services. The Court will address this issue in two parts. First, the Court concludes that this issue falls outside the scope of this lawsuit. Second, even if Plaintiffs' requested relief included expanding access to direct care services, the Court does not have sufficient evidence in the record to conclude that Plaintiffs would have been granted relief related to direct care services following trial. The Court will explain.

From the beginning, Plaintiffs have made it clear that this case was about access to individualized housing services. In their amended complaint, Plaintiffs alleged that Defendant "failed to inform all persons receiving a Disability Waiver of individualized

16

housing service options and [] failed to explain how to access such services." (Am. Compl. ¶ 28.) Moreover, Plaintiffs asserted that Defendant "failed to provide transition planning and support for such services." (*Id.*) The prayer for relief focused on providing Plaintiffs with "[a]ccess to person-centered planning services" and "services that ensure creation of and facilitate implementation of [a] comprehensive moving plan." (*Id.* at Prayer for Relief ¶ 4.) The requested relief also included "[s]tatewide planning and training" related to individualized housing services. (*Id.*)

In February 2017, Plaintiffs again stated that they were seeking a common remedy: "access to individualized transition plans and an opportunity to implement those plans." (Doc. No. 37 at 8.) They further explained that they sought "a realistic opportunity to engage with professionals to advise them regarding housing options and access to providers in order to create a suitable individualized housing plan." (*Id.*)

In their interrogatory answers, Plaintiffs again explained the structural relief that they sought, focusing on access to individualized housing services. They stated that they wanted to "ensure that every [Disability] Waiver recipient is informed of his/her residential options." (Doc. No. 291-1 at 83.) If a Disability Waiver recipient would like to move or would like more information about moving, Plaintiffs requested that individualized housing services be authorized and provided. (*Id.*) Moreover, Plaintiffs demanded that written notice be provided if services were denied for any reason. (*Id.* at 83-84.) Plaintiffs also demanded that reasonable changes be made to the service system, including mandating that individualized housing options be explained to waiver recipients, designating coordinators to help develop and implement individualized

transition plans, and creating a network of providers, waiver recipients, DHS and lead agency staff, and other stakeholders, with the goal of "expanding the creation and use of individualized housing options." (*Id.* at 84.) The last demand arguably relates to direct care services; however, it focused on increased communication and cooperation rather than a change in the funding or quantity of direct care services.

The clearest expression of Plaintiffs' requested relief is outlined in the expert report of Dennis F. Price from July 2018. (Doc. No. 310-1.) In the report, Price broke down the requested relief into five parts: (1) educating individuals with disabilities and their support networks; (2) identifying individuals with disabilities who want to move out of corporate foster care facilities; (3) mandating personal transition plans for individuals with disabilities who express an interest in moving; (4) expanding the group of support personnel; and (5) developing and expanding statewide waiver services. The fifth category touched on direct care services. The requested relief, however, centered on data gathering. For example, the report suggested that Defendant "identify the various types of residential providers and services that it needs to increase by developing a better gaps analysis process." (*Id.* at 70.) It also suggested that Defendant track how often lead agencies authorize services to support individualized housing options and locate lead agencies doing this at a lower level. (*Id.*) The requested relief did not involve requiring Defendant to expand access to direct care services or requiring Defendant to increase its funding of direct care services. Those issues fall outside the scope of this lawsuit.

Even if those issues fell within the scope of this lawsuit—which the Court strongly believes they do not—the Court still cannot conclude that such relief would have been

granted had the parties proceeded to trial.  If Plaintiffs' ADA and RA claims had won on the merits, Defendant would have only been required to make reasonable modifications to the Disability Waiver system.  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 (1999).  Relief that would result in "a fundamental alteration" of the state's services system would not have been granted.  *Id.*  The Court is not in a position to determine what reasonable modifications could be made to the waiver system that would increase Plaintiffs' access to direct care services.  Nor is the Court in a position to assess whether such modifications would result in a fundamental alteration.  And while the objectors stress the importance of access to direct care services—and the Court agrees with the objectors on this point—it is still unclear what specific changes need to be made outside of Plaintiffs' requested relief and whether those changes would be feasible under the law.

Indeed, Plaintiffs have acknowledged that there are insufficient direct care services in Minnesota; however, the Court agrees with Plaintiffs that this lawsuit was never meant to solve that problem.  If the objectors seek fundamental alterations to the Disability Waiver system, the best avenue for pursuing such relief is through the legislature.

### 2.    Notice

The objectors also argue that the parties failed to provide sufficient notice of the Agreement.  Rule 23(e)(1) requires the Court to "direct notice in a reasonable manner to all class members who would be bound by the [proposed Agreement]."  Because this is a (b)(2) class, "the Court has considerable discretion in determining what constitutes appropriate notice."  *In re Nat'l Arb. F. Trade Pracs. Litig.*, No. 10-cv-2122, 2011

WL 13135575, at *2 (D. Minn. Aug. 8, 2011).  "[T]he notice must [be] reasonably [calculated] to convey the required information and it must afford a reasonable time for those interested to make their appearance."  *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th Cir. 1975) (internal quotations and citation omitted).  In general, "notice by mail to the last know[n] address" of each class member is sufficient.  *Id.* at 121.

In this case, notice was sent by mail to individuals who currently reside in a group home and who had indicated during their MnCHOICES assessment a desire to move or learn more about moving.  Defendant mailed the notice to 2,567 individuals.  (Doc. No. 901.)  While the objectors point out errors that were made during the notice process, Defendant caught the errors and the parties then agreed to reschedule the fairness hearing so that complete notices could be sent to a larger group of people.  There is no evidence that the final notice documents contained any errors.

The objectors argue that the notice was confusing and many class members likely did not understand the notice.  Plaintiffs acknowledged that the notice may have been difficult for some class members to understand.  For that reason, Plaintiffs' counsel included their phone number on the notice, and made themselves available to answer questions when people called them.  Plaintiffs also took additional steps to ensure that class members were aware of the Agreement and the fairness hearing, including issuing press releases and meeting with disability advocacy groups to help spread news of the Agreement.

Certainly, more could have been done to ensure that each and every class member received notice of the Agreement and fully understood the terms.  The standard, however,

is not whether the parties did everything possible to ensure notice; rather, the standard is one of reasonableness.  The Court concludes that this notice was practicable under the circumstances and gave class members a reasonable amount of time to object.

### 3.    Scope of the class

Several objectors also argue that the class is underinclusive and should instead include all Minnesotans with disabilities living in a corporate foster care setting. Since 2017, the class has been limited to individuals 18 and older who have received a Disability Waiver, live in a licensed CRS facility, and have not been given the choice and opportunity to reside in the most integrated residential setting appropriate to their needs. (*See* Doc. No. 99 at 35.)  Plaintiffs have estimated the class to be between 690 and 1,500 people.  (*Id.* at 7; Doc. No. 936 ("Fairness Hearing Transcript") at 21.)  Thus, a significant portion of the approximately 13,800 waiver recipients living in corporate foster care fall outside of the class.  As noted above, some may still benefit from this Agreement, despite not falling within the class.  Ultimately, the narrow class definition is reflective of the narrower scope of this case.

Importantly, those who fall outside of the class will not be impacted by the Agreement's release-of-claims provision.  In addition, several objectors described instances of mistreatment and retaliation that they have experienced within their group homes.  If any individual—whether a member of the class or not—has been mistreated or retaliated against by their providers, those claims against service providers also fall outside of the scope of this lawsuit and will not be released by this Agreement. Moreover, the Agreement only releases claims existing up to the Effective Date of the

Agreement.  As Plaintiffs note in their briefing (*see* Doc. No. 950 at 6), class members may pursue claims against Defendant based on actions Defendant takes *after* the Effective Date of the Agreement.  (*See* Agreement § 3.B.)  The inclusion of this release-of-claims provision does not make the Agreement unfair, unreasonable, or inadequate.

### 4.   Additional objections

The objectors raise a number of additional issues.  Many of the objections overlap, and the Court will consider the most pertinent objections below.

The objectors argue that the Agreement improperly places the burden on individuals with disabilities to notify their case manager or MnCHOICES assessor that they want to move or would like more information about moving.  As Plaintiffs note, however, the Agreement now requires MnCHOICES assessors to ask questions about whether their clients want to move somewhere different.  (Agreement § 2.G.)  During litigation, Plaintiffs argued that Defendant failed to ensure that Disability Waiver recipients were asked about their residential preferences during their MnCHOICES assessment.  (Doc. No. 37 at 9.)  Plaintiffs noted that less than half of waiver recipients had a preferred residential setting identified in their file.  (*Id.*)  Thus, Plaintiffs contended, Defendant is not consistently asking waiver recipients about their residential preferences.  This Agreement addresses that problem by making those questions mandatory.

Additionally, objectors argue that the Court should maintain jurisdiction.  As Plaintiffs note, class members will be able to raise issues of noncompliance in state court.  While it would be more convenient for this Court to handle issues of noncompliance—and the Court would have welcomed such a provision because it is most familiar with the

case—the Court cannot strike down this Agreement for its failure to include continued jurisdiction.

Finally, the objectors argue that the Agreement's terms and reporting period should be indefinite.  Here, the Court understands that these were points of contention during negotiations.  (*See* Doc. No. 926 at 46 n.21.)  While certainly a longer duration would better serve the class members, that does not make the Agreement unfair, unreasonable, or inadequate, as the Agreement represents a compromise between the parties.

Overall, the Court has read and thoroughly reviewed each objection in this case, considering both the number of objections and the substance of those objections. Ultimately, the Court finds that the Agreement still warrants approval.

## II.    Attorney's Fees

The parties also filed a joint motion for attorney's fees and costs.  (Doc. No. 848.) The parties request that the Court award Plaintiffs' attorneys $1,138,000.00 in costs and attorney's fees associated with this matter.  Plaintiffs' counsel has documented more than 17,000 hours of work on this case.  (Doc. No. 851 ¶ 7, Ex. A.)  They estimate their total attorney's fees to be approximately $5 million and total costs to be over $187,000.00 (*Id.* ¶¶ 7, 9.)  Having considered the materials submitted by the parties in support of this motion, the Court finds that award for attorney's fees and costs to be appropriate and reasonable, given the lengthy procedural history of the case and the complexity of the issues.  The Court therefore grants the parties' joint motion.

## CONCLUSION

Overall, the Court concludes that the Agreement warrants approval.  The objectors have raised a number of concerns about the agreement, including the Agreement's failure to address direct care services.  Many of these objections may have merit, and Plaintiffs, for example, agree with the objectors that there are insufficient direct care services available in Minnesota.  But Plaintiffs assert that this lawsuit was not meant to address staffing shortages or change Defendant's funding of Disability Waiver services.  The Court agrees with Plaintiffs.  While the objectors' concerns may have merit, these issues fall outside the scope of this litigation.  Indeed, requests for changes in funding or access to direct care services may be best addressed through the legislature, rather than litigation.

Moreover, the objectors suggest a number of changes to the Agreement that would have made the Agreement better for the class members.  Again, while this may be true, the standard for the Court is not whether the objectors could have negotiated a better deal but whether the Agreement is fair, adequate, and reasonable.  The Court concludes that it is.

Nothing in the Court's ruling today is meant to minimize the lived experiences of the objectors or any class member.  People with disabilities confront stigma and discrimination on a regular basis.  It is a shameful part of our country's past and present. While many issues remain that are separate from this litigation, the Court is hopeful that this Agreement will create positive change.  And the Court sincerely hopes that the objectors, Plaintiffs, and others within the disability rights community will continue to

advocate for their rights.  Ultimately, we will all be judged by how we treat the most vulnerable members of our society.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     The parties' joint motion for final approval of settlement (Doc. No. [924]) is **GRANTED**.

2.     The parties' joint motion for attorney's fees and costs (Doc. No. [848]) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 14, 2023                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge